Jeff D. Friedman
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

Steve W. Berman (*pro hac vice pending*)
George W. Sampson (*pro hac vice pending*)
Robert F. Lopez (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com
robl@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| GARY FEITELSON, a Kentucky resident, and DANIEL MCKEE, an Iowa resident, on behalf of themselves and all others similarly situated, | No. |
| | CLASS ACTION COMPLAINT |
| Plaintiffs, | COMPLAINT FOR VIOLATION OF THE SHERMAN ANTITRUST ACT, CLAYTON ANTITRUST ACT, CALIFORNIA CARTWRIGHT ACT, AND CALIFORNIA UNFAIR COMPETITION LAW |
| v. | |
| GOOGLE INC., a Delaware corporation, | |
| Defendant. | **DEMAND FOR JURY TRIAL OF ANY ISSUES SO TRIABLE** |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    JURISDICTION ................................................................................................. 3

III.    PARTIES ............................................................................................................ 3

IV.    RELEVANT FACTS .......................................................................................... 4

    A.    Google is a monopolist in general search. ............................................ 4

    B.    Google is a monopolist in handheld general search. ............................. 5

    C.    Google engages in unlawful behavior in order to restrain trade and
to maintain and grow its monopoly in handheld general search. ........... 7

        1.    Google has been the subject of, and has settled, various
antitrust investigations. ............................................................ 8

        2.    Google's restrains competition through the use of its
Mobile Application Distribution Agreements. ........................ 10

    D.    Google's practices with respect to its Android apps and search
product restrain and injure competition in markets where already
there are high barriers to entry ............................................................ 13

    E.    Google conceals its MADA restrictions. ............................................ 20

    F.    Google further forecloses competition in the market by entering
into exclusive contracts with Apple. ................................................... 22

    G.    Google's unlawful practices harm consumers. ................................... 23

V.    INTERSTATE TRADE AND COMMERCE ................................................... 24

VI.    RELEVANT MARKETS ................................................................................ 24

VII.    CLASS ALLEGATIONS ................................................................................ 25

VIII.    CLAIMS FOR RELIEF .................................................................................. 29

    FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT
(15 U.S.C. § 1) ................................................................................................ 29

    SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN
ACT– MONOPOLIZATION (15 U.S.C. § 2) ................................................. 30

    THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT –
ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) ..................................... 31

    FOURTH CAUSE OF ACTION VIOLATION OF THE CLAYTON ACT
(15 U.S.C. § 14) .............................................................................................. 32

FIFTH CAUSE OF ACTION VIOLATION OF THE CARTWRIGHT
ACT (Cal. Bus. & Prof. Code § 16727) ............................................................ 33

SIXTH CAUSE OF ACTION VIOLATION OF THE UNFAIR
COMPETITION ACT (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ................................ 35

PRAYER FOR RELIEF ............................................................................................ 36

JURY TRIAL DEMANDED ...................................................................................... 37

## I.      INTRODUCTION

1.      Google Inc. ("Google") has long been a monopolist in the overall U.S. market for general Internet search (hereafter "general search").  Google search is the Internet's most powerful tool, and "to Google" has become synonymous with searching the Internet.  Internet search has made Google the largest, and the most profitable, web-centric company in America.

2.      Google also is a monopolist in the large and fast-growing American market for mobile and tablet general Internet search (hereafter "handheld general search").  But Google's maintenance and expansion of its monopoly in handheld general search, and, by extension, general search, is not merely a function of having built a better search engine.  Instead, Google has found a way to use its Android mobile operating system ("Android OS") to maintain and expand its monopoly in both of these U.S. markets.

3.      Having recognized that personal computing was moving away from the desktop and that Internet searches increasingly are being done on smartphones and tablets, Google purchased the Android OS in 2005.  By giving away the Android OS itself for free, Google rapidly built an enormous user base in the United States.

4.      But Android itself only enables the basic functionality of a handheld device; what brings mobile phones and tablets to life are applications.  Some of the most popular handheld-device applications, including the YouTube video app and Google Play (which enables shopping in Google's app store) also are Google properties.  As Google well knows, customers expect to see these apps on their Android devices.  So Google, by way of secret Mobile Application Distribution Agreements ("MADA"), allows Android OS device manufacturers to pre-load a suite of Google apps including the YouTube app and Google Play client, among others, onto a phone or tablet – but *only* if the manufacturer pre-loads onto prime screen real estate *all* of the apps in the suite, whether the manufacturer wants them or not.  Because consumers want access to Google's products, and due to Google's power in the U.S. market for general handheld search, Google has unrivaled market power over smartphone and tablet manufacturers.

CLASS ACTION COMPLAINT
010437-11  683086 V1

5.     Among the suite of apps covered by Google's MADAs is the Google Phone-top Search app – a widget for conducting web searches via Google's search engine.  This case arises because of recent revelations that Google has restrained trade and abused its market power by requiring distributors to install the Google Phone-top Search app and to "set" it "as the default search provider for all Web search access points," including the Internet browser, on phones or tablets subject to its MADAs.  As Google well knows, consumers do not know how to switch, nor will they go to the trouble of switching, the default search engine on their devices, so this practice is a highly effective means of ensuring that consumers will use Google search to conduct general Internet queries rather than one of its competitors' search products.  And Google badly wants default search engine status because it results in more paid search-related advertisements, which are the source of most of its billions and billions of dollars in annual profits.

6.     If device manufacturers bound by Google's distribution agreements were free to choose a default search engine other than Google, the quality of Internet search overall would improve because search engines become more effective as they process more and more search queries.  With default search engine status providing access to more searches, Google's competitors in search would become more effective as they processed more queries, and this competition would push Google to improve as well.  Also, if Google's rivals were allowed to compete for default status, they would do so in part by offering to pay device manufacturers for that status on various Android smartphones and tablets.  Such payments to device manufacturers, maximized by way of competitive bidding, would lower the bottom-line cost associated with production of the covered devices, which in turn would lead to lower consumer prices for smartphones and tablets.

7.     Google's MADAs are contracts in restraint of trade that are designed to maintain and extend its monopolies in general search and handheld general search.  Simply put, there is no lawful, pro-competitive reason for Google to condition licenses to pre-load popular Google apps on making its search product the default search engine on covered devices.  By insisting on these contracts with device manufacturers, to the detriment of competition and consumers, Google has

- 2 -

violated the Sherman Act, the Clayton Act, California's Cartwright Act, and California's Unfair Competition Act.  Plaintiffs seek an injunction prohibiting Google from forcing its unlawful distribution agreements on device manufacturers, and they seek monetary relief to restore the quantum of money they overpaid for their Android handheld devices as a result of the competition foreclosed by these contracts.

## II.   JURISDICTION

8.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because plaintiffs allege violations of federal law, namely the federal Sherman and Clayton Acts. The Court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

9.   This Court has personal jurisdiction over the defendant by way of the fact that the defendant is licensed to do business in the state of California and in fact conducts business in this state.

10.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as unlawful practices are alleged to have been committed in this federal judicial district and the defendant resides and regularly conducts business in this district.

11.   Assignment to the San Jose division of this Court is appropriate because the defendant has its headquarters in Mountain View, Santa Clara County, California, which is located in this division of the Northern District of California.  Also, it is believed and therefore alleged that many members of the proposed class reside or do business in the San Jose division of the Northern District of California.

## III.   PARTIES

12.   Plaintiff Gary Feitelson is the owner of an HTC EVO 3D mobile phone purchased in or about July 2011 in Louisville, Kentucky.  This device is an Android OS device believed, and therefore alleged, to be covered by one of the exclusionary Google contracts, *i.e.*, a Google-HTC MADA, described herein.  Mr. Feitelson uses his phone, *inter alia*, to perform Internet general searches.  But for the restraints alleged herein, Mr. Feitelson's phone would have cost less and had

- 3 -

better search capabilities as the result of competition that would have ensued but for Google's unlawful restraints.

13. Plaintiff Daniel McKee is the owner of a Samsung Galaxy S III mobile phone purchased in or about July 2012 in Des Moines, Iowa. This device is an Android OS device believed, and therefore alleged, to be covered by one of the exclusionary Google contracts, *i.e.*, a Google-Samsung MADA, described herein. Mr. McKee uses his phone, *inter alia*, to perform Internet general searches. But for the restraints alleged herein, Mr. McKee's phone would have cost less and had better search capabilities as the result of competition that would have ensued but for Google's unlawful restraints.

