# Exhibit A

EXECUTABLE

## MOBILE APPLICATION DISTRIBUTION AGREEMENT
### (ANDROID)

Google

Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Google BD Rep: Christine Moon

Google Sales Engineer: Lan Roche

Google Legal Contact: Helen Tsuo

**COMPANY:** Samsung Electronics Co., Ltd.

| | Company Contact Information: | Company Technical Contact: | Company Legal Notices to: |
|---|---|---|---|
| Attention: | Justin Cho | Jil Sahng | CS Han |
| Title: | Senior Manager | Principle Engineer | Senior Legal Counsel |
| Address, City, State, Postal Code, Country: | 416, Maetan- 3Dong, Yeongtong gu Suwon Si, Gyeonggi do 443-742 | 416, Maetan- 3Dong, Yeongtong-gu Suwon Si, Gyeonggi do 443-742 | 416, Maetan- 3Dong, Yeongtong-gu Suwon Si, Gyeonggi do 443-742 |
| Phone: | 82-10-2826-2567 | 82-10-7202-0098 | 82-10-7217-7242 |
| Fax: | 82-31-301-7636 | 02-31-301-7636 | 82-31-301-7636 |
| Email: | justin.cho@samsung.com | j.sahng@samsung.com | changsu.han@samsung.com |

Effective Date: January 1, 2011

Term: Starting on the Effective Date and continuing through December 31, 2012 (inclusive)

Renewal Term: None.

This Mobile Application Distribution Agreement, (referred to as the "Agreement"), effective as of the date noted above (the "Effective Date"), is made by and between Samsung Electronics Co., Ltd., a Korean corporation with offices at the address noted above ("Company"), and Google Inc., for itself and its Affiliates, (which, with its affiliates, shall be referred to herein as "Google") with offices at the address noted above.

1. **Definitions.** The following capitalized terms shall have the meanings set forth below:

    1.1. **"Actively Promote"** or **"Actively Promoting"** means the proactive promotion of a Google Application on any Device as a key value proposition of the device, including point of sale promotion, media advertising, and general consumer-focused promotion of a Google Application or Google services on any Device.

    1.2. **"Affiliates"** of a party means a company that controls or is controlled by, or is under common control with that party. For purposes of this definition, "control" means the ability to influence the acts of an entity by virtue of a controlling interest of 50% or more of the voting rights of the capital of such entity.

Page 1 of 14

Confidential
(Revd. 11/10)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## TRIAL EXHIBIT 2775

CASE NO. 10-03561 WHA
DATE ENTERED _____
BY _____
DEPUTY CLERK

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY       Oracle America v. Google, 3:10-cv-03561-WHA       GOOGLE-03371669

EXECUTABLE

1.3. **"Android Compatible Device(s)"** means Device(s) that: (i) comply with the Android Compatibility Definition document (which may be updated from time to time), which can be found at the Android compatibility website (http://source.android.com/compatibility); and (ii) successfully pass the Android Compatibility Test Suite (CTS).

1.4. **"Android Market"** means the marketplace Google has created and operates which allows registered Android Market developers to distribute Android Products.

1.5. **"Android Products"** means software, content and digital materials designed for use on Android-based devices.

1.6. **"Client ID"** means unique alphanumeric code(s) provided by Google to Company to be used to identify Google Applications usage on Company Devices, as such Client IDs may be modified by Google from time to time in its sole discretion upon notice to Company.

1.7. **"CTS Report"** means the report that is generated after the CTS is completed.

1.8. **"Default Home Screen"** means the default display of a Device, prior to any changes made by End Users, that appears without scrolling in both portrait and landscape modes when the Device is in active idle mode (i.e. not in sleep mode).

1.9. **"Device"** means the device(s) approved by Google pursuant to Section 4.3 (Google Approval and Launch) and using only the Android operating system which is enabled by Company and used by an End User to access the Service.

1.10. **"End User(s)"** means an end user customer of the Service.

1.11. **"Final Embed Date"** means the latest possible date Company can accept updated Google Applications from Google for a specific Device deployment.

1.12. **"Google Applications"** means the machine-readable binary code version of the Google applications listed below which are provided to Company in connection with this Agreement, and any modifications or updates thereto that Google may make available to Company hereunder from time to time in its sole discretion. List of Google Applications (may be changed by Google from time to time): Set-up Wizard, Google Phone-top Search, Gmail, Google Calendar, Google Talk, YouTube, Google Maps for Mobile, Google Street View, Contact Sync, Android Market Client (not products downloaded from Android Market), Google Voice Search, and Network Location Provider.

1.13. **"Google Applications Agreements"** means (i) the Mobile Services Distribution Agreement between the parties dated January 1, 2011 as applicable to Google Phone-top Search and all related amendments or similar between Google and Company and as updated and amended from time to time without reference to service levels or customizations set out in such agreements.

1.14. **"Google Mobile Branding Guidelines"** means Google's brand treatment guidelines for mobile in effect from time to time (and any content contained or referenced therein), which are located at http://www.google.com/wssynd/mobile_guidelines.html and http://www.google.com/permissions/guidelines.html (or such other URLs as may be provided by Google from time to time), together with such additional brand treatment guidelines for mobile as Google may make available to Company from time to time.

