BINGHAM MCCUTCHEN LLP
Brian C. Rocca (SBN 221576)
  brian.rocca@bingham.com
Sujal J. Shah (SBN 215230)
Susan J. Welch (SBN 232620)
Three Embarcadero Center
San Francisco, CA  94111
Telephone:  415.393.2000
Facsimile:  415.393.2286

WILLIAMS & CONNOLLY LLP
John E. Schmidtlein (SBN 163520)
  jschmidtlein@wc.com
Jonathan B. Pitt (*pro hac vice*)
James H. Weingarten (*pro hac vice*)
Benjamin M. Stoll (*pro hac vice*)
725 12th St NW
Washington DC 20005
Telephone: 202.434.5000
Facsimile: 202.434.5029

BINGHAM MCCUTCHEN LLP
Hill B. Wellford (*pro hac vice* )
  hill.wellford@bingham.com
Jon R. Roellke (*pro hac vice*)
Gregory F. Wells (SBN 212419)
2020 K Street NW
Washington, DC 20006
Telephone:  202.373.6000
Facsimile:  202.373.6001

Attorneys for Defendant
Google Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

GARY FEITELSON, a Kentucky resident, and DANIEL MCKEE, an Iowa resident, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GOOGLE INC., a Delaware corporation,

Defendant.

No. 5:14-cv-02007 BLF

**DEFENDANT GOOGLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT; MEMO OF POINTS AND AUTHORITIES IN SUPPORT**

**(PROPOSED ORDER FILED CONCURRENTLY)**

Date:          November 20, 2014
Time.         9:00 a.m.
Judge:       Hon. Beth Labson Freeman
Dept.         Courtroom 3, 5th Floor

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

I.    INTRODUCTION ............................................................................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND...................................... 4

    A.    The Android Operating System ........................................................... 4

    B.    Google's Mobile Application Distribution Agreement ("MADA") .... 4

    C.    Named Plaintiffs ................................................................................... 6

    D.    Summary of Amended Allegations ...................................................... 7

III.  SUMMARY OF CLAIMS ............................................................................... 8

IV.  STATEMENT OF ISSUES TO BE DECIDED .............................................. 9

V.   LEGAL STANDARD ...................................................................................... 9

VI.  PLAINTIFFS FAIL TO ALLEGE FORECLOSURE OR SUFFICIENT EFFECT ON COMMERCE TO SUPPORT ANY OF THEIR ANTITRUST CLAIMS ............. 10

    A.    Plaintiffs Fail to Allege Exclusive Dealing Under Sherman Act § 1 (Claim 1) ........................................................................................... 10

        1.    Plaintiffs fail to allege any exclusivity .................................... 11

        2.    Plaintiffs concede the availability of alternative distribution channels ................................................................................... 12

        3.    Plaintiffs fail to allege substantial market foreclosure ............ 14

    B.    Plaintiffs Have Abandoned Tying Under Sherman Act § 1 (Claim 1) ............... 15

    C.    Plaintiffs Fail to Allege Actionable "Exclusionary Conduct" Under Sherman Act § 2 (Claims 2 and 3) .................................................... 16

VII. PLAINTIFFS FAIL TO ALLEGE A CLAIM UNDER CLAYTON ACT § 3 ............. 18

VIII. PLAINTIFFS FAIL TO ALLEGE ANTITRUST INJURY AND LACK ANTITRUST STANDING ................................................................................... 18

    A.    Plaintiffs Fail To Allege Antitrust Injury Because Their Alleged Injuries In The Handheld Device Market Did Not Occur In The Market Where Competition Was Allegedly Restrained ...................... 19

    B.    Plaintiffs' Alleged Injuries In The Handheld Device Market Are Too Remote And Unduly Speculative ....................................................... 21

    C.    Plaintiffs Also Do Not Have Standing To Bring Claims Based On Alleged Injuries In The Alleged Search Markets ............................... 23

IX.  PLAINTIFFS' STATE LAW CLAIMS ARE WHOLLY DERIVATIVE OF THEIR FEDERAL ANTITRUST CLAIMS AND FAIL FOR THE SAME REASONS ........... 23

    A.    Plaintiffs Fail To Allege A Claim Under Cartwright Act § 16727 (Claim 5) ........................................................................................... 23

    B.    Plaintiffs Fail to State an Unfair Competition Law ("UCL") Claim (Claim 6) ........................................................................................... 25

X.   LEAVE TO AMEND SHOULD NOT BE GRANTED .............................. 25

XI.  CONCLUSION .............................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
5
    592 F.3d 991 (9th Cir. 2010)..............................................................................10, 11, 12, 13

6

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
7
    190 F.3d 1051 (9th Cir. 1999).......................................................................19, 20, 21

8

*Amfac Mortg. Corp. v. Arizona Mall of Tempe, Inc.,*
    583 F.2d 426 (9th Cir. 1978)..................................................................................5

9

*Apple Inc. v. Psystar Corp.,*
10
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...............................................................9

11

*Ashcroft v. Iqbal,*
    556 U.S. 677-79 (2009)...................................................................................1, 15

12

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.,*
13
    241 F.3d 696, 701 (9th Cir. 2001)........................................................................21

14

*Assoc. Gen. Contractors of Cal., Inc. v. Carpenters,*
15
    459 U.S. 519 (1983).............................................................................10, 19, 22

16

*Bayou Bottling, Inc. v. Dr. Pepper Co.,*
    725 F.2d 300 (5th Cir. 1984)................................................................................12

17

*Bell Atlantic Corp. v. Twombly,*
18
    550 U.S. 544 (2007)........................................................................9, 10, 15, 22

19

*Blue Shield v. McCready,*
20
    457 U.S. 465 (1982).............................................................................................21

21

*Cargill, Inc. v. Monfort of Colo., Inc.,*
    479 U.S. 104 (1986).......................................................................................19, 20

22

*Cascade Cabinet Co. v. Western Cabinet & Millwork Inc.,*
23
    710 F.2d 1366 (9th Cir. 1983)...............................................................................17

24

*Catch Curve, Inc. v. Venali, Inc.,*
    519 F. Supp. 2d 1028 (C.D. Cal. 2007) ...............................................................16

25

*CDC Techs., Inc. v. IDEXX Lab., Inc.,*
26
    186 F.3d 74 (2d Cir. 1999)..............................................................................13, 14

27

*Colonial Med. Group, Inc. v. Catholic Healthcare West,*
28
    No. C-09-2192, 2010 U.S. Dist. LEXIS 51350 (N.D. Cal. 2010) ....................15, 18

*In re DRAM Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) ................................................ 19, 24

*In re DRAM Antitrust Litig.*,
    536 F. Supp. 2d 1129 (N.D. Cal. 2008) ................................................ 19, 20

*El Aguila Food Prods v. Gruma Corp.*,
    301 F. Supp. 2d 612 (S.D. Tex. 2003) ........................................................ 12

*Epstein v. Wash. Energy Co.*,
    83 F.3d 1136 (9th Cir. 1996) ...................................................................... 9

*Garon v. eBay, Inc.*,
    No. 10-05737, 2011 WL 6329089 (N.D. Cal. Nov. 30, 2011) ............................ 25

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................ 14, 15, 18

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) .................................................................. 23

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ....................................................... 19, 23, 24

*Lorenzo v. Qualcomm*,
    603 F. Supp. 2d 1291 (S.D. Cal. 2009) ................................................ 20, 21, 22

*Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*,
    94 F. Supp. 2d 804 (E.D. Ky. 1999) ........................................................ 12

*Lucas v. Bechtel Corp.*,
    800 F.2d 839 (9th Cir. 1986) .......................................................... 19, 22

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000) ................................................................ 24

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ................................................. 10, 11, 13, 14

*Pac. Bell Tel. Co. v. Linkline Comm'ns, Inc.*,
    555 U.S. 438 (2009) ............................................................................ 17

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ................................................................ 16

*PNY Techs., Inc. v. SanDisk Corp.*,
    No. 11–cv–04689, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ................... *passim*

*PNY Techs., Inc. v. SanDisk Corp.*,
    No. 11-cv-04689, 2014 U.S. Dist. LEXIS 58108 (N.D. Cal. April 25, 2014) ......... 14, 15

*Prime Partners IPA of Temecula, Inc. v. Chaudhuri*,
    No. 11-cv-01860, 2012 WL 1669726 (C.D. Cal. May 14, 2012) ........................................ 25