14. Defendant Google is a Delaware corporation with its headquarters and principal place of business in Mountain View, California. Google is America's leader in general Internet search conducted on all devices, and in handheld general search. It also is the owner of the Android OS and popular and exclusive mobile and tablet applications including YouTube, Google Maps, and Gmail. Additionally, Google is the owner of the Google Play (formerly Android Market) client, by which owners of Android devices bearing it are enabled to buy applications, music, movies, and books from the Google Play store. Google was number 55 on last year's U.S. Fortune 500, with 2013 revenues of $55.2 billion and profits of $10.737 billion.

## IV. RELEVANT FACTS

15. The plaintiffs, like many millions of Americans, are consumers of Android OS devices who have been affected adversely by Google's unlawful practices in commerce.

**A.     Google is a monopolist in general search.**

16. General Internet searches occur, *inter alia*, when a user goes to a search engine website – Google.com, for example – and executes a query there, or when he enters a query into his browser's search bar and a pre-designated search engine operating in the background executes it. For example, the user might query "name of the 32nd president of the United States." Google is a monopolist in the U.S. market for general search conducted on all devices, including laptops, desktops, mobile phones, and tablets. According to StatCounter, Google's search engine share

CLASS ACTION COMPLAINT
010437-11  683086 V1

over all these devices was at 81.87% as of March 2014.

(http://gs.statcounter.com/#desktop+mobile+tablet-search_engine-US-monthly-201401-201403

(last accessed April 16, 2014).)  Google's share is even larger, factoring in the .71% of the market

that AOL held as of April 2014, and the .36% of the market that Ask Jeeves held as of that same

time, both of which Google powers.  By contrast, Google's competitor Bing's share was at a

distant 9.8% as of that point in time, and its competitor Yahoo!'s share was at an even more distant

6.42%.  (*Id.*)  (Yahoo! search is currently powered by Bing.  Bing is owned by Microsoft.)



17.     By any standard, Google's 81.87%+ share of the U.S. handheld general search

market is a monopoly.

**B.     Google is a monopolist in handheld general search.**

18.     Google also is a monopolist in U.S. market for handheld general search.

19.     Recognizing that Internet search was migrating from desktops to mobile devices,

Google purchased the Android OS in August 2005.  Handheld device manufacturers including

- 5 -

1   Samsung Electronics Co., Ltd. ("Samsung"), HTC Corporation ("HTC"), and others have adopted

2   Android as the operating system for their popular smartphone and tablet devices.  These devices

3   have included the popular Samsung Galaxy and HTC EVO smartphone lines, and the Samsung

4   Galaxy and HTC Flyer tablet lines.

5           20.     With respect to mobile phones, according to comScore, a firm that regularly surveys

6   over 30,000 U.S. mobile subscribers in the U.S., Android's share of the United States smartphone

7   market was at 51.7% as of January 2014.  comScore also reports that as of January 2014,

8   Americans owned 159.8 million smartphones, up 7% from October 2013.  Thus, Android OS

9   powers the majority of smartphones owned by U.S. users.  But this does not begin to tell the story

10  of Google's dominance in mobile and tablet devices.  That dominance is based in its monopoly in

11  handheld general search.

12          21.     Handheld general search occurs when a smartphone or tablet user performs an

13  Internet search query on his or her device.  If, for example, the user wants to know where the

14  nearest coffee shop is located, she might type her query into the search bar of her mobile browser.

15  The browser then will hand off the request to a pre-set search engine, such as the Google search

16  engine, that will operate behind the scenes to execute her request.  Or she might use a dedicated

17  search app, for example a Google-branded app or widget that was pre-loaded onto her phone, and

18  enter her search term there.  Not surprisingly, when she does so with a Google widget, the search is

19  processed through the Google search engine.  Or she might go to https://www.google.com via her

20  browser and run the search from there – which is not as likely as the other two methods described,

21  given the extra step involved to navigate to the Google website before entering the desired query.

22  But in that event, too, a search engine – Google's – will execute the search.  Whichever of these

23  methods the phone or tablet user employs, search results will be returned to her.

24          22.     Google is the dominant mobile and tablet search engine in the United States.  As of

25  March 2014, StatCounter reports that Google's U.S. handheld general search engine share – the

26  share of mobile phone and tablet searches run through Google's search engine – was at an

27  astounding *86.82%.*  Its competitor Yahoo!'s share was at a distant 7.64%, and its competitor

28                                                          - 6 -

Bing's share was at an even more distant 5.16%. (http://gs.statcounter.com/#mobile+tablet-search_engine-US-monthly-201401-201403-bar (last accessed April 16, 2014).)



23.     The handheld general search market is a submarket of the Internet general search market. The former captures Internet general searches performed on portable, wireless, handheld smartphones and tablets. The latter captures Internet general searches performed not only on these handheld devices, but on desktop and laptop computers, too. By any standard, Google's 86.88% share of the U.S. handheld general search market is a monopoly.

**C.     Google engages in unlawful behavior in order to restrain trade and to maintain and grow its monopoly in handheld general search.**

24.     Google maintains monopoly status in handheld general search, which ensures that the vast majority of mobile and tablet searches will be run by its search engine. Cornering the market on handheld-device searches translates to colossal profits.

25.     Google makes its money by selling advertising. The primary component of its advertising profits is search advertising. Search advertising, which is a function of Google's AdWords platform, serves paid ads in conjunction with so-called organic or natural search results.

Thus, if an individual conducts a search for "flat screen tv" that is run by Google's search engine, he will be returned not only a series of organic results in the form of links to responsive websites, but also, he often will be returned a series of advertisements at the top and/or right (or north and east) of the results page or pages. These search advertisements are based on a computerized analysis of the search terms that the individual entered, and paid ads are served as a function of a bidding process that advertisers have undertaken in order to "buy" words in the search query.

26.     Search advertising results in billions of dollars of revenue to Google annually. (*See* http://arstechnica.com/tech-policy/2014/01/court-orders-google-to-pay-1-36-of-adwords-revenue-for-infringing-patents/ (estimating that Google's U.S. AdWords revenue, which is based on ads generated by search queries, "is somewhere in the range of $15 billion to $18 billion annually") (last accessed April 30, 2014).) Unfortunately, Google has not competed simply on the basis of a better search engine, but also various unlawful tactics designed to favor its interests. These tactics have caught the attention of Congress and regulators at home and abroad.

**1.      Google has been the subject of, and has settled, various antitrust investigations.**

27.     In September 2011, the U.S. Senate Subcommittee on Antitrust, Competition Policy and Consumer Rights held a hearing on "The Power of Google: Serving Consumers or Threatening Competition?," at which Google's Executive Chairman, Eric Schmidt, appeared and answered questions related to Google's status as a monopolist; charges that it rigged search results to favor its own interests; and charges that it scraped content from various websites and served it up in non-organic search results, among others. (*See generally* Power of Google Transcript of Sept. 21, 2011 Hearing (available at http://www.gpo.gov/fdsys/pkg/CHRG-112shrg71471/pdf/CHRG-112shrg71471.pdf (last accessed March 20, 2014)).)

28.     Following this hearing, *The New York Times* reported in an October 12, 2012, article entitled "Drafting Antitrust Case, F.T.C. Raises Pressure on Google," that

> [t]he Federal Trade Commission is raising the ante in its antitrust confrontation with Google with the commission staff preparing a recommendation that the government sue the search giant.
>
> The government's escalating pursuit of Google is the most far-reaching antitrust investigation of a corporation since the landmark

CLASS ACTION COMPLAINT
010437-11  683086 V1

> federal case against Microsoft in the late 1990s.  The agency's central focus is whether Google manipulates search results to favor its own products, and makes it harder for competitors and their products to appear prominently on a results page….

29.     Google ultimately reached a settlement with the U.S. government to head off an antitrust lawsuit.  (*See*, *e.g.*, "Google Agrees to Change Its Business Practices to Resolve FTC Competition Concerns in the Markets for Devices Like Smart Phones, Games and Tablets, and in Online Search" (available at http://www.ftc.gov/news-events/press-releases/2013/01/google-agrees-change-its-business-practices-resolve-ftc (last accessed March 26, 2014)).)  In that settlement, Google agreed to two terms involving search advertising.  According to the Federal Trade Commission, "Google []agreed to give online advertisers more flexibility to simultaneously manage ad campaigns on Google's AdWords platform and on rival ad platforms; and to refrain from misappropriating online content from so-called "vertical" websites that focus on specific categories such as shopping or travel for use in its own vertical offerings." (*Id*. at 1.)