1.15. **"Intellectual Property Rights"** means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, unfair competition law, publicity rights law, privacy rights law, and any and all other proprietary rights, as well as, any and all applications, renewals, extensions, restorations and re-instatements thereof, now or hereafter in force and effect worldwide.

1.16. **"Launch"** means the initial distribution of a Device in accordance with the terms of this Agreement.

1.17. **"Optional Google Applications"** are the Google Applications listed below which are provided to Company in connection with this Agreement, and any modifications or updates thereto that Google may make available to

Page 2 of 14

Confidential
(Revd. 11/10)



EXECUTABLE

Company hereunder from time to time in its sole discretion. List of Optional Google Applications (may be changed by Google from time to time): Orkut, Google Goggles, Google Earth, Finance, News & Weather, Google Buzz and Google Voice. Optional Google Applications are licensed, and have the same rights and obligations, as Google Applications except that the requirements set forth in 3.4 (Placement Requirements) shall not apply and Company has the option of including the Optional Google Applications on a Device.

1.18. **"Phone Top"** means with respect to the default navigation hierarchy of a Device UI, the top-most level screen from which applications can be launched by an End User.

1.19. **"Service"** means the wireless service owned and/or operated by Telecom Operator that allows End Users using a Device to access the Internet.

1.20. **"Telecom Operator"** means a company that provides wireless service that allows End Users using a Device to access the Internet approved by Google to distribute Google Applications to End User in the Territories.

1.21. **"Territories"** means the country or countries in which distribution of Google Applications is permitted under the conditions as provided by Google to Company upon execution of this Agreement, which may be updated by Google from time to time. Distribution of Google Applications, products or services outside of the Territories is prohibited.

1.22. **"Trademarks"** means the trade names, trademarks, service marks, logos, domain names and other distinctive brand features of each party as owned by such party from time to time.

2. **Google Applications.**

2.1. **License Grant.** Subject to the terms and conditions of this Agreement (including Section 2.7), Google hereby grants to Company a nontransferable, nonsublicensable (except Company may sublicense to Telecom Operators with whom Company has a written agreement), nonexclusive license during the Term to: (a) reproduce the Google Applications to the extent necessary to exercise the right granted in (b); and (b) distribute the Google Applications for no cost directly to End Users only in the Territories specifically authorized by Google via the distribution methods specified by Google. For the sake of clarity, Company may sublicense the Google Applications to Affiliates, resellers and distributors for distribution or manufacturing purposes only when the Google Applications are pre-loaded on the Devices. Devices may only be distributed if all Google Applications (excluding any Optional Google Applications) authorized for distribution in the applicable Territory are pre-installed on the Device, unless otherwise approved by Google in writing. Initial distribution in each individual Territory, and the appearance and implementation of Google Applications, shall be subject to Google's prior written approval, and shall adhere to the terms and conditions of this Agreement, including but not limited to the Google Mobile Branding Guidelines. Additionally, where Google specifies a specific version of a Google Application to be distributed in a certain Territory, Company shall distribute only such version within such Territory. Company may also sublicense the Google Applications to its contractors for testing, evaluation and development purposes only (not distribution) and only with contractors with which Company has a written agreement that is no less protective of the Google Applications as set forth in this Agreement.

2.2. **License Grant Restrictions.** Company shall not and shall not –assist, instruct, or encourage any third party to: (a) disassemble, de-compile or otherwise reverse engineer the Google Applications or otherwise attempt to learn the source code or algorithms underlying the Google Applications; (b) create derivative works from or based on the source code or algorithms underlying the Google Applications; (c) except as expressly set forth in this Agreement, provide, sell, license, distribute, lease, lend, or disclose the Google Applications to any third party; (d) exceed the scope of any license granted to Company hereunder; (e) ship, divert, transship, transfer, export or re-export the Google Applications, or any component thereof, into any country or use it in any manner prohibited by any export control laws, restrictions, or regulations administered by the U.S. Commerce Department's Bureau of Export Administration, the U.S. Department of Treasury's Office of Foreign Assets Control or any other applicable government agency; or (f) take any actions that may cause or result in the fragmentation of Android, including but not limited to the distribution by Company of a software development kit (SDK) derived from Android or derived from Android Compatible Devices and Company shall not assist, instruct or encourage any third party to distribute a software development kit (SDK) derived from Android, or derived from Android Compatible Devices.

Page 3 of 14

Confidential
(Revd. 11/10)



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-03371671

EXECUTABLE

2.3.     **Delivery.** Upon availability, Google shall deliver the Google Applications to Company. For the sake of clarity, the parties acknowledge and agree that Google has no obligation to develop or deliver any Google Application, and any such development or delivery is at Google's sole discretion. Company shall use commercially reasonable efforts to commence distribution of updated versions of Google Applications promptly after such updated versions of Google Applications are made available by Google, but no more than 60 days after availability.