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
    890 F.2d 139 (9th Cir. 1989) .......................................................................................... 21

*R.J. Reynolds Tobacco Co. v. Philip Morris*,
    199 F. Supp. 2d 362 (M.D. N.C. 2002) .......................................................................... 12

*Rheumatology Diagnostics Lab., Inc. v. Artna, Inc.*,
    No. 12-cv-05847, 2014 U.S. Dist. LEXIS 16631 (N.D. Cal. 2014) .............................. 15

*Sicor Ltd. v. Cetus Corp.*,
    51 F.3d 848 (9th Cir. 1995) ............................................................................................ 17

*Spectrum Sports v. McQuillan*,
    506 U.S. 447 (1993) ........................................................................................................ 17

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ........................................................................................................ 14

*TeleAtlas N.V. v. Navteq Corp.*,
    397 F. Supp. 2d 1184 (N.D. Cal. 2005) ......................................................................... 18

*Thompson v. Western Elec. Co.*,
    680 F.2d 1263 (9th Cir. 1982) ........................................................................................ 17

*Transamerica Computer Co. v. IBM*,
    698 F.2d 1377 (9th Cir. 1983) ........................................................................................ 17

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .......................................................................................... 15

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) .......................................................................................... 17

*Verizon Commc'ns v. Law Office of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................................................. 16, 17

*W. Parcel Express v. UPS*,
    190 F.3d 974 (9th Cir. 1999) .................................................................................... 11, 12

*In re Webkin Antitrust Litig.*,
    695 F. Supp. 2d 987 (N.D. Cal. 2010) ............................................................................ 16

*In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ........................................................................... 21

*William O. Gilley Enters. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ............................................................................................ 9

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Williams v. I/B/ Fischer Nevada*,
   999 F.2d 445 (9th Cir. 1993) ........................................................................ 17

**California Cases**

*Belton v. Comcast Cable Holdings, LLC*,
   151 Cal. App. 4th 1224 (2007) .................................................................... 24

*Chavez v. Whirlpool Corp.*,
   93 Cal. App. 4th 363 (2001) ........................................................................ 25

*Kolling v. Dow Jones & Co.*,
   137 Cal. App. 3d 709 (1982) ........................................................................ 20

*Morrison v. Viacom*,
   66 Cal. App. 4th 534 (1998) ........................................................................ 24

*Redwood Theatres, Inc. v. Festival Enters., Inc.*,
   200 Cal. App. 3d 687 (1998) ........................................................................ 24

*Vinci v. Waste Mgmt., Inc.*,
   36 Cal App. 4th 1811 (1995) ......................................................... 19, 20, 24

**Federal Statutes**

15 U.S.C. § 14 ................................................................................................... 18

Clayton Act ............................................................................................... *passim*

**California Statutes**

Cal. Bus. & Prof. Code § 16727 ............................................................... *passim*

Cal. Bus. & Prof. Code § 17200 ........................................................................ 8

**Rules**

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 1

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on November 20, 2014 at 9:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Beth Labson Freeman in the above-entitled Court, Defendant Google Inc. will, and hereby does, move this Court for an order to dismiss with prejudice plaintiffs' First Amended Complaint ("FAC") under Federal Rule of Civil Procedure 12(b)(6). This motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, all pleadings and exhibits filed to date, and any argument at the hearing.

Google Inc. requests an order dismissing the FAC and each of its Claims For Relief with prejudice on account of plaintiffs' failure to state a claim to relief that is both plausible on its face and supported by sufficient factual allegations. More specifically:

- Plaintiffs fail to allege facts to support the necessary elements of claims under federal antitrust law for illegal restraint of trade (Sherman Act § 1) or actual or attempted monopolization (Sherman Act § 2);

- Plaintiffs fail to allege conduct that falls within the ambit of Clayton Act § 3, which applies only to tangible commodities, and not to services or licenses;

- Plaintiffs fail to allege facts establishing antitrust injury and they lack antitrust standing, which are necessary prerequisites to all of their antitrust claims; and

- Plaintiffs' state law claims (under California's Cartwright Act and UCL) are wholly derivative of their federal claims and should be dismissed for the same reasons.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In the face of Google's motion to dismiss, having been made aware of the fatal deficiencies in their claims, plaintiffs chose to voluntarily amend their Complaint instead of responding to the motion. The resulting FAC, however, asserts the same implausible legal theories, again concedes fundamental facts that defeat their claims, and adds only "naked assertions" of alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 677-79 (2009) (claims must be plausible and supported by well-pleaded facts, not "naked assertions" and "mere conclusory statements"). Plaintiffs' failure to allege additional *well-pleaded* and *relevant* facts in the FAC is both an acknowledgment of the original Complaint's failures, and an implicit admission that further amendment would be futile.

Plaintiffs, on behalf of a putative nationwide class of Android device purchasers, still claim that Google's licensing and distribution of *free* mobile software applications ("apps") to original equipment manufacturers ("OEMs") somehow caused *consumers* to overpay for their Android mobile devices that were preloaded with these free apps.  Google licenses its Android operating system *at no charge* to OEMs to use on the mobile devices they manufacture, and through separate mobile app license agreements—called Mobile Application Distribution Agreements ("MADAs")—Google allows OEMs to preload a suite of free Google apps onto these Android devices.  OEMs retain full discretion over whether to use the Android operating system on a device and, if so, whether to also use Google apps on that device.  Google's conduct is not only fully consistent with but actually promotes lawful competition.  Yet, according to plaintiffs, the MADAs foreclose rival search engine apps from being preloaded as the default search engine on these devices.  Although plaintiffs again attempt to concoct federal and state antitrust claims based on Google's MADAs, they still include an array of self-defeating allegations, which demonstrate the absence of any market foreclosure or exclusionary conduct:

- OEMs do not have to license any Google apps for preload as a condition to license the Android mobile operating system for use on the OEMs' mobile devices.

- OEMs are not required to set Google Search as a "default" on *all* of their devices—an OEM only has to preload Google Search on those devices that an OEM chooses to preload with the optional suite of Google apps.

- Even when Google Search is preloaded on an Android device, OEMs remain free to also preload any other competitive apps on the device, including rival search apps.

- The Google apps in question (such as YouTube and Google Maps) are admittedly popular with consumers, and Google charges nothing for them:  consumers can download and use them for free.

- Users of Android devices, such as plaintiffs here, are free to customize their devices after purchase—including adding competitive apps to the device, rearranging the location of apps, and changing search engines.

In light of these facts, plaintiffs fail to allege substantial foreclosure or unlawful exclusionary conduct, which are fundamental elements of their federal and state antitrust claims.  Notably, the FAC, like its predecessor Complaint, never alleges that the MADAs *prevent* rival search engines from reaching consumers through the various distribution channels available to

them.  Plaintiffs instead merely complain of Google's efforts to secure prominent placement of Google Search on Android devices.  The Complaint does not allege facts to sufficiently plead, as they must, that:  (a) any OEM was somehow coerced to preload Google Search on any device; (b) any OEM was prevented from preloading an app of its choice on a device; or (c) any consumer was prevented from obtaining the apps that he or she desired.

This motion raises the following core issues:

**First,** as for exclusive dealing, plaintiffs merely allege, in conclusory fashion, that the MADAs create an inconvenience for search competitors.  But Plaintiffs fail to specifically allege an actual exclusivity requirement or that the MADAs substantially foreclose rival search engines.  Plaintiffs now expressly concede a fatal fact:  search competitors have many alternative means to access consumers.  *E.g.*, Dkt 31, FAC ¶ 53 ("One possible alternative channel for distribution of a rival search engine is via a dedicated search website."); ¶ 56 ("Another alternative means of distribution that a competitor might try is to convince users to download and use its app."); ¶ 57 ("Alternatively, a competitor…might attempt to convince Android OS device consumers to re-set their default search engines….).  In the absence of substantial foreclosure, there is no claim.

**Second,** plaintiffs apparently have abandoned any alleged tying claim.  Google's original motion sought dismissal of any tying claim on several specific grounds.  Dkt 28, MTD at 9-11.  In response, plaintiffs' FAC eliminates references to "tying" (*see* FAC deleting references to tying formerly in Dkt 1, Compl. ¶¶ 41, 65, 70 & fn. 5), and does not address any of the defects.