30.     Google also has faced intense scrutiny from the European Union's antitrust authorities for these same sorts of practices.  In February 2014, the E.U. and Google announced that they had reached a settlement in avoidance of litigation.  By way of the settlement, Google has agreed to display rival search ads next to its own specialized search ads.  It also has agreed to allow website owners the right to opt out of display of their content crawled by Google's search engine agents on covered web pages.  And Google has agreed to cease making it difficult or impossible for advertisers to port search advertising campaigns, *i.e.*, AdWords campaigns, to rival search engines. (*See Commitments in Case COMP/C-3/39.740*, dated January 31, 2014, at 2-15 (available at http://services.google.com/fh/files/blogs/google_commitments_full_2014.pdf (last accessed March 22, 2014).)  But the settlement has yet to attain final approval by the E.U.  Instead, it is under heavy fire from various quarters, including the E.U.-affiliated European Consumer Organisation, for not going far enough, and for leaving Google's anti-competitive practices unchecked.  (*See*, *e.g.*, http://www.eubusiness.com/Members/BEUC/google-antitrust (last accessed April 4, 2014).)

- 9 -

CLASS ACTION COMPLAINT
010437-11  683086 V1

**2.** **Google's restrains competition through the use of its Mobile Application Distribution Agreements.**

31.     A manufacturer of an Android OS smartphone or tablet must obtain a license from Google to pre-load popular Google apps including YouTube, the Google Play client, Maps, Calendar, Gmail, Talk, among others.

32.     Google uses its popular apps to coerce manufacturers into making it the default search engine provider on handheld devices.  This unlawful tactic is currently under investigation by European Union authorities, following the lodging of a complaint by FairSearch.org, of which Microsoft, Expedia, tripadvisor, Oracle, and others are members.  (*See*, *e.g.*, "In Europe, New Protest Over Google," *The New York Times*, April 8, 2013; "Google Reaches Settlement in EU Antitrust Probe," *The Wall Street Journal*, February 5, 2014 ("The [European Union] commission is also examining whether Google is abusing its market share for mobile phones running its Android operating system, according to people familiar with the examinations.  Competitors have said the company forces them to install software for Google searches.").)

33.     Recently revealed copies of Google's contracts with device manufacturers provide the details of Google's abusive market manipulation.  If a smartphone or tablet manufacturer such as Samsung or HTC wishes, for example, to pre-load Google's popular and exclusive YouTube app on a given Android OS phone or tablet, or if it wishes to install Google's popular and exclusive Google Play client on that device, then Google requires that the manufacturer must agree to make Google the default search engine on the device.  The manufacturer also must agree to pre-load *all* of a suite of Google applications onto prime screen real estate.  Further, the manufacturer must agree to make Google location services the default location services provider on the phone.  Additionally, the manufacturer must agree that it will pass a so-called Android Compatibility Test as to that device, which Google administers and controls in its sole discretion.[1]  (Ex. A (MADA

---

[1] Plaintiffs do not yet have sufficient information to identify which other manufacturers beyond Samsung and HTC have, or have had, contracts with Google with these same or substantially similar terms.  But the Joint Submission of Corrected Exhibit List (Dkt. No. 923) submitted in the *Oracle v. Google* matter, lists MADAs between Google and a who's who of Android OS device manufacturers, including LG, Toshiba, Fujitsu, Funai, iriver, GigaByte Tech. Co., JVC Kenwood,

- 10 -

between Google and Samsung), ¶¶ 2.1 ("Devices may only be distributed if all Google Applications[2] (excluding any Optional Google Applications) authorized for distribution in the applicable Territory are pre-installed on the device, unless otherwise approved by Google in writing."), 2.7 ("The license to distribute Google Applications in Section 2.1 is contingent upon the Device becoming an Android Compatible Device."), 3.4 (providing that "Google Phone-top Search must be set as *the default search provider for all search access points on the Device* providing for the prime placement of Google Applications" (emphasis added) and also providing for the prime placement of "Google Applications"), 3.8(c) ("Company shall configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices."); Ex. B (MADA between Google and HTC), ¶¶ 2.1 (same as ¶ 2.1 in Google-Samsung agreement), 2.7 (same as ¶ 2.7 in Google-Samsung agreement), 3.4 (same as ¶ 3.4 in Google-Samsung agreement), 3.8(c) (same as ¶ 3.8(c) in Google-Samsung agreement).)

34.     To summarize, the Google MADA requires that:

"Devices may only be distributed if all Google Applications [listed elsewhere in the agreement] . . . are pre-installed on the Device . . . ." (Exs. A and B, ¶ 2.1.)

The device manufacturer must "preload all Google Applications approved in the applicable Territory . . . on each [covered] device." (Exs. A and B,  ¶ 3.4(1).)

The device manufacturer must place "Google's Phone-top Search and the Android Market [Google Play] Client icon . . . at least on the panel immediately adjacent to the Default Home Screen," with "all other Google Applications . . . no more than one level below the Phone Top."  (Exs. A and B, ¶ 3.4(2)-(3).)

---

NEC Casio MobileComm, NEC Corp., Phillips Electronics Hong Kong, Sony, Acer, ASUSTek Computer, Dell, TCT Mobile, Yulong Computer Telecomm. Scientific, ZTE Corp., and Kyocera. Unfortunately, these MADAs are not available for public inspection because they were not entered into evidence in the case.  It appears likely, however, that Google has insisted on similar tying arrangements with some or all of these other manufacturers, in violation of federal and state law, and to the detriment of competition and consumers.  (*See Oracle America v. Google* (N.D. Cal. No. 3:10-cv.03561), Dkt. No. 923 at Entries 83-85, 286, 2742-2756, and 2772-2702.)

[2] In both the Google-Samsung and Google-HTC MADAs, "Google Applications" is defined as "the Google applications listed below . . . ": "Set-up Wizard, Google Phone-top Search, Gmail, Google Calendar, Google Talk, YouTube, Google Maps for Mobile, Google Street View, Contact Sync, Android Market Client (not products downloaded from Android Market), Google Voice Search, and Network Location Provider." (Ex. A, ¶ 1.12; Ex. B, ¶ 1.11.)

CLASS ACTION COMPLAINT
010437-11  683086 V1

- 11 -

The device manufacturer must set "Google Phone-top Search . . . as the default search provider for all Web search access points on the Device."  (Exs. A and B, ¶ 3.4(4).)

Google's Network Location Provider service must be pre-loaded and set as the "default network-based location provider on all Android Compatible Devices."  (Exs. A and B, ¶ 3.8(c).)

35.     These provisions are confidential and are not ordinarily available to the public. MADA provision 6.1 prohibits a device manufacturer from sharing any Confidential Information (as defined), and Google labels the MADA documents as "Confidential," which makes the MADA subject to this restriction.  Two MADA documents became available during recent litigation: in *Oracle America v. Google*, the HTC MADA and Samsung MADA were admitted as Trial Exhibits 286 and 2775, respectively, though both documents indicate in their footers that they are "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY."

36.     Default search engine status is exceedingly important to Google.  If a Google search app or widget is placed prominently on a handheld device, as in the following example of the Samsung Galaxy S III mobile phone home screen bearing the Google Phone-top Search bar across its middle, Google knows that phone and tablet owners will use it.



- 12 -

Also, most phone and tablet users are unaware of the interaction between their browser – which on this Samsung device would be accessed by pushing the "Internet" icon – and the search engine which happens to be powering it; they simply want information from the World Wide Web. (Using the browser to execute a search is an alternative to typing a search into the Google Phone-top search bar.) They do not realize that when they initiate a search by typing a query into the search/address box of their mobile web browser – the so-called omnibox – the query is executed via a search engine such as Google.

37.     If Google is set as the default search engine provider, so much the better to sustain and grow Google's monopoly position and power in handheld general search. As Google's Vice-President of Product Management & Marketing put it:

> So *more users more information, more information more users, more advertisers more users*, it's a beautiful thing, lather, rinse, repeat, that's what I do for a living. So that's what someone alluded to *the engine that can't be stopped*.[3]

38.     By way of Google's coercive and exclusionary practice with Android OS device manufacturers such as Samsung and HTC, Google restrains and quashes competition for default search engine status before it even can begin. There is no lawful reason to compel manufacturers wishing to pre-load the YouTube app onto a device, or to enable their customers to access the Google Play store and its 1.2 million apps, to make Google the default search engine on that device as well. Instead, Google's practice is a pure power play designed to maintain and extend its monopoly in handheld general search.