2.4.     **Form of Distribution Offering.** (a) During the Term, upon Google's approval as described in Section 4.3, Company shall make the Google Applications available to End Users on the Device as described in this Agreement. For the sake of clarity, Company has no obligation to install the Google Applications on all of its devices. The form of any such offering shall be as set forth in this Agreement, and shall adhere to the Google Mobile Branding Guidelines. Without limiting the foregoing sentence, except for End Users as expressly set forth in this Agreement, Company shall not offer or distribute the Google Applications to any third party (except as set forth in Section 2.1). (b) Company shall not, and shall not assist, instruct or encourage any third party to: (i) serve or otherwise place any advertisements during the launch process of the Google Applications; (ii) offer, download or install, or allow any third party to offer, download or install, any additional products during the launch process of the Google Applications; or (iii) preload, install or launch any Google Application (or otherwise act or fail to act) such that an End User is denied the opportunity to review and accept (or reject) the relevant Google terms of service

2.5.     **Accurate Reproduction.** Company agrees that in connection with its exercise of the rights granted in 2.1 of this Agreement, it will accurately reproduce the Google Applications (including any legal notices and marks contained therein) and will not insert into the Google Applications any viruses, worms, date bombs, time bombs, or other code that is specifically designed to cause the Google Applications to cease operating, or to damage, interrupt, allow access to or interfere with any Google Applications or End User data.

2.6.     **Open Devices.** The parties will create an open environment for the Devices by making all Android Products and Android Application Programming Interfaces available and open on the Devices and will take no action to limit or restrict the Android platform.

2.7.     **Authorization to Distribute Google Applications on the Devices & Compatibility.**

The license to distribute Google Applications in Section 2.1 is contingent upon the Device becoming an Android Compatible Device. Each Device must become an Android Compatible Device at least 30 days prior to the Final Embed Date of the Device. The final software build on Devices must pass the Compatibility Test Suite prior to Launch. Company agrees as follows:

(a) each of its employees that are designated by Company in an email to CTS@android.com is authorized to submit and upload CTS Reports on behalf of Company.

(b) the CTS has not been modified or altered by Company or its employees or agents.

(c) Company will execute the CTS completely.

(d) no CTS Reports have been altered.

(e) the contents of each CTS Report is true to the best of Company's knowledge.

(f) Google and its affiliates may include the name of Android Compatible Devices and Company's name in presentations, marketing materials, press releases, and customer lists (which includes, without limitation, customer lists posted on Google web sites) for marketing purposes only after Company's written approval which shall not be unreasonably withheld. Google may publish the results of each CTS Report after the applicable Device is Launched.

2.8.     **Other Agreements.** This Agreement will supersede any agreements between the parties regarding Android-powered devices, but will have no affect on any other agreements between the parties regarding other devices or Google services or applications.

Page 4 of 14

Confidential
(Revd. 11/10)



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-03371672

EXECUTABLE

3. **Device Distribution Requirements.**

3.1. Company agrees that it will be solely responsible for the distribution of the Devices and managing its inventory.

3.2. Unless otherwise permitted in writing by Google, Company will ensure that Devices distributed in Germany make use of the "Google Mail" (and not "Gmail") Google Trademark;

3.3. Company understands and agrees that it shall not Actively Promote, and shall not assist or encourage any third party in Actively Promoting Google Applications or any Google services except in those Territories in which such Google Applications or services are expressly authorized by Google in this Agreement. Specific information regarding Territories will be provided to Company after Company's acceptance of this Agreement.

3.4. **Placement Requirements.** Unless otherwise approved by Google in writing: (1) Company will preload all Google Applications approved in the applicable Territory or Territories on each Device; (2) Google Phone-top Search and the Android Market Client icon must be placed at least on the panel immediately adjacent to the Default Home Screen; (3) all other Google Applications will be placed no more than one level below the Phone Top; and (4) Google Phone-top Search must be set as the default search provider for all search access points on the Device. Notwithstanding the foregoing, there are no placement requirements for Optional Google Applications.

3.5. **Distribution.** Company shall preload the Google Applications on the Devices so that, after preload, an icon representing each Google Application shall appear on the Device as specified in the above Placement Requirements. In addition:

(a) Preload by Company of a Google Application shall be limited to installation by Company of the Google Application, and shall not involve launch of the Google Application

(b) End User selection of an icon representing an already preloaded Google Application shall launch such Google Application.

3.6. **Support.** Each party is responsible for customer care and support of its users. Google will provide support for Google Applications as made generally available to users of Google Applications.

3.7. **Branding.** Branding on the hardware of the Devices will be determined by Company, but shall not include any Google branding or Google Trademarks without Google's approval.

3.8. **Network Location Provider.** The following requirements apply to Network Location Provider:

(a) Company shall ensure Network Location Provider will be turned off by default.

(b) Company shall ensure that the appropriate prompts are displayed to the End User seeking the End User's consent to use Network Location Provider as provided by Google. Company shall not prevent the End User from providing consent prior to enabling Network Location Provider or any application making use of Network Location Provider.

(c) Company shall configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices.

(d) Company will enable all features of Network Location Provider, including network-based location resolution, anonymous network location data collection, and reverse-geocoding.

3.9. **Google Legal Terms.** Company shall ensure that the appropriate Google Terms of Service, Privacy Policy and Legal Notices as provided by Google are available to the End User as provided by Google.