**Third**, the actual and attempted monopolization claims are premised on the same flawed "exclusive dealing" conduct addressed above, and thus those claims fail for the same reasons.

**Fourth**, the Complaint also fails to adequately plead that plaintiffs suffered antitrust injury and thus lack antitrust standing, which is fatal to each of their claims.  Plaintiffs do not allege that they *purchased anything*, directly *or even indirectly*, from Google in the alleged relevant markets.  Instead, they offer nothing more than a general and speculative theory about rival search engines hypothetically paying OEMs for default search engine status and OEMs somehow passing that hypothetical payment on to consumers through a multi-layered distribution chain.  Plaintiffs do not allege that any rival search engine even attempted to pay for

default status, and cannot allege that any was foreclosed from doing so.  Plaintiffs' allegations are insufficient to plead that they "overpaid" for Android devices preloaded with Google's *free* mobile apps and *free* search services.  Because plaintiffs' alleged injury (purported overpayment for Android devices) did not occur in the market they claim was foreclosed (free internet search), and their attenuated theory of harm is remote and speculative, plaintiffs fail to establish the threshold showing of antitrust standing.  This failure is an independent ground for dismissal.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Android Operating System

Android is a free, open-source operating system offered by Google that provides OEMs, carriers, and app developers a software platform on which to offer advanced mobile services to consumers.  FAC ¶¶ 6, 7, 23, 44-46.  Android's open-source nature allows Android device-makers the freedom to customize and differentiate their smartphone and tablet devices from competitive devices—without having to pay any fees to Google for the operating system license. *Id.* ¶¶ 44-46.  As a result, many OEMs "adopted Android as the operating system for their popular smartphone and tablet devices," which are offered to consumers through a variety of channels, in various forms and configurations, and at different price points. *Id.* ¶ 23.  Android devices compete with Apple's iOS devices, such as the iPhone, and Microsoft's Windows Phones, among other devices. *See id.* ¶ 24 & fn. 16.  Plaintiffs do not allege that Google's free licensing of Android violates the antitrust laws or harms consumers in any way.[1]

### B.   Google's Mobile Application Distribution Agreement ("MADA")

Google's MADA is a separate licensing agreement under which Google provides OEMs the option to preload a suite of proprietary Google apps on one or more of their Android devices. FAC ¶¶ 7, 35, 36 (copies of MADAs are attached to the FAC as Exhibits A & B).  Google licenses the suite of apps under the MADA for free, and the MADA is optional—OEMs can obtain a free license for Android and/or make Android devices without entering into the MADA.

---

[1] Since its release in 2008, Android has spurred a tidal wave of innovation, leading to countless different consumer devices manufactured by numerous OEMs and sold to consumers at various price points (the lion's share of which are priced substantially below the Apple iPhone or iPad).

*Id.* ¶¶ 6, 7, 36, 44.[2]  Among other requirements, the MADA requires OEMs to preload Google Search as the default search engine for certain search functions on the device and to ensure that their devices conform to certain Android compatibility requirements to promote interoperability between Android devices from different manufacturers.  *Id.* ¶¶ 36, 46.  The MADA typically has a two-year term with no automatic renewal.  *Id.* Exs. A, B at 1.[3]

Importantly, the MADA does not prevent OEMs from preloading competitors' apps on devices covered by the MADA, including rival search engine apps.[4]  *Id.* ¶ 44; Exs. A, B § 2.6.  Likewise, the MADA does not prevent end users from downloading or using competitors' products.  *Id.* ¶¶ 44, 53, 56, 57; Exs. A, B § 2.6.  In fact, the MADA requires OEMs to provide access to Google Play, which gives end users access to over one million apps, including apps by Google's competitors (including search engines).  *Id.* ¶¶ 7, 17, 35.  Moreover, it does not prevent a user from switching to other search engines for searches on the device.  *Id.* ¶¶ 8, 41, 53, 56-57.

The MADA allows OEMs to decide on which devices they choose to preload the suite of Google's apps.  *Id.* Exs. A, B §§ 2.1, 4.3 (limiting MADA's requirements to devices mutually agreed upon by the OEM and Google); *Id.* Ex. A § 2.4 ("For the sake of clarity, Company has no obligation to install the Google Applications on all of its devices.").  Thus, an OEM that has entered into a MADA can choose to install Google apps on all, some, or none of its devices at its sole discretion.  While plaintiffs focus on the fact that OEMs, under the MADA, may choose to preload Google Search on some devices (*id.* ¶¶ 7-10, 35, 36, 40-42, 51, 70, 84-85), they do not allege that any OEM wanted to preload a non-Google search engine on other devices but was prevented from doing so by the MADA.

Further, there is no allegation that the MADA prevents *any user* from downloading *any* app on *any* device, and by its plain terms the MADA does not do so.  *See id.* at Exs. A & B.  Any

---

[2] For example, the Kindle Fire (by Amazon) and Nokia X smartphones (by Nokia) are Android-based devices that are not subject to a MADA and come without any preloaded Google apps.

[3] A court may consider all materials incorporated in the complaint, including exhibits.  *Amfac Mortg. Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 429-30 (9th Cir. 1978).

[4] Plaintiffs expressly conceded this point in the original Complaint.  Compl. ¶ 41 ("the MADA allows a phone manufacturer to install certain third-party applications in addition to the listed Google Applications"); ¶ 42 ("manufacturers can install competitors' apps").

consumer can load Google's search tool on a mobile device, as a default search engine or otherwise, without making a contractual commitment to Google (*see id*. ¶¶ 5, 8, 25);[5] likewise, any consumer can load competing search tools on a mobile device, as a default search engine or otherwise.  *See id.* ¶¶ 8, 25, 44, 53-57, 66.

There are various ways to search for information on mobile devices, such as entering queries on a search engine's website (e.g., www.bing.com or www.duckduckgo.com), using a search engine's widget,[6] using the search bar of a mobile browser, or accessing information within a myriad of native apps (*e.g.*, Yelp, Expedia, TripAdvisor, and a host of others).  *Id*. ¶¶ 19, 25, 40, 53-57, 66.  Both OEMs and consumers can install multiple search apps—with or without widgets—or multiple browsers on a particular mobile device.  *See id*. ¶¶ 25, 44, 56, 57, 66; Exs. A, B § 2.6.  Consumers also can change search settings on their mobile devices to designate any search engine to handle search queries through various search access points.  *See id*. ¶¶ 8, 41, 57, 80.  The MADA does not prevent a consumer from ultimately determining how to conduct searches on the device.[7]

### C.     Named Plaintiffs

The two named plaintiffs live in Kentucky and Iowa and obtained Android devices manufactured by two different OEMs:  HTC and Samsung.  FAC ¶¶ 15, 16.  Notably, there are no allegations that either plaintiff:

- purchased anything, directly or indirectly, from Google (or that any part of the cost of plaintiffs' mobile devices—including the alleged "overcharge"—went to Google);
- ever sought to use or install a non-Google Search app or widget, or was prevented from doing so;
- ever sought to change search settings on their devices, or was prevented from doing so; or

---

[5] Google is able to avoid charging consumers for the use of its search engine because it displays advertisements along with search results.  FAC ¶¶ 29, 30.

[6] A widget is not an app, but rather a shortcut to the underlying app.  An example of a search widget is in the screenshot in paragraph 40 of the FAC, which shows a Google Search box in the middle of the phone's homepage.

[7] Other search engine providers in the United States include, but are not limited to, Microsoft (Bing), Yahoo, Apple (Siri), AOL, Ask Jeeves, and DuckDuckGo, which focus on general information, *id*. ¶¶ 20, 26, 44, 55-57, 61, 62, 65-67, 75-77, and Facebook, Yelp, Expedia, TripAdvisor and Amazon, which focus on more specialized information.  *See id.* ¶ 77.

- was unable to search using the internet browser on their mobile devices, which, per the MADA, could be powered by a rival search engine.

**D.      Summary of Amended Allegations**

The FAC adds an array of conclusory or irrelevant allegations, but plaintiffs are no closer to stating a viable antitrust claim.  Plaintiffs' inability to add well-pleaded factual allegations related to their claims simply underscores that no further amendment could resuscitate their case.