**D.     Google's practices with respect to its Android apps and search product restrain and injure competition in markets where already there are high barriers to entry.**

39.     Consider the impact on a device manufacturer seeking to substitute an offering that competes with a Google app. For example, a phone manufacturer might conclude that some non-Google service is preferable to one of the listed Google Applications – perhaps faster, easier to use, or more protective of user privacy. Alternatively, a phone manufacturer might conclude that its

---

[3] Source: Jonathan Rosenberg, Google VP of Product Management & Marketing, *Inside the Black Box: Technology & Innovation at Google*, Speech to Claremont McKenna College (emphasis added).

CLASS ACTION COMPLAINT
010437-11  683086 V1

users care more about a lower price than about pre-loaded Google apps.  Such a manufacturer might be willing to install exclusively and prominently an app from some other search-engine provider, location-services provider, or other developer in exchange for a payment, which would be partially shared with consumers via a lower selling price for the phone.  Google's MADA restrictions disallow any such configuration if the phone is to include any of the listed Google apps.

40.     The MADA provisions help Google whenever a phone manufacturer sees no substitute to even *one* of Google's apps.  Manufacturers may perceive that Bing Search, DuckDuckGo, Yahoo! Search, and others are reasonable substitutes to Google Search.  Manufacturers also may perceive that Bing Maps, MapQuest, Yahoo! Maps, and others are reasonable substitutes to Google Maps.  But it is not clear what other app store besides Google Play that a manufacturer could preinstall onto a smartphone in order to offer a comprehensive set of apps.  Furthermore, a manufacturer would struggle to offer a phone without a pre-installed YouTube app.  Without the expected pre-loaded app allowing easy access to the short-format entertainment videos that are YouTube's specialty, a phone would be unattractive to many consumers, thus undermining carriers' efforts to sell data plans, and putting the phone at heightened risk of commercial failure.  Needing Google Play and YouTube, a manufacturer must then accept Google Search, Maps, Network Location Provider, and more – even if the manufacturer prefers a competitor's offering or prefers a payment for installing some alternative exclusively.

41.     In principle, the MADA allows a phone manufacturer to install certain third-party applications in addition to the listed Google Applications.  For example, the phone manufacturer could install other search, maps, or email apps in addition to those offered by Google.  But multiple apps are duplicative, confusing to users, and a drain on limited device resources.  Moreover, in the key categories of search and location, Google requires that its apps be the default, and Google demands prominent placements for its search app and app store.  These factors sharply limit users' attention to other preloaded apps, reducing competitors' willingness to pay for pre-installation.

- 14 -

Thus, even if phone manufacturers or carriers preload multiple applications in a given category, the multiple apps are unlikely to significantly weaken the effects of Google's tie.

42.     These MADA restrictions suppress competition.  Thanks to the MADA, alternative vendors of search, maps, location, email, and other apps cannot outcompete Google on the merits; even if a competitor offers an app that's better than Google's offering, the carrier is obliged to install Google's app also, and Google can readily amend the MADA to require making its app the default in the corresponding category (for those apps that don't already have this additional protection).  Furthermore, competitors are impeded in using the obvious strategy of paying manufacturers for distribution; to the extent that manufacturers can install competitors' apps, they can offer only inferior placement adjacent to Google, with Google left as the default in key sectors – preventing competitors from achieving scale or outbidding Google for prominent or default placement on a given device.

43.     These MADA provisions serve both to help Google expand into areas where competition could otherwise occur, and to prevent competitors from gaining traction.

44.     Google's practices with respect to its MADAs restrain and hurt competition because they constitute yet one more way by which Google forecloses its rivals in handheld general search from competing.  The results are especially pernicious given that already there are high barriers to entry in the markets for general search.

45.     Any search engine becomes better over time as more and more search inquiries are run through it.  Searches executed via Google's search engine provide Google with data that Google utilizes to improve its search algorithm.  For example, if a user's quest for specific information is not satisfied by clicking on prominent links in results returned by the search engine, she will click on a lower-ranked link or enter new search terms, and this data allows the algorithm powering the search engine to adapt, or to be modified, to produce better results.  This, in turn, enhances Google's appeal to consumers, and the cycle repeats itself.  Then, because Google attracts more users with these ever-improving search results, Google attracts yet more ad dollars because advertisers will follow the most consumers.  And with more advertising dollars, Google

- 15 -

CLASS ACTION COMPLAINT
010437-11   683086 V1

1  can spend even more money to enhance its infrastructure[4] and search product, the effect of which

2  will be to attract yet more.  (*See*, *e.g.*, C. Argenton & J. Prüfer, "Search Engine Competition with

3  Network Externalities," *Journal of Competition Law and Economics*, 8(1), 73-105 (2012), at 1-2,

4  9, 11, 13.)  This is the "beautiful thing" of which Mr. Rosenberg, Google VP of Product

5  Management and Marketing, has spoken.

6       46.     The high barrier to entry posed by Google's "beautiful" cycle has been recognized

7  by antitrust regulators.  As the federal government recognized in its February 18, 2010, "Statement

8  of the Department of Justice Antitrust Division on Its Decision To Close Its Investigation of the

9  Internet Search and Paid Search Advertising Agreement Between Microsoft Corporation and

10  Yahoo! Inc.":

> The search and paid search advertising industry is characterized by
> an unusual relationship between scale and competitive performance.
> The transaction will enhance Microsoft's competitive performance
> because it will have access to a larger number of queries, which

---

[4] Huge financial and computational resources are required to run a search engine as a consequence of the enormity of the World Wide Web.  Search engines crawl the web via robots in order to index the contents of the nearly *one billion* websites in existence.  (*See* http://www.internetlivestats.com/total-number-of-websites/ (last accessed April 14, 2014).) Needless to say, this is a Herculean task due to the ever-expanding nature of the web.  Google's head of search stated at an August 2012 search press breakfast that there were some 20 *trillion* URLs online and that Google crawled over 20 *billion* of those on an average day.  He also reported that Google answered 100 billion searches per month.  (http://searchengineland.com/google-search-press-129925 (last accessed April 22, 2014) (emphasis added).)  Contrast this to what Google reported only four years earlier, when the numbers already were staggering.  As Google wrote in July 2008:  "Recently, even our search engineers stopped in awe about just *how* big the web is these days – when our systems that process links on the web hit a milestone:  1 trillion (as in 1,000,000,000,000) unique URLs on the web at once!" (http://googleblog.blogspot.com/2008/07/we-knew-web-was-big.html (last accessed April 14, 2014) (emphasis in original).)  Google reported further:

> Even after removing … exact duplicates, we saw a trillion unique
> URLs, and the number of individual web pages out there is growing by
> several billion pages per day….  We don't index every one of those
> trillion pages … [b]ut we're proud to have the most comprehensive
> index of any search engine….  Today, Google downloads the web
> continuously ….  [M]ultiple times every day, we do the computational
> equivalent of fully exploring every intersection of every road in the
> United States.  Except it'd be a map about 50,000 times as big as the
> U.S., with 50,000 roads and intersections."

(*Id.*)

- 16 -

1

2

3

4

5

6

7

should accelerate the automated learning of Microsoft's search and paid search algorithms and enhance Microsoft's ability to serve more relevant search results and paid search listings, particularly with respect to rare or 'tail' queries.  The increased queries received by the combination operation will further provide Microsoft with a much larger pool of data than it currently has or is likely to obtain without this transaction.  The larger data pool may enable more effective testing and thus more rapid innovation of potential new search-related products, changes in the presentation of search results and paid search listings, other changes in the user interface, and changes in the search or paid search algorithms.  This enhanced performance, if realized, should exert correspondingly greater competitive pressure in the marketplace.

8   Yet even after consummation of the Microsoft-Yahoo! deal referenced in this statement by the

9   Department of Justice, in which Microsoft's Bing began to power Yahoo! searches, Bing has

10  struggled mightily.  As *The Washington Post* reported recently, Microsoft's "online services

11  division, which oversees search engine Bing, reported a loss of $1.3 billion in 2013 – less than the

12  previous year but still in the red."  (http://www.washingtonpost.com/blogs/the-

13  switch/wp/2014/02/05/investors-want-microsofts-new-ceo-to-kill-xbox-bing-and-surface/ (last

14  accessed April 14, 2014.)  This has brought pressure from investors to dump Bing altogether.