Confidential
(Revd. 11/10)



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-03371673

**Trial Exhibit 2775 Page 5 of 14**

4. **General Requirements.**

4.1.  Payments. (a) Except as set forth in this Section 4.1, Company and Google shall each retain any and all revenue generated from provision of their respective products or services.  For the sake of clarity, except as expressly set forth in this Agreement, neither party shall be required to account to the other or otherwise make any payment to the other regarding the Applications, Google products or services, the Devices, the Service or any revenue generated therefrom.

(b) For each month during the applicable Term of the Google Applications Agreement (as "Term" is defined in the applicable Google Applications Agreement), Google shall make payments to Company in accordance with the applicable Google Applications Agreement.  Nothing in this Agreement will change the Term of the Google Applications Agreements (as "Term" is defined in each such Google Applications Agreement).

4.2.  Reports. Within thirty (30) days of the end of each calendar quarter during the Term, Company shall provide a written report of the total number of Devices distributed with a preloaded version of a Google Application during such calendar quarter (by Google Application, Territory, and Device model within each Territory, to the extent that such reporting is available. These reports will be submitted to android-partner-support@google.com.

4.3.  Google Approval and Launch. Company's distribution and implementation of the Google Applications shall be subject to Google's prior approval (not to be unreasonably withheld) to ensure adherence to the terms and conditions of this Agreement, including but not limited to the Google Mobile Branding Guidelines. Company shall not Launch any Device incorporating the Google Applications until it has obtained Google's approval as set forth in (a), (b) and (c) (as applicable) below:

(a) For the initial Launch of each Device model, Company will complete a Device Launch Addendum in the form set forth on Exhibit A. Google will review the Device Launch Addendum and will notify Company of any problems. Once the parties mutually agree on the Device Launch Addendum, the parties must sign the Device Launch Addendum to make it effective. Company will: (1) no less than 30 days before the initial Launch, notify Google via email (or via a website provided by Google) of such Launch; (2) provide Device samples in accordance with Section 4.4(a) below; (3) submit a CTS Report for such Launch; and (4) submit the Device's final software build for such Launch.

(b) For any subsequent Launches of a Device model after the initial Launch of such Device model, including software changes for any new Telecom Operator in each new Territory or any software updates for any previously approved Launch, Company must obtain Google's written (which may be by way of email) approval (not to be unreasonably withheld) prior to Launch. Company will: (1) no less than 30 days before each Launch Date, notify Google via email (or via a website provided by Google) before each Launch; (2) submit a CTS Report for each Launch; and (3) if requested by Google, submit the Device's final software build for such Launch.

(c) Google must provide approval (as defined in Sections 4.3(a) or 4.3(b), as applicable) of the implementation of the Google Applications on the Device in writing before distribution of any Device and such Device must only be distributed in Territories and with Telecom Operators as approved by Google. Upon receipt of each such Google approval, Company will begin distribution and implementation in accordance with this Agreement (each a "Launch Date"). Company will provide contact information to facilitate Google's communication regarding approvals to Company. Company will provide written confirmation to Google of Launch promptly following each Launch Date. Company agrees that the restrictions, including restrictions against Active Promotion, set forth at the following web site (or other URL provided by Google and as updated by Google from time-to-time) shall apply to all Launches unless otherwise approved by Google in writing: https://sites.google.com/a/google.com/gms_distribution/geo-availability-of-google-applications. Company will provide a monthly report on shipment volumes and applicable Territories for each Device.

4.4.  Implementation Requirements. The parties shall provide the materials and information listed below:

(a) At least 30 days prior to the Final Embed Date for each initial Launch of each Device model incorporating the Google Applications, Company shall deliver to Google no less than four (4) Device samples for such Device model for Google's approval as set out in Section 4.3 (Google Approval and Launch). Google may use such Devices to test the operation and presentation of relevant Google products, services and sites on the Device. Devices will be sent to a Google address to be provided by Google to Company.

Page 6 of 14

Confidential
(Revd. 11/10)

EXECUTABLE

(b) If at any time the Devices provided under this Section 4.4 are no longer capable of displaying the current implementation of relevant Google products, services or sites, Company will provide Google with replacement Devices as required.

(c) If at any time the software on the Devices as distributed to End Users changes the representation of Google products, services and sites, Company shall make available to Google the new software and / or Devices for approval.

(d) Company agrees to assist Google with ongoing testing of Devices and Android applications.  Google may from time to time provide Company with Android-based applications and tests that should be run on Devices (which may represent families of Devices) on which such applications will be loaded to assure the operation and presentation of such application. Company will load such applications on Devices and run such test in a timely manner to help assess the operation and presentation of such applications and provide the test results to Google.

(e) Company shall configure the appropriate Client ID for each Device as provided by Google.

(f) Company shall use its best efforts to provide all other information, equipment and/or assistance reasonably necessary to allow Google to deliver the Google Applications and make the Google Applications (including over-the-air updates thereto) available on the Service and the Devices.

4.5.    **Over-the-Air Updates.**  Google may auto-update Google Applications over-the-air at Google's discretion. Company shall not prevent such over-the-air auto-update. In Google's sole discretion, Google may enable Company to provide Device builds to Google for distribution by Google to Devices via an over-the-air update. Company hereby grants Google a non-exclusive, worldwide, license to distribute the Device build during the Term. Nothing in this Agreement shall require Company to provide Device builds for Google to distribute and Google shall not be obligated to distribute such Device builds.