For example, instead of alleging facts demonstrating that Google has actually foreclosed competition, plaintiffs try to change the subject.  Plaintiffs lead with a lengthy and selective summary of a New York Times article regarding decade-old conduct by Microsoft in a different market.  FAC ¶¶ 1-3.  Plaintiffs do not explain how the technology and markets discussed in the 2006 article relate in any way to whether MADAs foreclose competition—the question before the Court in this case—nor do plaintiffs explain how alleged conduct by Microsoft makes it more plausible that Google engaged in anticompetitive conduct a decade later.

To the extent plaintiffs do attempt to address the central issue in this case (*i.e.*, whether MADAs foreclose competition), plaintiffs' additional allegations reveal there is no foreclosure. For example, plaintiffs now expressly concede various channels of distribution by which search engine providers can access consumers.  FAC ¶¶ 51-58.  But instead of alleging that the MADAs foreclose these alternative channels—the mere existence of which defeats their claims— plaintiffs complain, in conclusory fashion, that the alternatives are not as effective as default status.  Similarly, even though plaintiffs now claim they did not know, at the time of purchase, that Google was set as the default search engine on their Android devices or whether and how default search status could be changed (FAC ¶¶ 15-16), they never allege that any technical, financial or practical impediments prevented them from using alternative search engines or changing the default search engine on their devices.

Plaintiffs also fail to provide additional facts to demonstrate they have antitrust standing. They allege no facts sufficient to plead plausibly that their alleged overpayment for devices was proximately caused by the MADAs.  As for the speculative nature of their injuries, plaintiffs again ignore facts relevant to this case in favor of economic theory and examples from other markets.  FAC ¶¶ 70-74.  They still fail to allege that any OEM, absent the MADA, would have

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    installed a non-Google Search app as the default, and on what terms it would have done so.

2    **III.    SUMMARY OF CLAIMS**

3           Plaintiffs again allege violations of Sections 1 and 2 of the Sherman Act, Section 3 of the

4    Clayton Act, California Cartwright Act (Cal. Bus. & Prof. Code § 16727), and the California

5    Unfair Competition Law (Cal. Bus. & Prof. Code § 17200).  FAC ¶¶ 95-141.  As with their

6    original Complaint, although plaintiffs do not identify the specific restraints of trade or forms of

7    exclusionary conduct that Google allegedly committed, plaintiffs appear to assert what the case

8    law identifies as "exclusive dealing"—*i.e.*, that the MADA somehow forecloses competitors

9    from competing for default search engine status.  *Id.* ¶¶ 42, 62, 71 & fn. 23.   Plaintiffs appear to

10   have now jettisoned their other restraint of trade claim—"tying"—although they still vaguely

11   claim that Google has somehow coerced OEMs by conditioning the option to pre-load "popular

12   Google apps on making its search product the default search engine on covered devices."  FAC ¶

13   10; *see also id.* ¶¶ 8, 42, 44, 84, 85, 89(a) & fn. 8.  All of plaintiffs' claims reference injuries

14   allegedly suffered by consumers arising from the MADAs entered into between Google and

15   Android OEMs.  *Id.* ¶ 84.  Specifically, plaintiffs speculate that but for the MADAs, rival search

16   engines might pay OEMs for default search status, which, in turn, could result in lower device

17   prices charged by retailers to consumers.  *Id.* ¶¶ 9, 71-73.

18          Plaintiffs still allege two "relevant markets" for purposes of their antitrust claims.  "The

19   first is the United States market for general search, *i.e.*, general Internet search conducted on

20   desktop computers, laptops, and handheld devices via the Google search engine or one of its

21   general search engine rivals, such as Bing.  The second is the United States market for handheld

22   search, *i.e.*, general Internet search conducted on smartphones and tablets."  *Id.* ¶ 75.

23          The proposed class includes all U.S. purchasers of Android mobile phones or tablets "as

24   to which Google and the manufacturer of such device have entered into a contract or contracts …

25   by which Google has conditioned the right to pre-load any application from a suite of Google

26   applications … on the manufacturer's mandatory acceptance and installation of Google search …

27   as the default search engine on that device."  *Id.* ¶¶ 84, 85.  As with the named plaintiffs, no class

28   members are alleged to have purchased anything from Google, directly or indirectly.  Instead,

plaintiffs claim they were injured by "overpaying" for their Android devices.  *See, e.g., id.* ¶¶ 89.e, 110, 121.  The proposed class seeks injunctive relief under federal law, *id.* ¶¶ 100, 111, 122, 128, and monetary damages, restitution, and injunctive relief for a nationwide class under California law.  *Id.* ¶¶ 134-135, 141; Prayer for Relief ¶ B.  The proposed class does not include purchasers of products that compete with Android devices, such as Apple's iPhones.

## IV.   STATEMENT OF ISSUES TO BE DECIDED

1.      Should the Court dismiss plaintiffs' restraint of trade (Sherman Act § 1) or actual or attempted monopolization (Sherman Act § 2) claims because they fail to allege necessary elements of those claims, including antitrust foreclosure or actionable exclusionary conduct?

2.      Should the Court dismiss plaintiffs' Clayton Act claim because it fails to allege conduct that falls within the ambit of Clayton Act § 3?

3.      Should the Court dismiss all of plaintiffs' federal and state antitrust claims because plaintiffs have failed to allege facts establishing antitrust injury and because plaintiffs lack antitrust standing, which are necessary prerequisites to these claims?

4.      Should the Court dismiss plaintiffs' state law claims because they are wholly derivative of their federal antitrust claims and fail for the same reasons?

## V.   LEGAL STANDARD

A complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*").  Although allegations of material fact are taken as true, a plaintiff must offer "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555.  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."  *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1195 (N.D. Cal. 2008) (quoting *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996)).  Moreover, "a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles" and common sense.  *William O. Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (citations omitted).  A court also may disregard internally inconsistent factual allegations.  *See Psystar*, 586 F. Supp. 2d at 1200 (rejecting allegations that

were "internally contradictory").

The Supreme Court has cautioned that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Carpenters* ("*AGC*"), 459 U.S. 519, 528, n. 17 (1983)).  This is particularly true in antitrust cases because "antitrust discovery can be expensive" and the "threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching" the summary judgment stage.  *Id.* at 558 (noting the "unusually high cost of discovery in antitrust cases").

## VI.   PLAINTIFFS FAIL TO ALLEGE FORECLOSURE OR SUFFICIENT EFFECT ON COMMERCE TO SUPPORT ANY OF THEIR ANTITRUST CLAIMS

Plaintiffs' exclusive dealing claim fails both as a matter of law and common sense, regardless of whether it is brought under Section 1 or 2 of the Sherman Act, Section 3 of the Clayton Act, or under California state law.

### A.    Plaintiffs Fail to Allege Exclusive Dealing Under Sherman Act § 1 (Claim 1)

Plaintiffs appear to plead an exclusive dealing claim premised on the unsupported assertion that Google's rivals are unable to compete to be the default search engine or otherwise be preloaded onto devices as a result of the MADA.[8]  FAC ¶¶ 99, 127, 133, 140.  This attempt fails as a matter of law.  "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  Exclusive dealing violates the antitrust laws only if it forecloses "existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement." *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).  Exclusive dealing is only illegal if there is actual foreclosure of competition in a substantial share of the relevant

---

[8] Plaintiffs also reference allegedly exclusive deals that Google has with Apple and Mozilla (FAC ¶¶ 48-50, 52, 77), which bear little, if any, relation to the purported class members, who are limited to Android (not Apple) device users.  In any event, the Apple and Mozilla agreements cannot support an exclusive dealing claim, either alone or in conjunction with the MADA allegations, because there are alternative distribution channels and no allegations about the extent of market foreclosure flowing from those agreements.  *See* Sections VI.A.1-3.

market; a "probable effect of foreclosing competition" is insufficient. *Allied Orthopedic*, 592 F.3d at 996 & n.1. "[E]xclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." *Omega*, 127 F.3d at 1162.

The factual allegations in the Complaint reveal that, at most, Google only negotiated for prominent placement of its app and search engine on devices of OEMs' own choosing—conduct that courts routinely find to be legal under the antitrust laws. Any alleged exclusive dealing claim should be dismissed because (a) the MADA does not require exclusivity, (b) many other distribution channels remain available to rivals; and (c) plaintiffs do not plead any facts establishing "substantial" market foreclosure, as there is no restriction—none whatsoever—on a consumer's ability to download, access, or use competitive apps and services.