15      47.     If Microsoft were to exit the market, then there is little hope for *any* meaningful

16  competition in the markets for general search and handheld general search.  As Steve Pociask and

17  Joseph P. Fuhr, Jr. of the American Consumer Institute put it in their July 24, 2012 paper entitled

18  "The Search for Market Dominance":

19

20

21

22

23

24

25

26

27

Most troubling, however, are recent events suggesting that rivalry in the search engine and search advertising markets has waned altogether.  Not only are many of the early search engine rivals gone, but most of the remaining competitors are using Google's search capability to some extent or through revenue-sharing deals.  For example, for years now, AOL has been using Google's search engine and, consequently, Google's advertising program.  Similarly, Ask.com downsized its staff several years ago and signed a five-year multi-billion dollar deal to use Google's advertising/sponsored links program.  More recently, both AOL and Ask.com have reaffirmed their dependence on Google.  As recently as last October, there are reports that Google was looking to finance a deal for others to buyout Yahoo.  Bing continues to sustain billions of dollars in losses and single-digit market share worldwide.  Google has locked into exclusive deals with various providers, making it the default search engine on many online web devices.  By all indications, competitors are waning, rivals are using Google's own services, and not even Microsoft can make a profitable dent into the market.  It appears that

28

CLASS ACTION COMPLAINT
010437-11  683086 V1

the market has tipped to Google, which funnels much of the web's traffic to and from its websites and partner websites.

(*Id.* at 8-9 (footnotes omitted) (available at http://www.ftc.gov/sites/default/files/attachments/frequently-requested-records/1311google-2013-00857.pdf) (last accessed April 15, 2014).)

48.     Google itself has acknowledged that scale is critical to the general search market and constitutes a grave barrier to entry.  For example, Google's executive chairman, Eric Schmidt, was quoted in an April 13, 2003 *New York Times* article entitled "In Searching the Web, Google Finds Riches" as stating:  "Managing search at our scale is a very serious barrier to entry."  And this was over 10 years ago, well before Google attained its present immense size and scale.  Mr. Schmidt has since tried to walk back that statement, but it remains as objectively true today as it was then – even more so.

49.     In fact, only a few years ago, Mr. Schmidt again acknowledged the immense power and marketplace effectiveness of Google's scale during an interview for an October 9, 2009.  *BloombergBusinessweek* article entitled "How Google Plans To Stay Ahead in Search."  In response to the question, "What is Google's biggest strength in search?"  Mr. Schmidt responded:  "We just have so much scale in terms of the data we can bring to bear."

50.     This is consistent with Mr. Schmidt's remarks expressed earlier in 2009, in response to a question during a FOX Business television interview about whether Microsoft's investment of some $80-100 million into promotion for its competitive search engine, Bing, would compel a response from Google.  As Mr. Schmidt put it, "From Bing's perspective they have a bunch of new ideas and there are some things that are missing.  We think search is about comprehensiveness, freshness, *scale, and size* for what we do.  *It's difficult for them to copy that.*"  (http://www.zdnet.com/blog/btl/schmidt-bing-has-not-changed-what-google-is-doing/19492 (emphasis added) (last visited March 20, 2014).)  When not even a company as successful and wealthy as Microsoft gives Google competitive pause due to Google's scale and the barriers to entry that it poses, then realistically, no company can hope to compete with Google in the fast-

- 18 -

CLASS ACTION COMPLAINT
010437-11  683086 V1

1   growing market for phone and tablet general search, especially when Google resorts to unlawful

2   behavior to maintain and expand its monopoly power.

3       51.    Indeed, as Reuters reported on November 21, 2012, in an article entitled "Google

4   competitor DuckDuckGo says it's getting shut out," "[u]pstart Internet search engine

5   DuckDuckGo, which promotes itself as a Google Inc. rival which does not track users' personal

6   information, says it is being hurt by the search giant …."  According to the article, Gabriel

7   Weinberg, the MIT graduate who started DuckDuckGo, complained that "the Android wireless

8   phone comes with Google as the phone's standard search mechanism."  (*Id.*)  "DuckDuckGo can

9   be added as an app to a mobile device, which is less convenient than being the default search

10  engine, said Weinberg."  But Google's anti-competitive tactics did not stop there.  Instead, Google,

11  having purchased a company which owned the domain name "duck.com," began redirecting traffic

12  from that domain name to itself after DuckDuckGo inquired about purchasing it.  (*Id.*)  This,

13  according to Mr. Weinberg, created confusion among consumers.  (*Id.*)  Mr. Weinberg also

14  complained of the difficulty of making DuckDuckGo the default search provider in Google's

15  Chrome web browser.  (*Id.*)  The article concluded by reporting that "[a] former antitrust enforcer,

16  who asked not to be named, said the actions that Weinberg complained about were unexciting

17  taken individually but, as a cluster, could be worrisome.  'It's relevant.  It's what antitrust enforcers

18  call monopoly soup,' said the enforcer."  (*Id.*)

19      52.    When Bing and other search engines such as DuckDuckGo are excluded from

20  competition by way of the practices described in this complaint, not only is actual competition

21  restrained and harmed by way of the exclusion itself, but even the *prospect* of real competition is

22  restrained and diminished.  When Google's search product grows in effectiveness, fueled by search

23  volumes strongly enhanced as a result of Google's anti-competitive practices, competitors fall yet

24  further behind both in terms of effectiveness but also in terms of reputation in the marketplace.

25      53.    Competition is further restrained and harmed by Google's unlawful contracts

26  because rivals to Google's applications, such as AOL's MapQuest, an alternative to Google Maps,

27  cannot compete for pre-load exclusivity on affected Android OS mobile devices.  Google's like

28

CLASS ACTION COMPLAINT
010437-11  683086 V1

applications must be pre-loaded pursuant to terms of its MADAs, in prime positions on the mobile phone's or tablet's screens.

54.     Not only is competition restrained and harmed by Google's practices, but so is the innovation that real competition brings.  When rivals are not able to compete, they will be less and less likely to make the investments in time and money that would mean better mobile search or maps (as one example) for everyone.  New potential competitors will stay away, too, from such a stacked marketplace.  And this means that consumers are robbed of what these aspiring competitors might bring to the market, if only they were given a fair chance to compete.

**E.      Google conceals its MADA restrictions.**

55.     The MADA restrictions have been unknown to the public and Google has effectively kept them hidden.  The MADA agreements are labeled "highly confidential attorneys eyes only."  Further, Google has misleadingly implied that it has no such restrictions.

56.     Google's public statements indicate few to no significant restrictions on use of the Android operating system or Google's apps for Android – leading reasonable observers and even industry experts to conclude, mistakenly, that Google allows its apps to be installed in any combination that manufacturers prefer.

57.     For example, on the "Welcome to the Android Open Source Project!" page, the first sentence touts that "Android is an open source software stack . . . ." (https://source.android.com/ (last accessed April 29, 2014).)  Nothing on that page indicates that the Android platform, or Google's apps for Android, suffers any restriction or limitation on the flexibility standard for open source software.

58.     Moreover, senior Google executives have emphasized the importance of Google's openness in mobile.  Former Google Senior Vice President Jonathan Rosenberg offered a 4300-word analysis of the benefits of openness for Google generally and in mobile in particular.  For example, Mr. Rosenberg argued: "In an open system, a competitive advantage doesn't derive from locking in customers, but rather from understanding the fast-moving system better than anyone else and using that knowledge to generate better, more innovative products."

CLASS ACTION COMPLAINT
010437-11  683086 V1

(http://googleblog.blogspot.com/2009/12/meaning-of-open.html (last accessed April 29, 2014).)

Mr. Rosenberg also argued that openness "allow[s] innovation at all levels – from the operating

system to the application layer – not just at the top" – a design which he said helps facilitate

"freedom of choice for consumers" as well as "competitive ecosystem" for providers.  (*Id.*)  Mr.

Rosenberg says nothing about MADA provisions or restrictions on what apps manufacturers can

install.  Yet there is no way to reconcile the MADA restrictions with Mr. Rosenberg's claim of

"allow[ing] innovation at all levels" and claimed "freedom of choice for consumers."