4.6.    **Site Pages.**  Company shall not, and shall not assist, instruct or encourage any third party to, redirect an End User away from, block access to, frame, or modify or change the look or feel of any web page or web site accessed via a Google Application, or place anything on or near any web site page that in any way implies that Google is responsible for the contents of such page.

4.7.    **Data Collection and Reporting.** Each party's applicable privacy and security policies shall apply with respect to the user information collected by it. The parties will provide each other reasonable aggregate information about usage of the Devices during the Term, in order to help each party improve End User's experience with the Device, consistent with each party's privacy policies. Such information will not involve any personally identifiable information.

4.8.    **Telecom Operator Customer Restrictions.**  The parties acknowledge and agree that the placement and distribution obligations contained in Section 3.4 and Section 4.3 are subject to restrictions placed upon Company by its direct Telecom Operator customers.  However, pursuant to Section 3.4 and Section 4.3, any such placement and distribution, including the appearance of Google Applications, shall be subject to Google's prior written approval, and shall adhere to the terms and conditions of this Agreement, including but not limited to the Google Mobile Branding Guidelines.

4.9.    **No Connectivity Notice.**  When an End User launches a Device's web browser or launches a Google Application and there is no data connectivity available, Company will not block, alter or prevent in any way the presentation of any message to such End User indicating lack of data connectivity.

4.10. **Points of Contact.** Each party shall each appoint a partner manager (the "Partner Manager") who shall be the point of contact for all issues concerning this Agreement.   Company's primary communication with Google regarding this Agreement will be through email sent to justin.cho@samsung.com.



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          Oracle America v. Google, 3:10-cv-03561-WHA                    GOOGLE-03371675

**Trial Exhibit 2775 Page 7 of 14**

EXECUTABLE

5. **Term and Termination.**

5.1. **Term.** The term of this Agreement shall begin on the Effective Date and continue for a period of two (2) years after the Effective Date, unless earlier terminated as provided in this Agreement. This Agreement shall not renew unless specifically agreed by the parties in writing.

5.2. **Termination.** (a) Either party may suspend performance or terminate this Agreement if (i) the other party is in material breach of the Agreement and fails to cure that breach within thirty (30) days after written notice; or (ii) the other party ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within ninety (90) days. (b) Notwithstanding the foregoing, either party may terminate this Agreement immediately upon written notice upon a breach of Sections 2.1 to 2.2 (License Grant and Restrictions), Section 2.4(b)(iii) (opportunity to review and accept Google terms of service), Section 2.5 (Accurate Reproduction), Section 6.1 (Confidentiality) or Section 7 (Trademarks), or as set forth in Section 12.4 (Change of Control). (c) Notwithstanding anything to the contrary, in the event that the government or controlling body of any country or territory in which the Google Applications are distributed or made available imposes any law, restriction or regulation that makes it illegal to distribute or make available the Google Applications, or any portion thereof, into such country or territory, or if any such law, restriction or regulation places a substantial burden on Google, where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment (such substantial burden, a "Substantial Burden"), then Google shall have the right to suspend the distribution and/or availability of such Google Applications in such country or territory until such time as such law, restriction or regulation is repealed or nullified or modified such that there it is no longer illegal or a Substantial Burden, as applicable, for the Google Applications to be distributed or made available in such country or territory ("Special Suspension").

5.3. **Effect of Termination.** Upon expiration or termination of this Agreement: (a) all rights and licenses granted hereunder shall immediately cease; (b) Company will immediately stop reproducing, offering or distributing the Google Applications; and (c) each Party shall return or destroy (and a duly appointed officer shall certify to such destruction) all copies of the Google Applications (in the case of Company) and any other Confidential Information in its possession which it is aware and to which it has access and is reasonably able to destroy or delete (which, for the avoidance of doubt, does not include archived backup copies which are not in live working use and which are no longer easily accessible or retrievable), including from all hard disks and memory. Neither party shall be liable to the other for any damages resulting solely from termination of this Agreement as permitted for under this Agreement.

5.4. **Sell-Off Right.** Notwithstanding the provisions of Section 5.3 above, for a period of ninety (90) days following expiration or termination of this Agreement ("Sell-Off Period"), Company shall have the right to distribute in accordance with the terms and conditions of this Agreement all Google Application(s) actually preloaded on the Device inventory as of the date of expiration or termination of this Agreement ("Inventory"), and such party shall have the right to use the Google Trademarks in accordance with this Agreement in connection with such Inventory ("Sell-Off Right"); provided, however, that Company shall provide no less than thirty (30) days prior written notification to Google of its intent to exercise the Sell-Off Right ("Sell-Off Right Notice"). Notwithstanding anything to the contrary, the Sell-Off Right shall not apply in the event that either (a) Company does not provide the Sell-Off Right Notice as set forth above in this Section 5.4, or (b) this Agreement (or any right granted hereunder) is suspended or terminated by Google pursuant to Section 5.2 of this Agreement.