### 1.    Plaintiffs fail to allege any exclusivity

Google's MADA does not impose exclusivity on either OEMs or consumers with regards to Google's mobile search app or any other app. *E.g.,* FAC ¶ 44. There is no allegation that OEMs are prevented from contracting with other providers to preload rival search engines on their devices in addition to Google Search or to preload any other apps from rival providers. *See id.* Under the MADA, OEMs also are free to decide on which devices to pre-install Google's apps, allowing OEMs flexibility to preinstall Google apps on some devices but not others. FAC Exs. A, B §§ 2.1, 4.3 (MADA's requirements limited to devices mutually agreed upon by OEMs and Google); Ex. A § 2.4 ("For the sake of clarity, Company has no obligation to install the Google Applications on all of its devices."). As a result, rivals can still seek to preload their search engine on devices, even where OEMs have entered into a MADA; and OEMs remain free to shift some (or even all) of their business to devices that are not subject to a MADA.

Courts have not hesitated to dismiss exclusive dealing claims premised on contracts that do not prevent rivals from competing for business. In *W. Parcel Express v. UPS*, 190 F.3d 974, 976 (9th Cir. 1999), for example, the Ninth Circuit concluded that there was no potential foreclosure of competition where the contracts at issue provided volume discounts but did not prevent customers from entering into contracts with other package delivery providers. The court explained that an "exclusive dealing contract involves a commitment by a buyer to deal only

with a particular seller." *Id.* (quoting L. Sullivan, *Law of Antitrust* § 163, at 471 (1977)). Likewise, in *Allied Orthopedic*, the Ninth Circuit evaluated manufacturers' agreements with groups of hospitals (called "group purchasing organizations" or "GPOs"), which offered market share discounts and prohibited member-hospitals from joining other GPOs. The Ninth Circuit concluded that the agreements did not foreclose competition because members could still purchase from other suppliers, even if it meant having to pay a higher price. 592 F.3d at 997-98.

Here, the exclusive dealing claims are even more specious than those found deficient in *Western Parcel* and *Allied Orthopedic*. The MADA not only permits rivals to compete to install their search app on any particular device, but even when an OEM preloads Google, rivals can still contract to have their search app preloaded elsewhere on the same device. FAC, Ex. A & B.

At most, the Complaint only alleges that the MADA requires promotional placement of Google's search engine. *See, e.g.,* FAC, ¶¶ 7, 36 (complaining that MADAs require placement of Google apps "onto prime screen real estate"); fn. 23 (Google requires that its apps be "in prime positions on the handheld devices' screens"). But courts consistently reject exclusive dealing claims where a retailer or distributor agrees to provide preferential treatment to a supplier's products or services, but not complete exclusivity. *See, e.g.*, *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) ("Without anything more, these practices are not barred by the antitrust laws. They are competitive acts."); *El Aguila Food Prods v. Gruma Corp.*, 301 F. Supp. 2d 612, 628-29 (S.D. Tex. 2003) (slotting fees paid for preferential shelf placement of its products were "an acceptable and desirable means to acquire market share"), *aff'd*, 131 F. App'x 450 (5th Cir. 2005); *R.J. Reynolds Tobacco Co. v. Philip Morris*, 199 F. Supp. 2d 362, 387 (M.D. N.C. 2002) (promotional payments to retailers in exchange for favorable display and promotional space "are not exclusive dealing arrangements"), *aff'd*, 67 Fed. App'x 810 (4th Cir. 2003); *Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*, 94 F. Supp. 2d 804, 816 (E.D. Ky. 1999) ("The Court has carefully considered Pepsi's [agreement with retailers for preferential shelf space] and finds nothing illicit in them.").

## 2. Plaintiffs concede the availability of alternative distribution channels

Even assuming—contrary to the MADA's express terms—that Google has prevented

rival search engines from being preloaded onto Android phones, plaintiffs' exclusive dealing claims still must be dismissed because of the availability of several alternative distribution channels to competitors.  It is widely recognized that "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition any part of the relevant market."  *Omega*, 127 F.3d at 1163; *see also CDC Techs., Inc. v. IDEXX Lab., Inc.*, 186 F.3d 74, 80 (2d Cir. 1999) (following *Omega*).

Plaintiffs concede, as they must, that there are several alternative and effective means of distributing search engines, even when an OEM signs a MADA.

- Competitors can distribute their own search engines directly to consumers through the Google Play app store, other competing Android app stores, or by consumers visiting their website from a mobile device or PC. FAC ¶¶ 7, 17, 19, 25, 42, 44, 53, 56, 66.
- Competitors can enter into distribution agreements with mobile browser suppliers to become the default search provider for queries entered into the browser's "search bar," *id.* ¶¶ 25, 66, 77.
- OEMs are free to preload competitive apps on any of their devices.  *Id.* ¶ 44, Exs. A, B §§ 2.1, 4.3, Ex. A § 2.4.
- Competitors can appeal directly to consumers to change default search settings on their mobile device or browser, as plaintiffs concede Microsoft and DuckDuckGo could do.  *Id.* ¶¶ 56-57, 65, 66 & fn. 20; *see also id.* ¶¶ 8, 41, 57 (default settings can be changed).
- Competitors can reach agreements to provide search capabilities to other search engines or websites, as plaintiffs concede Microsoft has done.  *Id.* ¶¶ 20, 61.

Courts do not hesitate to dismiss exclusive dealing claims where, as here, alternative distribution channels or direct customer sales are available.  *See Allied Orthopedic*, 592 F.3d at 997-98 (dismissing exclusive dealing claim because other distribution channels available to rivals); *Omega*, 127 F.3d at 1162-63 (dismissing exclusive dealing claim due to "potential alternative sources of distribution" including direct sales); *PNY Techs., Inc. v. SanDisk Corp.*, No. 11–cv–04689, 2014 WL 2987322, at *8-9 (N.D. Cal. July 2, 2014) (dismissing claim where plaintiff "fails to plead the lack of alternative channels of distribution").

Whether these alternative channels may not be the most "cost-efficient and effective way for any search engine company to distribute its product," *id.* ¶ 52, is irrelevant.   As the Ninth Circuit explained in *Omega*, exclusive arrangements involving "the best, most efficient and cheapest source of supply" will have no foreclosure effect where alternative sources of

distribution are available.  127 F.3d at 1163 (quoting *General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983)).  Applying this reasoning in the *CDC* case, the Second Circuit held that exclusive contracts with nationwide distributors were permissible because manufacturers could use regional distributors or direct sales to reach customers.  186 F.3d at 80-81.

*SanDisk* is particularly instructive.  The plaintiff in that case alleged that SanDisk's "exclusive dealing arrangements deny its competitors meaningful market access" and that there were "limited alternative channels of distributions" available to competitors.  *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-04689, 2014 U.S. Dist. LEXIS 58108, at *7 (N.D. Cal. April 25, 2014).  Judge Orrick concluded these allegations fail "because they are nothing but bare assertions"—plaintiff did not explain "why" the "existing channels are insufficient" and alleged no facts regarding "who has made such attempts, when, or to what extent any [competitor] tried."  *Id.* at *30-31.  Even after the plaintiff added 100 paragraphs to the complaint, Judge Orrick again concluded that the plaintiff "fail[ed] to adequately plead that there are no 'potential alternative channels of distribution,'" and dismissed the claims with prejudice.  *SanDisk*, 2014 WL 2987322 at *6, 9.  Plaintiffs' amended allegations here are similarly flawed and should suffer the same fate.  *See, e.g.,* FAC ¶ 56 (conclusory allegation that an "advertising campaign" by Microsoft would be ineffective at convincing users to download the Bing app); ¶ 57 (conclusory allegation that DuckDuckGo could try to teach consumers how to change default search engines, but that would require "effort on the part of the consumer" and thus it may not be effective).

### 3. Plaintiffs fail to allege substantial market foreclosure

An exclusive dealing claim is also deficient because plaintiffs fail to sufficiently allege substantial market foreclosure.  Exclusive dealing is only unlawful when "the competition foreclosed by the contract [is] found to constitute a substantial share of the relevant market."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45-46 (1984) (concurring opinion) ("Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers and sellers are

frozen out of a market by the exclusive deal.")[9]; *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("40% to 50% share usually required in order to establish a § 1 violation").