59.     Additionally, Andy Rubin, then Senior Vice President of Mobile at Google, in an

April 2011 blog post claimed that "[D]evice makers are free to modify Android to customize any

range of features for Android devices."  (http://android-developers.blogspot.com/2011/04/i-think-

im-having-gene-amdahl-moment.html (last accessed April 30, 2014).)  He continued: "If someone

wishes to market a device as Android-compatible or include Google applications on the device, we

do require the device to conform with some basic compatibility requirements.  (After all, it would

not be realistic to expect Google applications – or any applications for that matter – to operate

flawlessly across incompatible devices)."  (*Id.*)  Mr. Rubin's post does not explicitly indicate that

the referenced "basic compatibility requirements" are the *only* requirements Google imposes, but

that is the natural interpretation.  Reading Mr. Rubin's remarks, particularly in light of his

introduction that Android is "an open platform," most readers would conclude that there are no

significant restrictions on app installation or search defaults.

60.     But that is not all.  Google Executive Chairman Eric Schmidt, following the

Senate's September 2011 "Power of Google" hearing, responded to written question 8.a put to him

by Sen. Herbert Kohl as follows:

> Has Google demanded that smartphone manufacturers make Google
> the default search engine as a condition of using the Android
> operating system?

Mr. Schmidt:

> Google does not demand that smartphone manufacturers make
> Google the default search engine as a condition of using the Android
> operating system. . . .

- 21 -

> One of the greatest benefits of Android is that it fosters competition at every level of the mobile market—including among application developers.  Google respects the freedom of manufacturers to choose which applications should be pre-loaded on Android devices.  Google does not condition access to or use of Android on pre-installation of any Google applications or on making Google the default search engine. . . .
>
> Manufacturers can choose to pre-install Google applications on Android devices, but they can also choose to pre-install competing search applications like Yahoo! and Microsoft's Bing. Many Android devices have pre-installed the Microsoft Bing and Yahoo! search applications.  No matter which applications come pre-installed, the user can easily download Yahoo!, Microsoft's Bing, and Google applications for free from the Android Market.

(Power of Google Transcript of Sept. 21, 2011 Hearing at 147-48 (available at http://www.gpo.gov/fdsys/pkg/CHRG-112shrg71471/pdf/CHRG-112shrg71471.pdf (last accessed March 20, 2014)).)  Mr. Schmidt's responses to questions from Sen. Mike Lee (question 15.b), from Sen. Al Franken (question 7), and from Sen. Richard Blumenthal (question 7) were similar and, in sections, identical, and were highly misleading given the terms of Google's MADAs.  (*Id.* at 165-66, 125-26, and 110.)

**F.      Google further forecloses competition in the market by entering into exclusive contracts with Apple.**

61.      As part of its strategy to maintain and extend its monopoly in handheld general search, Google also has entered into exclusionary agreements with the largest non-Android phone manufacturer, Apple Inc. ("Apple").

62.      Google has paid Apple hundreds of millions of dollars, if not billions of dollars over the years, to act as the default search engine on Apple iPhones, iPads, and iPods.  It is estimated that it will pay Apple over a billion dollars in 2014 to retain this status.  (*See*, *e.g.*, http://searchengineland.com/financial-analyst-affirms-googles-1-billion-in-default-search-payments-to-apple-148255 (last accessed April 4, 2014).)  This arrangement forecloses competing search engine companies from the best opportunity to break Google's stranglehold on the handheld general search market.

63.      No pro-competition justification exists for the exclusion of rival search engines from acting as the default search engine on Apple mobile devices.

- 22 -

**G.      Google's unlawful practices harm consumers.**

64.      Consumers are harmed by Google's practices in aid of maintaining and advancing its monopolies because they are robbed of choice, because of the stifling of innovation, and because their handheld devices cost more than they would if Google did not foreclose competition. As to the latter harm, when Google's competitors in handheld general search are prevented from competing with regard to default engine status, or for app exclusivity, on a phone or tablet, money they would pay manufacturers for that status – which would drive down the price of that device – stays in these competitors' pockets.  This means that consumers pay more for affected phones and tablets than they would but for Google's unlawful behavior.

65.      Google's mandatory MADA terms that tie Google search to its other products, without business necessity or justification, in fact kill competition and consumer choice.  As Susan A. Creighton, counsel for Google and former Director of the Bureau of Competition at the Federal Trade Commission, put it at the Power of Google hearing:  "And this really gets to the question of, are there impediments to the ability of consumers to choose.  So if someone found, for example, that as Microsoft did there [with respect to Netscape], that Microsoft was intimidating OEMs from being able to offer rival product so that it never got to market, then I would want to have relief that went to those provisions that were preventing choice."  (Power of Google Transcript of Sept. 21, 2011 Hearing at 46-47 (available at http://www.gpo.gov/fdsys/pkg/CHRG-112shrg71471/pdf/CHRG-112shrg71471.pdf (last accessed March 20, 2014)).[5])

66.      This lawsuit aims to achieve the sort of relief to which Google's counsel referred and to restore to consumers the price premium they paid for their affected mobile phones and tablets.

---

[5] Google's counsel also remarked that competition among search engines for default status with Apple was a good thing – even as Google's own MADAs, with their tying provisions, make it impossible with respect to affected Android OS products.  (*See id.* at 45 ("[W]e actually want Apple to be able to have companies like Bing and Google competing to be the best search engine. . . .  Now, [Apple] having picked Google, Bing and Yahoo are going to compete that much harder the next time.  So when you have that kind of a contestable market, that you have someone who's a stand-in for consumers, because Apple is not going to take the worst search engine.").)

CLASS ACTION COMPLAINT
010437-11  683086 V1

- 23 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.    INTERSTATE TRADE AND COMMERCE

67.    The activities of the defendant as alleged in this complaint were within the flow of, and substantially affected, interstate commerce.

## VI.    RELEVANT MARKETS

68.    Where it is necessary that plaintiffs demonstrate the existence of relevant markets, there are two.  The first is the United States market for general search, *i.e.*, general Internet search conducted on desktop computers, laptops, and handheld devices via the Google search engine or one of its general search engine rivals, such as Bing.  The second is the United States market for handheld general search, *i.e.*, general Internet search conducted on smartphones and tablets.

69.    *First*, Google has acknowledged the existence of a "general search" category (*see id*. at 72 and 102 (referring to Microsoft's Bing search engine in a written response posed by a U.S. Senator in the "Power of Google" proceedings, Google's counsel remarked:  "Here, by comparison, Google has no ability to exclude a *general search engine rival such as Microsoft* from the market."; and its executive chairman stated in response to another written question:  "As I acknowledged during the Committee hearing, Google is 'in the area' of 65% of queries [for desktop search] in the U.S., if you look only at Google's *general search competitors*, such as Microsoft's Bing and Yahoo!") (emphases added).)

70.    Though Google today seems intent on denying the existence of this obvious market – even as it (a) pays Apple hundreds of millions, if not billions, of dollars for default search engine status on the iPhone and (b) insists on unlawful tying arrangements with Android OS manufacturers to maintain and expand its dominance of it in smartphones and tablets – Google's executive chairman was correct when in September 2010 he remarked in a *Wall Street Journal* video interview that there is in fact a market for general search.  Whatever Google's current efforts to dilute the discreteness of this market with references to specialized searches run through Facebook, for example, or Yelp, its executive chairman himself rightly waved away such efforts from others only a short while ago.  As AFP reported in a September 25, 2010, article entitled "Google chief sees Bing as main threat":

- 24 -

1

2

> Google chief executive Eric Schmidt on Friday said that Microsoft's Bing search engine was the company's main threat, not Facebook or Apple.

3

4

> "While it's true Web search is not the only game in town, *searching information is what it is all about*," Schmidt said in Wall Street Journal interview video posted online.

5

6

> He described Apple as a well-respected competitor and Facebook as a "company of consequence doing an excellent job in social networking," but said that Microsoft's latest-generation search engine was Google's main competition.

7

8

> "We consider neither to be a competitive threat," Schmidt said, referring to Facebook and Apple. "*Absolutely, our competitor is Bing*. Bing is a well-run, highly competitive *search engine*."

9

10

(http://www.google.com/hostednews/afp/article/ALeqM5gJL1jBNwMhcjiDZl-

P1EVe8Lalpw?hl=en (last accessed March 22, 2014 (emphasis added).)