5.5. **Survival.** The provisions of Sections 1 (Definitions), 2.2 (License Grant Restrictions), 5.5 (Survival), 6.1 (Confidentiality), 8 (Proprietary Rights), 9.2 (Disclaimer), 10 (Limitation of Liability), 11 (Indemnification) and 12 (General) shall survive expiration or termination of this Agreement.

6. **Confidentiality and PR.**

6.1. **Confidentiality.** (a) Definition. "Confidential Information" is information disclosed by one party to the other party under this Agreement that is marked as confidential or would normally under the circumstances be considered confidential information of the disclosing party. Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another party. (b) Confidentiality Obligations. The recipient will not disclose the Confidential Information, except to affiliates, employees, and

Page 8 of 14

Confidential
(Revd. 11/10)



**Trial Exhibit 2775 Page 8 of 14**

EXECUTABLE

agents who need to know it and who have agreed in writing to keep it confidential. The recipient, its affiliates, employees, and agents may use Confidential Information only to exercise rights and fulfill obligations under this agreement, while using reasonable care to protect it. The recipient may also disclose Confidential Information when required by law after giving reasonable notice to discloser.

6.2.     **Publicity.**  Except as set forth in Section 2.7, neither party may make any public statement regarding the relationship contemplated by this Agreement without the other's prior written approval. Requests for marketing, press releases and other publicity issues should be made by submitting a request at http://services.google.com/permissions/application (and selecting the appropriate Android entry in the "Request Type" menu).

7.  **Trademarks.**

7.1.     **General.** Each party shall own all right, title and interest, including without limitation all Intellectual Property Rights, relating to its Trademarks.  Some, but not all examples of Google Trademarks are located at: http://www.google.com/permissions/trademarks.html (or such other URLs Google may provide from time to time). Except to the limited extent expressly provided in this Agreement, neither party grants, and the other party shall not acquire, any right, title or interest (including, without limitation, any implied license) in or to any Trademarks of the first party; and all rights not expressly granted herein are deemed withheld.  All use by Google of Company Trademarks (including any goodwill associated therewith) shall inure to the benefit of Company and all use by Company of Google Trademarks (including any goodwill associated therewith) shall inure to the benefit of Google.  No party shall challenge or assist others to challenge the Trademarks of the other party (except to protect such party's rights with respect to its own Trademarks) or the registration thereof by the other party, nor shall either party attempt to register any Trademarks or domain names that are confusingly similar to those of the other party.

7.2.     **License to Google Trademarks.**  Subject to Google's written approval prior to each use of a Google Trademark and to the terms and conditions of this Agreement, Google grants to Company a limited, nonexclusive and nonsublicensable license during the Term to display those Google Trademarks expressly authorized for use in this Agreement, solely for the purposes expressly set forth herein.  Notwithstanding anything to the contrary, Google may revoke the license granted herein to use Google's Trademarks upon providing Company with written notice thereof and a reasonable period of time to cease such usage.  Furthermore, in its use of any Google Trademarks, Company agrees to adhere to the Google Mobile Branding Guidelines.

Company shall not, and shall not assist, instruct or encourage any third party to produce any consumer packaging or materials for the Device that identifies or suggests that Google is the manufacturer of the Device.  In this regard, Company shall ensure that any Device packaging or user guide produced by the Company identifies Company as the manufacturer of the Device and provides contact details in the applicable Territories in which the Device is distributed.

7.3.     **License to Company Trademarks.**  Subject to the terms and conditions of this Agreement, Company grants to Google a limited, nonexclusive and nonsublicensable license during the Term to display those Company Trademarks expressly authorized for use in Section 2.7 of this Agreement, solely for the purposes expressly set forth herein.  Google must get Company's prior written approval for the use of Company Trademarks not set forth in Section 2.7 of this Agreement.  Notwithstanding anything to the contrary, Company may revoke the license granted herein to use Company's Trademarks upon providing Google with written notice thereof and a reasonable period of time to cease such usage.  Furthermore, in its use of any Company Trademarks, Google agrees to adhere to the Company Mobile Branding Guidelines.

8.  **Proprietary Rights.** (a) Company acknowledges that, as between the parties, Google (and/or its licensors) retains all right, title and interest, including without limitation all rights in copyrights, trademarks, trade secrets, patents and know-how, in and to the Google Applications and the Google Trademarks. Company has, and shall acquire, no rights in the foregoing except those expressly granted by this Agreement.  Google shall not be restricted from selling, licensing, modifying, or otherwise distributing the Google Applications and/or the Google Trademarks to any third party. (b) Google acknowledges that, as between the parties, Company (and/or its licensors) retains all right, title and interest, including without limitation all rights in copyrights, trademarks, trade secrets, patents and know-how, in and to the Devices and the Company Trademarks. Google has, and shall acquire, no rights in the foregoing except those expressly granted by this

Page 9 of 14

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-03371677

**Trial Exhibit 2775 Page 9 of 14**

EXECUTABLE

Agreement. Except as set forth in this Agreement, Company shall not be restricted from selling, licensing, modifying, or otherwise distributing the Devices and/or the Company Trademarks to any third party.