There is no allegation in the Complaint regarding how much of either relevant market is foreclosed by the MADAs. Instead, plaintiffs allege only that "Google's conduct affects and forecloses a substantial amount of interstate commerce." FAC ¶ 98. Such conclusory allegations cannot support an exclusive dealing claim. Again, *SanDisk* is instructive. Judge Orrick rejected plaintiff's initial barebones allegation of "substantial foreclosure," concluding that such "threadbare recitals of the elements of a cause of action" is "exactly what *Twombly* and *Iqbal* warned against." *SanDisk*, 2014 U.S. Dist. LEXIS 58108 at *27; *see also SanDisk*, 2014 WL 2987322 at *6 (granting motion to dismiss following amendment because plaintiff "in no way plausibly show that [defendant's] agreements unlawfully foreclosed competition"). Similar to the MADAs here, the *SanDisk* agreements were of short duration—no longer than two years—which "negate[s] substantially their potential to foreclose competition." *Id*. at *4 (citing *Omega*, 127 F.3d at 1163). In fact, the MADAs are even *less* restrictive than the agreements approved of in *SanDisk*, since OEMs are not required to preload Google's mobile apps on any devices and therefore remain free to shift any amount of their volume to other devices that are not subject to a MADA. *See* FAC Exs. A, B §§ 2.1, 2.4, 4.3.

Case law from this District and elsewhere is in accord. *Rheumatology Diagnostics Lab., Inc. v. Artna, Inc*., No. 12-cv-05847, 2014 U.S. Dist. LEXIS 16631, at *34-42 (N.D. Cal. 2014) ("plaintiffs still do not allege the extent of foreclosure, what size each market is, or how the agreement affected each market or its participants' shares"); *Colonial Med. Group, Inc. v. Catholic Healthcare West*, No. C-09-2192, 2010 U.S. Dist. LEXIS 51350, at *15-19 (N.D. Cal. 2010) (no facts "from which it reasonably could be inferred that the percentage of the product market foreclosed is sufficiently substantial"), *aff'd*, 444 Fed. App'x. 937 (9th Cir. 2011).

## B.    Plaintiffs Have Abandoned Tying Under Sherman Act § 1 (Claim 1)

Although plaintiffs previously implied they were bringing a tying claim in their first

---

[9] *Superseded in part by statute on other grounds as stated in Illinois Tool Works*, 547 U.S. at 41.

Complaint (*See* Compl. ¶¶ 4, 7, 41, 65, 70, & fns. 1 & 5), they have abandoned any such claim in the FAC. After Google demonstrated why the Complaint failed to state a tying claim, plaintiffs filed a FAC that not only neglected to address those deficiencies, but actually eliminated four out of five references to "tying" as well. *See* FAC (deleting references to tying formerly in Compl. at ¶¶ 41, 65, 70 & fn. 5). This is unsurprising since plaintiffs do not and cannot allege any facts sufficient to demonstrate that Google engaged in an illegal tying arrangement:[10]

- Plaintiffs again fail to allege the existence of a relevant tying product market.

- Plaintiffs also fail to allege that Google had sufficient market power in a tying product market to coerce OEMs because they have not defined the tying product. Compounding this deficiency is the lack of any specific allegations that Google coerced OEMs into taking a product they did not want and would have obtained from another supplier. Here, plaintiffs continue to allege that Google Search is a popular and well-designed product that Google provides to OEMs free of charge. FAC ¶ 4, ¶ 5 (Google "built a better search engine"), Exs. A, B §§ 2.1, 4.1 (no payments required for apps).

- Finally, plaintiffs fail to clearly identify a tied product and do not allege facts sufficient to show a "not insubstantial effect" in the tied product market, which requires facts that, if proven, would establish a "pernicious effect on competition and lack of…any redeeming value." *In re Webkin Antitrust Litig.*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010) (citation omitted). Notably, there is no allegation that the MADA forecloses rivals from alternative means of distribution or competing more generally against Google.

### C.  Plaintiffs Fail to Allege Actionable "Exclusionary Conduct" Under Sherman Act § 2 (Claims 2 and 3)

Plaintiffs allege that Google has engaged in monopolization and attempted monopolization in violation of Sherman Act § 2. Plaintiffs assert that the same alleged "restraint of trade" conduct under Section 1—*i.e.*, their failed exclusive dealing (or tying) claims—also violates Section 2. *See* FAC ¶¶ 106, 107. These claims fail for the same reasons.

The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power. *Verizon Commc'ns v. Law Office of Curtis V. Trinko, LLP*, 540 U.S.

---

[10] Plaintiffs must allege: "(1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied-product market." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003). To satisfy the first element, plaintiffs must allege "two distinct products and two distinct markets." *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1039 (C.D. Cal. 2007).

398, 407 (2004).  The statute targets "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id*.; *Pac. Bell Tel. Co. v. Linkline Comm'ns, Inc*., 555 U.S. 438, 448 (2009) (citation omitted).  An attempt to monopolize violates Section 2 upon proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in a relevant market. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456, 459 (1993).[11]

A common and critical element of both monopolization and attempted monopolization claims is a showing of exclusionary or anticompetitive conduct.  *Transamerica Computer Co. v. IBM*, 698 F.2d 1377, 1382 (9th Cir. 1983); *see, e.g., SanDisk*, 2014 WL 2987322, at *11 ("Because I again conclude that the TAC does not sufficiently plead actionable exclusive dealing, PNY cannot state a claim for attempted monopolization.").  That is because "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."  *Trinko*, 540 U.S. at 407; *see also United States v. Syufy Enters*., 903 F.2d 659, 669 (9th Cir. 1990) ("an efficient, vigorous, aggressive competitor is not the villain antitrust laws are aimed at eliminating").

Where, as here, plaintiffs do not state a claim under Section 1 of the Sherman Act, they cannot use those same flawed allegations to form the basis of a Section 2 claim.  *See Sicor Ltd. v. Cetus Corp*., 51 F.3d 848, 856 (9th Cir. 1995) (dismissing Section 2 claim because alleged conduct was the same as underlying dismissed Section 1 claim); *Williams v. I/B/ Fischer Nevada*, 999 F.2d 445, 448 (9th Cir. 1993) (where agreement "does not establish a section 1 claim, it cannot form the basis of a section 2 claim"); *Cascade Cabinet Co. v. Western Cabinet & Millwork Inc*., 710 F.2d 1366, 1374 n.3 (9th Cir. 1983) (failure to establish claim under Section 1 precludes finding in favor of plaintiff on same claim under Section 2); *Thompson v. Western Elec. Co*., 680 F.2d 1263, 1267 (9th Cir. 1982) ("a § 1 claim insufficient to withstand summary

---

[11] Google denies that the markets defined in the FAC are relevant antitrust markets, and denies that it has market power in those alleged "markets."  Google does not (and need not), however, challenge the sufficiency of these allegations for purposes of this motion to dismiss.

judgment cannot be used as the sole basis for a § 2 claim"); *see also Colonial Med. Group,* 2010 U.S. Dist. LEXIS 51350, at \*21-22  ("the Court has found that Colonial has failed to state a § 1 claim based on such arrangement, Colonial's § 2 claim fails for this additional reason").

The Section 2 claims must therefore be dismissed for the reasons above.  *See* §§ VI.A-B.

## VII.   PLAINTIFFS FAIL TO ALLEGE A CLAIM UNDER CLAYTON ACT § 3

Plaintiffs allege that Google has violated Clayton Act § 3 by requiring OEMs to make Google Search the default search engine when OEMs sought "to pre-load YouTube or Google Play onto a device."  FAC ¶ 125.  Plaintiffs base this claim entirely on the "requirements" in the MADAs, asserting that the "MADAs are designed to lessen competition substantially" and, as a result, they help "create, or maintain and expand, Google's monopoly."  *Id.,* ¶¶ 125-126.  This claim fails as a matter of law because Clayton Act § 3 applies *only* to tangible products—not to licenses like the MADA.  *See* FAC, Exs. A & B (MADA § 2.1, entitled "License Grant").