11

12

     71.    *Second*, a relevant submarket, in addition to, or as an alternative to, the first relevant

13

market, is the United States market for handheld general search. Not only do industry analysts

14

consider handheld general search to be a distinct market, but so does Google in its pitches to

advertisers. (*See*, *e.g.*, http://services.google.com/fh/files/misc/mobile-search-ppt.pdf (PowerPoint

15

presentation to advertisers based on Google-Nielsen survey and study).)

16

     72.    Substantial barriers to entry to the overall general search market and the handheld

17

general search market exist because of Google's monopolization of those markets, including by

18

means of the unlawful conduct alleged in this complaint.

19

20

**VII.   CLASS ALLEGATIONS**

     73.    Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(1) and (2).

21

     74.    Plaintiffs bring this action on behalf of themselves and the following class, for

22

injunctive relief based on violations of the federal Sherman and Clayton antitrust acts:

23

24

> All U.S. purchasers of any Android OS mobile telephone or tablet as to which Google and the manufacturer of such device has entered into a contract or contracts, including the so-called Mobile Application Distribution Agreement, by which Google has conditioned the right to pre-load any application from a suite of Google applications, including the YouTube app or the Google Play client, on the manufacturer's mandatory acceptance and installation of Google search, or so-called Google Phone-top Search, as the default search engine on that device.

25

26

27

28

- 25 -

CLASS ACTION COMPLAINT
010437-11  683086 V1

1    Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries;

2    defendant's current or former employees, officers, directors, agents, and representatives; and the

3    district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate

4    family members.

5         75.    Plaintiffs also bring this action on behalf of themselves and the following class, for

6    monetary and injunctive relief based on violations of California's Cartwright Act and Unfair

7    Competition Law:

8              All U.S. purchasers of any Android OS mobile telephone or tablet as
               to which Google and the manufacturer of such device has entered
9              into a contract or contracts, including the so-called Mobile
               Application Distribution Agreement, by which Google has
10             conditioned the right to pre-load any application from a suite of
               Google applications, including the YouTube app or the Google Play
11             client, on the manufacturer's mandatory acceptance and installation
               of Google search, or so-called Google Phone-top Search, as the
12             default search engine on that device.

13   Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries;

14   defendant's current or former employees, officers, directors, agents, and representatives; and the

15   district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate

16   family members.

17        76.    Upon information and belief, the unlawful conduct alleged in this complaint,

18   including preparation of, imposition of the terms of, and entry into, the Google MADAs, was

19   effected, implemented, adopted, and ratified in the state of California, where Google maintains its

20   U.S. headquarters.  Furthermore a substantial part of the anti-competitive conduct took place in

21   California.  For these reasons, plaintiffs allege that they and the nationwide class proposed in the

22   preceding paragraph are entitled to monetary and injunctive relief under California law.

23        77.    In the event that the Court determines that California law does not apply nationwide,

24   plaintiffs will bring alternative, additional class allegations based on the laws of the various states

25   permitting such actions under their antitrust and unfair competition laws.

26        78.    **Numerosity:**  The exact number of the members of the proposed classes is

27   unknown and is not available to the plaintiffs at this time, but upon information and belief, the

28                                            - 26 -

1    classes will consist of many hundreds of thousands of members, or even millions of members, such

2    that individual joinder in this case is impracticable.

3        79.    **Commonality:**  Numerous questions of law and fact are common to the claims of

4    the plaintiff and members of the proposed classes.  These include, but are not limited to:

5            a.    Whether Google unlawfully has conditioned the contractual right of any

6    manufacturer of any Android OS mobile telephone or tablet to pre-load on that device any of

7    Google's applications, including the YouTube app or the Google Play client, on the manufacturer's

8    mandatory acceptance and installation of Google search, or so-called Google Phone-top Search, as

9    the default search engine on that device;

10           b.    Whether there are U.S. antitrust markets for general search and handheld

11   general search;

12           c.    Whether Google has unlawfully monopolized, or attempted to monopolize,

13   the markets for general search and handheld general search, including with respect to Android OS

14   mobile telephones and tablets;

15           d.    Whether competition in the general search and handheld general search

16   markets has been restrained and harmed by Google's monopolization of those markets;

17           e.    Whether consumers have been harmed, including by way of having paid

18   more for their affected Android OS mobile telephones and tablets than they would have but for

19   Google's unlawful conduct, as a result of Google's unlawful practices;

20           f.    Whether plaintiffs and members of the proposed classes are entitled to

21   declaratory or injunctive relief to halt Google's unlawful practices, and to their attorney fees, costs,

22   and expenses;

23           g.    Whether plaintiffs and members of the proposed classes  are entitled to any

24   damages or restitution incidental to the declaratory or injunctive relief they seek, and to their

25   attorney fees, costs, and expenses related to any recovery of such monetary relief; and

26

27

28
                                                   - 27 -

h.      Whether plaintiffs and members of the proposed classes are otherwise entitled to any damages or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

80.      **Typicality:**  Plaintiffs' claims are typical of the claims of the members of the proposed classes.  The factual and legal bases of Google's liability are the same and resulted in injury to plaintiffs and all of the other members of the proposed classes.

81.      **Adequate representation:**  Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately.  They have retained counsel competent and experienced in complex class-action litigation.  Plaintiffs have no interests that are antagonistic to those of the proposed classes, and their interests do not conflict with the interests of the proposed class members they seek to represent.

82.      **Prevention of inconsistent or varying adjudications:**  If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results.  This would have the effect of establishing incompatible standards of conduct for the defendant.  Certification of plaintiffs' proposed classes would prevent these undesirable outcomes.

83.      **Injunctive and declaratory relief:**  By way of its conduct described in this complaint, the defendant has acted on grounds that apply generally to the proposed classes.  Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

84.      **Predominance and superiority:**  This proposed class action is appropriate for certification.  Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable.  Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter.  Here, the class action device will present far fewer management difficulties,

1   and it will provide the benefit of a single adjudication, economies of scale, and comprehensive

2   supervision by this Court.  Further, uniformity of decisions will be ensured.

### VIII.   CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT**
**(15 U.S.C. § 1)**

6       85.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

7       86.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the

8   proposed nationwide Sherman Act and Clayton Act class (hereafter "federal law class") described

9   above.

10      87.     Under the MADAs described herein, manufacturers of Android OS smartphones

11  and tablets wishing to pre-load onto a device any Google application contained in a Google-

12  designated suite of apps must agree to pre-load *all* Google applications from that suite onto that

13  device.  This suite of apps includes not only the YouTube app and Google Play client, among

14  others, but Google's Phone-top Search, *i.e.*, Google's search engine product, as well.  Thus, a

15  manufacturer wishing to pre-load YouTube or Google Play onto a device also is required to pre-

16  install Google Phone-top Search on that device and to make it the default search engine "for all

17  Web search access points on the Device."  (Exs. A and B, ¶ 3.4.)  These requirements mean, *inter*

18  *alia*, that no rival search engine can compete for default search engine status on an affected device

19  because, by definition, there can be only one default search engine.

20      88.     Google's MADAs are contracts in restraint of trade.  Google's conduct affects and

21  forecloses a substantial amount of interstate commerce.

22      89.     Plaintiffs and the federal law class have been harmed by Google's conduct, both in

23  terms of the denial of choice and other injuries to competition and innovation, but also in terms of

24  the supra-competitive prices they paid for their smartphones and tablets due to the inability of

25  Google's rivals to compete for default search engine status or exclusive application pre-loading,

26  including by way of paying device manufacturers fees for such status.  Had Google's rivals been

27  able to compete for such status on a given device, including by way of making payments to device

28                                                      - 29 -

manufacturers, the effect would have been to lower the cost to produce that device, and consumer prices would have been lower than what they were but for Google's unlawful conduct.  For these reasons, Google's conduct has been a substantial factor in causing plaintiffs' and the proposed classes' harm.

90.     Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store.  Plaintiffs and the federal law class are entitled to an injunction, pursuant to 15 U.S.C. § 26, to prevent Google from persisting in its unlawful behavior to their detriment.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION**
**(15 U.S.C. § 2)**

91.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

92.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide federal law class described above.

93.     The relevant markets are the U.S. general search market and the handheld general search market.

94.     Google possesses monopoly power in the relevant markets.

95.     For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant markets.

96.     Google has the power to exclude competition in the relevant markets, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to maintain and expand its monopoly power in both.

97.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-a-vis its rivals in the U.S. markets for handheld general search and general search.

98.     Google has combined with device manufacturers to maintain and grow its monopoly in handheld general search and general search, with the effect being that competition is foreclosed, that innovation is stifled, and that consumer choice is gravely diminished.