9.  **Representations, Warranties and Disclaimer.**

    9.1.   **Representations and Warranties.** Each party represents and warrants to the other that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its affiliates are a party or violate any rights of any third parties arising therefrom. Company represents and warrants that it has and will maintain throughout the Term all rights, authorizations and licenses that are required with respect to the Devices, any materials provided by Company to be distributed by Google (including Company's Device builds but excluding any Google materials and software, that are incorporated in the Device builds) and any Company content or services, and that the Devices, materials provided by Company to Google, and the Company's content or services, and their use, distribution, sale and license, do and shall continue to comply with all applicable foreign, federal, state, and local laws, rules and regulations. Company represents and warrants that any materials provided by Company to be distributed by Google (including Company's Device builds but excluding any Google materials and software that are incorporated in the Device builds) will comply with all applicable open source licensing requirements.

    9.2.   **Disclaimer.** BETWEEN THE PARTIES, OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 9.1, THE GOOGLE APPLICATIONS AND THE ANDROID PLATFORM ARE PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND AND GOOGLE EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. GOOGLE DOES NOT WARRANT THAT THE GOOGLE APPLICATIONS AND/OR ANY OTHER GOOGLE PRODUCTS OR SERVICES PROVIDED HEREUNDER WILL MEET ALL OF COMPANY'S REQUIREMENTS OR THAT PERFORMANCE OF SUCH SERVICES WILL BE UNINTERRUPTED, VIRUS-FREE, SECURE OR ERROR-FREE. OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 9.1, THE DEVICES ARE PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND AND COMPANY MAKES NO WARRANTY OF ANY KIND TO GOOGLE WITH RESPECT TO THE DEVICES, AND EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, COMPANY DOES NOT WARRANT THAT THE DEVICES WILL BE UNINTERRUPTED, VIRUS-FREE, SECURE OR ERROR-FREE.

10. **Limitation of Liability.**

    10.1.  **Limitations.** SUBJECT TO SECTION 10.2: (A) LIMITATION ON INDIRECT LIABILITY. NEITHER PARTY MAY BE HELD LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR ANY DAMAGES OTHER THAN DIRECT DAMAGES, EVEN IF THE PARTY IS AWARE OR SHOULD KNOW THAT SUCH DAMAGES ARE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY. (B) LIMITATION ON AMOUNT OF LIABILITY. NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR MORE THAN ONE HUNDRED THOUSAND U.S. DOLLARS ($100,000.00 USD).

    10.2.  **Exceptions to Limitations.** These limitations of liability do not apply to: (a) breaches of confidentiality obligations, violations of Intellectual Property Rights (including without limitation a breach of the license to use Trademarks under Section 2.1-2.2 (License Grant and Restrictions), Section 2.4(b)(iii) (opportunity to review and accept Google terms of service), or Section 2.5 (Accurate Reproduction).

    10.3.  **Allocation of Risk.** The parties agree that (a) the mutual agreements made in this Section 10 reflect a reasonable allocation of risk, and (b) that each party would not enter into the Agreement without these limitations on liability.

Confidential
(Revd. 11/10)



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY        Oracle America v. Google, 3:10-cv-03561-WHA        GOOGLE-03371678

**Trial Exhibit 2775 Page 10 of 14**

EXECUTABLE

## 11. Indemnification.

**11.1. By Google.** Google will defend, or at its option settle, any third party lawsuit or proceeding brought against Company based upon or otherwise arising out of: (a) any breach or claimed breach of the first sentence of Section 9.1; (b) any claim that the Google Applications or Google Trademarks infringe any Intellectual Property Right; or (c) any third party claim arising out of or resulting from End User's use of any Google Application. Notwithstanding the foregoing, in no event shall Google have any obligations or liability under this Section 11.1 arising from: (i) modifications of the Google Applications or the Google Trademarks by any party other than Google; and (ii) combination of the Google Applications or the Google Trademarks with any other software or products or any other materials. Google, in its sole and reasonable discretion, reserves the right to terminate Company's continued distribution of or access to the Google Applications or the Google Trademarks which are alleged or believed by Google to infringe the rights of a third party. Google shall have no obligations under this Section 11.1 regarding the Android platform or any third party products distributed through the Android Market.

**11.2. By Company.** Company will defend, or at its option settle, any third party lawsuit or proceeding brought against Google based upon or otherwise arising out of: (a) any breach or claimed breach of Section 9.1; (b) the improper or unauthorized replication, packaging, marketing, distribution, or installation of the Google Applications by Company or its Affiliates in violation of this Agreement, including without limitation claims based on representations, warranties, or misrepresentations made by Company; (c) any breach or claimed breach of Sections 2.4(b)(iii), Section 3.2 (Google Mail), or Section 3.3 (Actively Promote); (d) any claim that any Device (or application installed thereon other than the Google Applications), or any Company Trademark infringes any Intellectual Property Right; or (e) any third party claim arising out of or resulting from End User's use of any Device (or application installed thereon other than the Google Applications), including without limitation any actions or claims in product liability, tort, contract or equity.

**11.3. Conditions of Indemnification.** The party seeking indemnification must promptly notify the other party of the claim and cooperate with the other party in defending the claim. The indemnifying party has full control and authority over the defense, but the other party may join in the defense with its own counsel at its own expense. THE INDEMNITIES ABOVE ARE THE ONLY REMEDY UNDER THIS AGREEMENT FOR VIOLATION OF A THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.