The Clayton Act only applies to "goods, wares, merchandise, machinery, supplies, or other commodities."  15 U.S.C. § 14.  "Courts have strictly construed the term 'commodity' and held that it denotes only tangible products of trade."  *TeleAtlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1192 (N.D. Cal. 2005) (citations omitted).  Thus, services and licenses do not fall within the ambit of the Clayton Act because they are not tangible commodities.  *See id.* at 1192-93 (dismissing Section 3 claim because a "license is not a tangible good").  Accordingly, the MADA, which licenses Google apps to OEMs, does not concern "tangible" commodities and therefore falls outside the scope of Clayton Act § 3.[12]

## VIII.   PLAINTIFFS FAIL TO ALLEGE ANTITRUST INJURY AND LACK ANTITRUST STANDING

Each claim in the Complaint must also be dismissed because plaintiffs lack antitrust standing.  Although plaintiffs allege that Google restrained competition in alleged relevant markets for general search and handheld search (FAC ¶ 75), plaintiffs' alleged injury—

---

[12] Even if a license to Google's apps involved "tangible commodities" subject to the Clayton Act—which it does not—the claim would fail for the same reasons.  *SanDisk*, 2014 WL 2987322, at \*4-10 (applying same analysis to exclusive dealing claims under Clayton and Sherman Acts); *Jefferson Parish*, 466 U.S. at 23 n. 39 (same standards apply).

overpaying for their Android devices—did not occur in those "markets."  Consumers *did not purchase anything*, directly or indirectly, from Google in the alleged relevant markets—indeed, consumers can use Google Search for free.  *See* FAC ¶ 6.  Consumers cannot "overpay" for Google's free Android operating system, free mobile apps, and free search services.  *Id.*  As a result, plaintiffs concoct a convoluted theory of harm in an attempt to show injury.  But the disconnect between any alleged anticompetitive conduct and plaintiffs' alleged injury is fatal.  Plaintiffs have not alleged antitrust injury, and the remote and speculative nature of plaintiffs' alleged harm cannot establish the threshold showing of antitrust standing.

"Antitrust standing is distinct from Article III standing.  A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999) (citing *AGC*, 459 U.S. at 535 n. 31).  Courts must consider the following factors to determine whether plaintiffs have standing to bring an antitrust claim:  (1) whether the plaintiffs suffered "antitrust injury," *i.e.*, the type of injury the antitrust laws were intended to prevent; (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.  *Id.* at 1054 (citing *AGC*, 459 U.S. at 535).  Plaintiffs must also demonstrate antitrust standing to bring a Cartwright Act claim.  *Vinci v. Waste Mgmt., Inc.*, 36 Cal App. 4th 1811, 1814 (1995) (citing *AGC*, 459 U.S. at 537-44); *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000); *In re DRAM Antitrust Litig.* ("*DRAM I*"), 516 F. Supp. 2d 1072, 1087-89 (N.D. Cal. 2007).

> **A.  Plaintiffs Fail To Allege Antitrust Injury Because Their Alleged Injuries In The Handheld Device Market Did Not Occur In The Market Where Competition Was Allegedly Restrained**

The first *AGC* factor, antitrust injury, is of "tremendous significance," *see Lucas v. Bechtel Corp.*, 800 F.2d 839, 844 (9th Cir. 1986), and the court should dismiss plaintiffs' antitrust claims for failing to allege antitrust injury even if the other factors "tilt in the plaintiffs' favor."  *In re DRAM Antitrust Litig.* ("*DRAM II*"), 536 F. Supp. 2d 1129, 1136, 1141 (N.D. Cal. 2008), *aff'd*, 538 F.3d 1107 (9th Cir. 2008).  A "showing of antitrust injury is necessary, but not sufficient, to establish standing."  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5

(1986).  Antitrust injury is also a prerequisite for standing to bring an injunctive relief claim.  *Id.* at 113; *Lorenzo v. Qualcomm*, 603 F. Supp. 2d 1291, 1300 (S.D. Cal. 2009).

To show antitrust injury, a plaintiff must allege: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Am. Ad Mgmt.*, 190 F.3d at 1055. Additionally, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.  Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  *Id.* at 1057; *see also DRAM II*, 536 F. Supp. 2d at 1137 (same); *Lorenzo*, 603 F. Supp. 2d at 1302 (to bring a Cartwright Act claim, "plaintiff must show an injury within the area of the economy that is endangered by a breakdown of competitive conditions") (citing *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 724 (1982)); *Vinci*, 36 Cal. App. 4th at 1816 (no antitrust standing under Cartwright Act because plaintiff "was neither a consumer or competitor in the market in which trade was restrained").

Plaintiffs claim they were injured "because their handheld devices cost more than they would if Google did not foreclose competition." FAC ¶ 69.  But they fail to allege any anticompetitive conduct in any market that includes handheld devices.[13]  They instead allege that competition was foreclosed in two so-called search markets: (a) an alleged "relevant market" for general Internet search; and (b) an alleged "relevant submarket" for handheld search.  *Id.* ¶ 75.  A device market and a search market are, of course, entirely different and involve different products or services.[14]  Because plaintiffs' alleged overpayment for handheld devices is "experienced in another [undefined] market" than the one "where competition is being restrained," they fail to allege antitrust injury.  *Am. Ad Mgmt.*, 190 F.3d at 1057.

---

[13]  Although plaintiffs never define any market for devices, it would include, at a minimum, devices manufactured by OEMs running Android, as well as devices running competing operating systems, such as Apple's iOS, Microsoft's Windows Mobile OS, BlackBerry's OS, and others.  There are no allegations that competition was foreclosed in any such market.

[14]  For example, a device market could include consumer products such as smartphones, while a search market could include search services delivered by software, such as by Google and Bing.

In *Lorenzo*, the plaintiff alleged that Qualcomm engaged in "unlawful licensing practices" in the market for "CDMA-related patents and technology" used in cell phones. 603 F. Supp. 2d at 1301. The plaintiff, however, was "an end consumer who suffered injury in the form of anticompetitive prices in the market for cell phones and cellular service." *Id*. The court held the plaintiff failed to allege antitrust injury because the "alleged injuries (payment of inflated prices in the market for cell phones and service) occurred in a separate market from the alleged antitrust violation (the market for CDMA patents and technology)." *Id*. at 1302-03. Similarly, plaintiffs here allege injury in the form of inflated prices in the market for mobile devices, but allege foreclosure of competition in alleged search markets (where the services are free).[15]

### B.   Plaintiffs' Alleged Injuries In The Handheld Device Market Are Too Remote And Unduly Speculative

Plaintiffs also fail to satisfy the *AGC* factors warning against standing for remote or speculative harms. When looking at the second factor—the "directness of the injury"—courts examine the "chain of causation between [plaintiff's] injury and the alleged restraint in the [alleged] market," *Am. Ad Mgmt.*, 190 F.3d at 1058, which "incorporates traditional limitations of proximate causation." *In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 901 (C.D. Cal. 2012) (citing *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001)); *see also*, *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 147 (9th Cir. 1989) (*en banc*) ("Directness in the antitrust context means close in the chain of causation.") (citation omitted). "Plaintiff must allege an injury that is not 'secondary, consequential, or remote' in order to have standing under the Cartwright Act." *Lorenzo*, 603 F.

---

[15]  Plaintiffs appear to invoke a very limited exception to this rule, which allows standing when the alleged injury is "inextricably intertwined" with the alleged anticompetitive conduct. *See* FAC at p.33 (using the phrase "inextricably intertwined," albeit in a heading rather than a factual allegation). However, "the simple invocation of [the phrase 'inextricably intertwined'] …will not allow a plaintiff to avoid the fundamental requirement for antitrust standing." *Lorenzo*, 603 F. Supp. 2d at 1301 (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 n.8 (3d Cir. 1999)) (alterations in original). Moreover, an injury is only "inextricably intertwined" if causing the injury is a "necessary step in effecting the ends of the alleged illegal" anticompetitive scheme. *See Blue Shield v. McCready*, 457 U.S. 465, 476-79, 484 (1982). Plaintiffs do not allege that causing plaintiffs to overpay for their devices was "necessary step" for Google to foreclose the alleged search markets.

Supp. 2d at 1302 (quoting *Cellular Plus, Inc. v. Super. Ct.*, 14 Cal. App. 4th 1224, 1233 (1993).).

Similarly, in order to have standing to seek injunctive relief, a plaintiff must allege "a threatened loss or injury cognizable in equity proximately resulting from the alleged antitrust violation." *Lucas*, 800 F.2d at 847 (citation omitted).