99.     There is no business necessity or other pro-competitive justification for Google's conduct.

100.    Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property by way of Google's conduct, including by way of overpaying for their affected Android OS smartphones and tablets.

101.    Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store.  Plaintiffs and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION
### (15 U.S.C. § 2)

102.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

103.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide federal law class described above.

104.    Google has attempted to monopolize the U.S. market for general search and the U.S. market for handheld general search.

105.    Google's anti-competitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for general search and the U.S. market for handheld general search.

106.    Google has a specific intent to achieve monopoly power in the U.S. market for general search and the U.S. market for handheld general search.

107.    Google has the power to exclude competition in the U.S. market for general search and the U.S. market for handheld general search, and it has used that power, including by way of

- 31 -

its unlawful practices in restraint of trade as described herein, in an attempt to monopolize those relevant markets.

108.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-a-vis its rivals in the U.S. markets for general search and handheld general search.

109.    Google has combined with device manufacturers in an attempt to monopolize handheld general search and general search, with the effect being that competition is foreclosed, that innovation is stifled, and that consumer choice is gravely diminished.

110.    There is no business necessity or other pro-competitive justification for Google's conduct.

111.    Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property by way of Google's conduct, including by way of overpaying for their affected Android OS smartphones and tablets.

112.    Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store.  Plaintiffs and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE CLAYTON ACT**
**(15 U.S.C. § 14)**

113.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

114.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide federal law class described above.

115.    Under the MADAs described herein, manufacturers of Android OS smartphones and tablets wishing to pre-load onto a device any Google application contained in a Google-designated suite of apps must agree to pre-load *all* Google applications from that suite onto that device.  This suite of apps includes not only the YouTube app and Google Play client, among

- 32 -

others, but Google's Phone-top Search, *i.e.*, Google's search engine product, as well. Thus, a manufacturer wishing to pre-load YouTube or Google Play onto a device also is required to pre-install Google Phone-top Search on that device and to make it the default search engine "for all Web search access points on the Device." (Exs. A and B, ¶ 3.4.) These requirements mean, *inter alia*, that no rival search engine can compete for default search engine status on an affected device because, by definition, there can be only one default search engine.

116.    Google's MADAs are designed to lessen competition substantially and tend to create, or maintain and expand, Google's monopoly in the U.S. markets for general search and handheld general search.

117.    Plaintiffs and the federal law class have been harmed by Google's conduct, both in terms of the denial of choice and other injuries to competition and innovation, but also in terms of the supra-competitive prices they paid for their smartphones and tablets due to the inability of Google's rivals to compete for default search engine status or exclusive application pre-loading, including by way of paying device manufacturers fees for such status. Had Google's rivals been able to compete for such status on a given device, including by way of making payments to device manufacturer, the effect would have been to lower the cost to produce that device, and consumer prices would have been lower than what they were but for Google's unlawful conduct. For these reasons, Google's conduct has been a substantial factor in causing plaintiffs' and the federal law class's harm.

118.    Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store. Plaintiffs and the federal law class are entitled to an injunction, pursuant to 15 U.S.C. § 26, to prevent Google from persisting in its unlawful behavior to their detriment.

### FIFTH CAUSE OF ACTION
### VIOLATION OF THE CARTWRIGHT ACT
#### (CAL. BUS. & PROF. CODE § 16727)

119.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

- 33 -

120.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide California law class described above (hereafter "California law class"). Alternatively, if the Court does not apply California law on a nationwide basis, plaintiffs bring this claim on their own behalf and on behalf of each member of a California class, as described above.

121.     Under the MADAs described herein, manufacturers of Android OS smartphones and tablets wishing to pre-load onto a device any Google application contained in a Google-designated suite of apps must agree to pre-load *all* Google applications from that suite onto that device. This suite of apps includes not only the YouTube app and Google Play client, among others, but Google's Phone-top Search, *i.e.*, Google's search engine product, as well. Thus, a manufacturer wishing to pre-load YouTube or Google Play onto a device also is required to pre-install Google Phone-top Search on that device and to make it the default search engine "for all Web search access points on the Device." (Exs. A and B, ¶ 3.4.) These requirements mean, *inter alia*, that no rival search engine can compete for default search engine status on an affected device because, by definition, there can be only one default search engine.

122.     Google's MADAs are designed to lessen competition substantially and tend to create, or maintain and expand, Google's monopoly in the U.S. markets for handheld general search and general search.

123.     Plaintiffs and the proposed class have been harmed by Google's conduct, both in terms of the denial of choice and other injuries to competition and innovation, but also in terms of the supra-competitive prices they paid for their smartphones and tablets due to the inability of Google's rivals to compete for default search engine status or exclusive application pre-loading, including by way of paying device manufacturers fees for such status. Had Google's rivals been able to compete for such status on a given device, including by way of making payments to device manufacturer, the effect would have been to lower the cost to produce that device, and consumer prices would have been lower than what they were but for Google's unlawful conduct. For these reasons, Google's conduct has been a substantial factor in causing plaintiffs' and the proposed classes' harm.

124.     Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store.  Plaintiffs and the California law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

125.     Plaintiffs and the California law class also are entitled to treble damages based on the monetary injuries caused to them by Google's unlawful conduct, including overpayment for their mobile phones and tablets.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF THE UNFAIR COMPETITION ACT**
**(CAL. BUS. & PROF. CODE §§ 17200 *et seq.*)**

126.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

127.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide California law class described above.  Alternatively, if the Court does not apply California law on a nationwide basis, plaintiffs bring this claim on their own behalf and on behalf of each member of a California class, as described above.

128.     California's Unfair Competition Law ("UCL") defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice.  CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

129.     Google has engaged in, and, upon information and belief, continues to engage in, acts of unfair competition as defined in California's UCL.  These acts of unfair competition include its violations of the federal Sherman and Clayton Acts, as well as California's Cartwright Act, as alleged herein.

130.     Google's conduct has harmed competition and consumers.  Consumers have overpaid for their affected Android OS mobile phones and tablets due to the inability of Google's rivals to compete for default search engine status or exclusive application pre-loading, including by way of paying device manufacturers fees for such status.  Had Google's rivals been able to compete for such status on a given device, including by way of making payments to device

- 35 -

manufacturer, the effect would have been to lower the cost to produce that device, and consumer prices would have been lower than what they were but for Google's unlawful conduct.

131.    Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store.  Plaintiffs and the California law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

132.    Google also should be required to disgorge ill-gotten profits resulting from its practices described herein as they relate to handheld general search, and from these disgorged sums, plaintiffs and the class should be allowed restitution of the money they overpaid for their mobile phones and tablets.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request the following relief:

A.    That the Court certify this case as a class action; that it certify the proposed federal law class, and the proposed California law class, on the nationwide bases requested; and that it appoint them as class representatives and their counsel to be class counsel;

B.    That the Court award them and the proposed classes all appropriate relief, including, but not limited to, injunctive relief requiring that Google cease the practices effected by its MADAs as described herein, and declaratory relief, adjudging such practices unlawful, as well as monetary relief, whether by way of restitution or damages, including treble, multiple, or punitive restitution or damages where mandated by law or otherwise available, as well as recovery of their attorneys' fees, costs, and expenses;

C.    That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

D.    That the Court award them and proposed classes such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

CLASS ACTION COMPLAINT
010437-11  683086 V1

1

**JURY TRIAL DEMANDED**

2

Plaintiffs demand a trial by jury on all issues so triable.

3      DATED: May 1, 2014                      HAGENS BERMAN SOBOL SHAPIRO LLP

4

By _____/s/ Jeff D. Friedman_____

5                                                   Jeff D. Friedman
715 Hearst Avenue, Suite 202
6                                              Berkeley, CA 94710
Telephone: (510) 725-3000
7                                              Facsimile:  (510) 725-3001
jefff@hbsslaw.com
8

Steve W. Berman (*pro hac vice pending*)
9      George W. Sampson (*pro hac vice pending*)
Robert F. Lopez (*pro hac vice pending*)
10     HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
11     Seattle, WA  98101
Telephone:  (206) 623-7292
12     Facsimile:  (206) 623-0594
steve@hbsslaw.com
13     george@hbsslaw.com
robl@hbsslaw.com
14

15                                             *Attorneys for Plaintiff and the Proposed Classes*

16

17

18

19

20

21

22

23

24

25

26

27

28

- 37 -