## 12. General.

**12.1. Notices.** All notices must be in writing and addressed to the attention of the other party's Legal Department and primary point of contact. Notice will be deemed given (a) when verified by written receipt if sent by personal courier, overnight courier, or mail; or (b) when verified by automated receipt or electronic logs if sent by facsimile or email.

**12.2. Force Majeure.** Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.

**12.3. Assignment.** Neither party may assign or transfer any part of this Agreement without the written consent of the other party, except to an affiliate but only if (a) the assignee agrees in writing to be bound by the terms of this Agreement and (b) the assigning party remains liable for obligations under the Agreement. Any other attempt to transfer or assign is void.

**12.4. Change of Control.** Upon a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction), (a) the party experiencing the change of control will provide written notice to the other party within 30 days after the change of control, and (b) the other party may immediately terminate this Agreement any time between the change of control and 30 days after it receives the written notice in subsection (a) of this Section 12.4.

**12.5. No Waiver; Severability; No Agency; No Third-Party Beneficiaries.** Failure to enforce any provision will not constitute a waiver. If any provision is found unenforceable, it and any related provisions will be interpreted to best accomplish the unenforceable provision's essential purpose. The parties are independent contractors, and this Agreement does not create an agency, partnership or joint venture. There are no third-party beneficiaries to this Agreement.

Confidential
(Revd. 11/10)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY        Oracle America v. Google, 3:10-cv-03561-WHA                    GOOGLE-03371679

**Trial Exhibit 2775 Page 11 of 14**

EXECUTABLE

12.6. **Controlling Law.** This Agreement, and all matters arising out of or relating to this Agreement, shall be governed by the laws of the State of New York. All disputes, controversies or difference which may arise between the parties out of or relation to or in connection with this Agreement should be settled amicably through friendly negotiation. In the event of any controversy or claim arising out of or relating to any provision of this Agreement or the breach thereof, except as set forth in the last sentence of this Section 12.6, such controversy or claim shall be finally settled in accordance with the Rules of Arbitration of the International Chamber of Commerce by three (3) arbitrators appointed in accordance with the said Rules unless the parties agree on the name of a sole arbitrator. The arbitration shall be held in Singapore, and shall be conducted in the English language. Notwithstanding anything above, such arbitration proceedings shall in no way impair or limit the right of either party to seek injunctive relief without recourse to arbitration, or to otherwise pursue immediate relief needed to prevent the breach of this Agreement. Notwithstanding the foregoing or anything to the contrary, any and all disputes, controversies or claims relating to one party's alleged or actual infringement of the Intellectual Property Rights related to this Agreement of the other party shall be instituted in a state or federal court in the Manhattan borough of New York City, New York, and Google and Company agree to submit to the exclusive jurisdiction of, and agree that venue is proper in, these courts in any such legal action or proceeding.

12.7. **Entire Agreement; Amendments; Counterparts.** This Agreement is the parties' entire agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject. Any amendment must be in writing and expressly state that it is amending this Agreement. The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

Confidential
(Revd. 11/10)



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY        Oracle America v. Google, 3:10-cv-03561-WHA        GOOGLE-03371680

**Trial Exhibit 2775 Page 12 of 14**

EXECUTABLE

IN WITNESS WHEREOF, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

COMPANY: Samsung Electronics Co., Ltd.

By _____

Name  Byung-Hwan Kim

Title  Senior Vice President

Date  January 5, 2011

GOOGLE INC.

By  Andy Rubin

Name  VP

Title  1/11/2011

Date



Page 13 of 14

Confidential
(Revd. 11/10)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY        Oracle America v. Google, 3:10-cv-03561-WHA        GOOGLE-03371681

**Trial Exhibit 2775 Page 13 of 14**

EXECUTABLE

## EXHIBIT A

### FORM OF

#### DEVICE LAUNCH ADDENDUM #___

This Device Launch Addendum is entered under and subject to the Mobile Application Distribution Agreement effective **[INSERT DATE]** between **[INSERT COMPANY NAME]** (Company) and Google Inc. (Google) (the "MADA").

Upon execution of this Addendum, **[INSERT COMPANY NAME]** Google agree to the Launch the Device as set forth below. No Launch may proceed until the both parties confirm Terminal Acceptance in writing.  All Launches are subject to the terms and conditions of the MADA.

| Device | Device Specifications | Device Image *(optional)* |
|---|---|---|
|  |  |  |

| Initial Territory(ies) | Initial Telecom Operator(s) | Target Launch Date | Device Forecast for the Territory | Target Terminal Acceptance Date | List of Google Applications | Restrictions on Google Applications (e.g., No YouTube in China) | Google Trademark *(if any)* |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

**Additional Terms (if any):**

**COMPANY:** _____

By _____

Name _____

Title _____

Date _____

**GOOGLE INC.**

By _____

Name _____

Title _____

Date _____

Page 14 of 14

Confidential
(Revd. 11/10)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-03371682

**Trial Exhibit 2775 Page 14 of 14**