Plaintiffs' conclusory allegation that "MADAs exert a direct impact on the handheld device market" by "caus[ing] higher phone prices," (FAC ¶ 82), is insufficient to demonstrate standing. *See Twombly*, 550 U.S. at 555. Plaintiffs' damages theory reveals that their alleged injury is not a direct result of the MADAs but a "remote" or "secondary" consequence of them. Plaintiffs' damages theory—offered with no factual support—proceeds in a number of complex steps. Without the MADAs, plaintiffs allege, competing search engines would "compete for default status … in part by offering to pay [OEMs] for that status on various Android smartphones and tablets." FAC ¶ 9. OEMs must then choose to pre-install a rival search engine on devices in exchange for a payment. These potential payments would allegedly "lower the bottom-line cost associated with production" of those devices. *Id.* OEMs then must decide to lower the sales price for their phones and tablets because of the potential payments. This, in turn, "would lead to lower consumer prices," *id.*, although plaintiffs never allege specific facts demonstrating that an OEM's lower price for a phone or tablet would be passed through the chain of distribution and result in lower prices to class members. Multiple independent actors (*e.g.*, rival search engine providers and OEMs) and various layers in the distribution chain (*e.g.*, retailers and phone carriers) stand between Google's alleged conduct and plaintiffs' alleged injury. Thus, any claimed injury is too remote because it would be dependent on the intervening decisions of these third parties. *See Lorenzo*, 603 F. Supp. 2d at 1303 (denying standing when multiple "intermediaries" separated alleged injuries from the anticompetitive conduct).

Similarly, the speculative nature of plaintiffs' damages theory also weighs against standing under the third *AGC* factor. Because plaintiffs' injury is indirect and subject to the independent behavior of third parties, plaintiffs' damages claim is highly speculative. *AGC*, 459 U.S. at 542 ("indirect" injuries that "may have been produced by independent factors" are "highly speculative"). Instead of addressing this deficiency, plaintiffs merely offer the

conclusory allegation that "the effect on consumer prices is not mere speculation." FAC ¶ 72. But for support, plaintiffs analogize to a different market (the market for PCs), *see* FAC ¶ 72-73, without providing any factual allegations indicating that the market for handheld devices is similar to the PC market. Plaintiffs neglect to mention that phone carriers—absent from the PC distribution chain—often stand in between OEMs and handheld device consumers, adding a level of complexity to the distribution chain and making plaintiffs' claim even more speculative. Additionally, plaintiffs offer no factual support for their claim that OEMs would select an alternative default search engine if not subject to a MADA. For example, plaintiffs do not allege that rival search engine companies actually bid for HTC or Samsung's business or that these companies wanted to select alternative default search providers. The speculative nature of plaintiffs' alleged injuries is another reason to deny standing.

### C. Plaintiffs Also Do Not Have Standing To Bring Claims Based On Alleged Injuries In The Alleged Search Markets

While plaintiffs focus on allegedly inflated prices of Android mobile devices covered by a MADA, they also claim an alternative injury in the alleged search markets. Plaintiffs do not and cannot allege that consumers overpaid for search (a free product). Rather, they claim consumers were harmed by "the stifling of innovation" and "robbed of what…competitors *might* bring to the market" if not for "Google's practices." FAC ¶¶ 68-70, 80-81 (emphasis added). But plaintiffs do not have standing to bring a claim based on this abstract theory of harm. *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (dismissal where plaintiffs alleged defendant "deprived consumers of competitive technology" because such a claim required court "to create in hindsight a technological universe that never came into existence," an exercise that "would be entirely speculative" because harm "could not possibly be adequately measured").

### IX. PLAINTIFFS' STATE LAW CLAIMS ARE WHOLLY DERIVATIVE OF THEIR FEDERAL ANTITRUST CLAIMS AND FAIL FOR THE SAME REASONS

### A. Plaintiffs Fail To Allege A Claim Under Cartwright Act § 16727 (Claim 5)

Federal antitrust precedents are persuasive authority when assessing claims under California's Cartwright Act, *Knevelbaard Dairies*, 232 F.3d at 985, and courts routinely dismiss

tag-along Cartwright Act claims when a plaintiff's federal antitrust claims fail.  *See Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("Our disposition of [the] Sherman Act claims disposes of [the] claims under the California Cartwright Act.  The Cartwright Act is patterned after the Sherman Act, and 'federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act.'") (citations omitted).  In particular, courts analyze exclusive dealing and tying in the same way under both the Cartwright Act and federal antitrust law.  *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1234-35 (2007) (applying federal antitrust analysis to tying claim brought under Cartwright Act); *Redwood Theatres, Inc. v. Festival Enters., Inc.*, 200 Cal. App. 3d 687, 694 (1998) ("Since the relevant case law under the Cartwright Act is comparatively sparse, [the court relied] chiefly on federal decisions.").  Thus, Plaintiffs' state law exclusive dealing and tying claims fail for the same reasons they fail under federal antitrust law.  *See* Section VI.A-B, *supra*.

Plaintiffs also cannot state a claim for relief under Section 16727 of the Cartwright Act because the law only applies to sales of tangible goods, not licenses or services.  *Morrison v. Viacom*, 66 Cal. App. 4th 534, 546 (1998).  The MADAs are licenses to preload services (Google Search, Google Play Store, YouTube, etc.), so they cannot violate the Cartwright Act for the same reason that they cannot violate the Clayton Act.[16]  *See* Section VII, *supra*.

Plaintiffs lack standing to bring a Cartwright Act claim because they fail to adequately plead an "antitrust injury."  *Knevelbaard Dairies*, 232 F.3d at 987-90 (requiring plaintiffs to show "antitrust injury" under both federal antitrust law and Cartwright Act).  Courts apply the same federal multi-factor antitrust injury test to determine if a plaintiff has standing to bring suit under the Cartwright Act.  *DRAM I*, 516 F. Supp. 2d at 1088-89; *Vinci*, 36 Cal. App. 4th at 1816.  Accordingly, Plaintiffs lack standing to bring a Cartwright Act claim for the same reason they lack standing to bring claims under the Sherman and Clayton Acts.  *See supra* Section VIII.

---

[16] Moreover, Section 16727 applies only to contracts for the sale of goods "for use within the State [of California]."  Cal. Bus. & Prof. Code § 16727.  Even if plaintiffs could somehow bring Google's upstream licensing practices within the ambit of Section 16727 because they purchased phones subject to a MADA, plaintiffs made those purchases in Kentucky and Iowa and there is no allegation they made those purchases "for use within" California. FAC ¶¶ 15, 16.

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

**B.      Plaintiffs Fail to State an Unfair Competition Law ("UCL") Claim (Claim 6)**

Plaintiffs acknowledge that their UCL claim is also entirely derivative of their antitrust claims.  FAC ¶ 139 ("acts of unfair competition include [] violation of the federal Sherman and Clayton Acts, as well as California's Cartwright Act").  This claim, therefore, rises and falls with the antitrust claims, which should be dismissed for the reasons above.  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers.").

## X.      LEAVE TO AMEND SHOULD NOT BE GRANTED

"[A]t the time Plaintiffs filed their FAC, Plaintiffs had been made aware of the significant pleading deficiencies addressed above; nevertheless, Plaintiffs made only meager factual amendments to their [] claim[s] that largely failed to address the more basic pleading failures." *Prime Partners IPA of Temecula, Inc. v. Chaudhuri*, No. 11-cv-01860, 2012 WL 1669726, at *12 (C.D. Cal. May 14, 2012).  The Court should therefore dismiss the FAC with prejudice.  *Id.*; *see also Garon v. eBay, Inc.*, No. 10-05737, 2011 WL 6329089, *5-7 (N.D. Cal. Nov. 30, 2011) (after voluntary amendment, dismissal of Sherman Act, UCL and other claims with prejudice because further amendment would be futile).

## XI.     CONCLUSION

Plaintiffs once again fail to allege facts to support the necessary elements of any federal antitrust claim and cannot establish antitrust standing.  Moreover, the Clayton Act does not reach the conduct at issue, and the wholly derivative state law claims also fail.  Google therefore requests an order granting its motion and dismissing the FAC and each claim with prejudice.

DATED:  September 19, 2014                    By:      /s/ Brian C. Rocca
                                                         _____
                                                         BINGHAM MCCUTCHEN LLP
                                                         Brian C. Rocca
                                                         brian.rocca@bingham.com

                                                         WILLIAMS & CONNOLLY LLP
                                                         John E. Schmidtlein
                                                         jschmidtlein@wc.com

                                                         Attorneys for Google Inc.