Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GARY FEITELSON, a Kentucky resident, and DANIEL MCKEE, an Iowa resident, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE INC., a Delaware corporation,<br><br>Defendant. | No. 5:14-CV-02007 BLF<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS<br><br>Date: November 20, 2014<br>Time: 9:00 a.m.<br>Judge: Hon. Beth Labson Freeman<br>Dept.: Courtroom 3, 5th Floor |

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................. 2

    A.   Google is a monopolist in general search ............................................... 2

    B.   Google is a monopolist in handheld general search ................................ 3

    C.   Google engages in unlawful behavior in order to restrain trade and to maintain and grow its monopoly in the search markets at issue ......................... 4

        1.   Google restrains and injures competition through the use of its MADAs .................................................................................... 4

        2.   Google further forecloses competition through the use of exclusive contracts with Apple ............................................... 6

    D.   Google restrains and injures competition in markets where already there are high barriers to entry ................................................................. 7

    E.   Google's unlawful practices harm consumers ......................................... 8

        1.   Google harms consumers by killing competition and consumer choice, and by stifling innovation ................................ 8

        2.   Google harms consumers by causing supra-competitive pricing of affected Android OS devices ....................................... 8

    F.   Only a few years ago, Google decried the behavior it now seeks to defend ....................................................................................................... 9

III. ARGUMENT .................................................................................................... 10

    A.   Legal standards ..................................................................................... 10

    B.   Plaintiffs state a claim under Section 1 of the Sherman Act based on the anti-competitive aim and effects of Google's exclusive arrangements with device manufacturers ................................................ 12

        1.   Plaintiffs adequately state a claim based on Section 1's broad proscription of anti-competitive agreements ..................... 12

        2.   Plaintiffs adequately state a claim based on Section 1's proscription of anti-competitive exclusive dealing agreements ................................................................................. 12

            a.   Plaintiffs adequately plead anti-competitive exclusive dealing agreements ....................................... 13

                (1)   Plaintiffs adequately allege exclusivity ............................. 13

(2)     Plaintiffs adequately plead the lack of comparable, cost-efficient alternative distribution channels ........................................................... 15

(3)     Plaintiffs adequately allege substantial market foreclosure ..................................................... 16

b.     Plaintiffs adequately plead *de facto* anti-competitive exclusive dealing arrangements ...................................................... 17

C.     Plaintiffs state a claim under Section 2 of the Sherman Act for monopolization, and, alternatively, attempted monopolization ............................ 19

D.     Plaintiffs state a claim under Section 3 of the Clayton Act based on Google's anti-competitive MADAs and *de facto* exclusionary arrangements .......................................................................................... 21

E.     Plaintiffs adequately allege antitrust injury and adequately demonstrate antitrust standing .................................................................. 21

F.     Plaintiffs adequately plead state law claims ........................................................ 24

1.     Plaintiffs state a claim under California's Cartwright Act ......................... 24

2.     Plaintiffs state a claim under California's Unfair Competition Law .................................................................. 24

IV.     CONCLUSION ............................................................................................................ 25

1

## TABLE OF AUTHORITIES

2

Page(s)

3

### CASES

4

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,
592 F.3d 991 (9th Cir. 2010) ......................................................................................11, 16, 17

5

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ........................................................................................................10, 11

6

7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ...................................................................................................................19

8

9

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983) ...................................................................................................................22

10

11

*Axiom Advisers & Consultants, Inc. v. School Innovations & Advocacy, Inc.*,
2006 U.S. Dist. LEXIS 11404 (E.D. Cal. Mar. 20, 2006) ........................................................22

12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................10, 11

13

14

*Blue Sky the Color of Imagination, LLC v. Mead Westvaco Corp.*,
2010 WL 4366849 (N.D. Cal. Sept. 23, 2010) .................................................................. *passim*

15

16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ...................................................................................................................22

17

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986) ...................................................................................................................22

18

19

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163, 83 Cal. Rptr. 2d 548 (1999) .....................................................................24, 25

20

21

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363, 113 Cal. Rptr. 2d 175 (2001) ...........................................................24, 25

22

*Church & Dwight Co., Inc. v. Mayer Labs., Inc.*,
2011 WL 1225912 (N.D. Cal. Apr. 1, 2011)...................................................................... *passim*

23

24

*Colonial Med. Grp., Inc. v. Catholic Healthcare W.*,
2010 WL 2108123 (N.D. Cal. May 25, 2010)..........................................................................16

25

26

*Community Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.*,
92 Cal. App. 4th 886, 112 Cal. Rptr. 2d 304 (2001) .................................................................24

27

*DCD Programs, Ltd. v. Leighton*,
833 F.2d 183 (9th Cir. 1987).....................................................................................................11

28

*Digidyne Corp. v. Data Gen. Corp.*,
   734 F.2d 1336 (9th Cir. 1984) ................................................................21

*In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*,
   2013 WL 812143 (D.N.J. Mar. 5, 2013) ..................................................17

*Eastman Kodak Co. v. Image Tech. Servs.*,
   504 U.S. 451 (1992) ..................................................................................19

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ................................................................11

*Farmers Ins. Exch. v. Superior Ct.*,
   2 Cal. 4th 377, 6 Cal. Rptr. 2d 487 (1992) ............................................25

*Foman v. Davis*,
   371 U.S. 178 (1962) ..................................................................................11

*Free Freehand Corp. v. Adobe Sys.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ..................................................23

*Gafcon, Inc. v. Ponsor & Assocs.*,
   98 Cal. App. 4th 1388, 120 Cal. Rptr. 2d 392 (2002) ............................25

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
   352 F.3d 367 (9th Cir. 2003) ..................................................................23

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ................................................................21

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ..................................................................24

*LePage's, Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ..............................................................19, 20

*Lorenzo v. Qualcomm Inc.*,
   603 F. Supp. 2d 1291 (S.D. Cal. 2009) ..............................................23, 24

*Masimo Corp. v. Tyco Health Care Grp.*,
   2004 WL 5907538 (C.D. Cal. June 10, 2004)....................................17, 20

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ..............................................................23, 24

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
   909 F.2d 1245 (9th Cir. 1990) ................................................................19

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ............................................................11, 18

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
   104 Cal. App. 4th 508, 128 Cal. Rptr. 2d 463 (2002) ...................................................24

*Phillips v. Bank of Am., N.A.*,
   2011 WL 2160583 (D. Haw. June 1, 2011) ...............................................................12

*PNY Techs., Inc. v. SanDisk Corp.*,
   2014 WL 2987322 (N.D. Cal. July 2, 2014) ...............................................11, 16, 17

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   2013 WL 6229141 (C.D. Cal. Dec. 2, 2013)...............................................11, 13

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995).......................................................................21, 22

*Resnick v. Hayes*,
   213 F.3d 443 (9th Cir. 2000) ....................................................................10

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
   2014 WL 524076 (N.D. Cal. Feb. 6, 2014) ...............................................16

*Roland Mach. Co. v. Dresser Indus., Inc.*,
   749 F.2d 380 (7th Cir. 1984) ....................................................................21

*Sullivan v. National Football League*,
   34 F.3d 1091 (1st Cir. 1994) ....................................................................22

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ............................................................................. *passim*

*Tele Atlas N.V. v. Navteq Corp.*,
   2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ...........................................20

*United States v. Dentsply*,
   399 F.3d 181 (3d. Cir. 2005) ...............................................................13, 19, 20

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.D.C. 2001)...................................................................14, 20

*Western Parcel Express v. UPS*,
   190 F.3d 974 (9th Cir. 1999) ...............................................................11, 18

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
   865 F. Supp. 2d 1002 (C.D. Cal. 2011)...................................................24

*Wilner v. Sunset Life Ins. Co.*,
   78 Cal. App. 4th 952, 93 Cal. Rptr. 413 (2000) ......................................24

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ...............................................................17, 20

## STATUTES

15 U.S.C. § 1 ............................................................................................................ *passim*

15 U.S.C. § 14 .......................................................................................................... 21, 22

California's Cartwright Act. ..................................................................................... 24, 25

California's Unfair Competition Law ....................................................................... 25

## OTHER AUTHORITIES

11 Areeda & Hovenkamp, Antitrust Law (2011) ..................................................... 20

3 Philip Areeda & Herbert Hovenkamp, Antitrust Law (2008) .............................. 19, 20

# I.     INTRODUCTION

Google Inc. ("Google"), which holds monopoly shares in the critical U.S. markets for Internet search, requires that manufacturers ("OEMs") of Android OS mobile devices seeking to pre-load one or more of its ostensibly free applications onto a device *must* also make its search product the default search engine on that device.  More specifically, if an Android OEM seeks to pre-load a Google app that consumers demand, such as the YouTube app, or the client that alone allows entry to Google's app store, then Google requires the OEM to pre-load *all* of a suite of apps; place them prominently; *and also* take Google's search product and make it the default search engine on the covered device.  This suit is about redressing the violations of antitrust and fair-competition law that flow from this apps/default search engine mandate.

Incredibly, Google claims that its all apps/default search engine mandate is basically meaningless.  But Google's mandate is far from meaningless, for, as Google intends, it forecloses Google's rivals in Internet search from the singularly effective channel of search engine distribution to handheld device users, thereby fortifying Google's monopoly in search, to the detriment of competition and consumers alike.  What is more, the deleterious effects of Google's practice with respect to Android OS devices is amplified by Google's default search engine arrangement with Apple Inc. ("Apple"), which is the other dominant player in mobile operating systems.  Collectively, Google's exclusivity arrangements with Android OEMs *and* Apple leave no oxygen for Google's rivals in search.

The stakes are high.  A plausible reading of Google's all apps/default search engine mandate is that it is designed to maintain and expand Google's monopoly in search until Google is the only search engine of any note left standing.  And Google will succeed in this if its behavior is left to run its course, unchecked by the enforcement of antitrust and fair-competition law.  Imagine the world then, where one behemoth player controls what Americans know about a person, and what they do not; where one player alone controls which businesses are visible, and which are not; and where the lack of any real competition squelches innovation outright.  Google's right to contractual terms of its choosing stops where the law intervenes to preserve competition and the societal benefits it brings.

This case should proceed because plaintiffs plead plausible violations of antitrust and fair-competition law.  More specifically, Google's motion fails for the following reasons:

1.     Plaintiffs adequately state a claim for illegal restraint of trade under Section 1 of the Sherman Act and for violation of Section 3 of the Clayton Act.  Google misrepresents plaintiffs' claim under Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs do not allege a tying claim now, nor did they in their initial complaint; therefore, Google's contention that plaintiffs do not state such a claim is surplusage.  Rather, plaintiffs claim that Google, via its Mobile Application Distribution Agreements ("MADA") with device manufacturers, impermissibly restrains trade by making it impossible for Google competitors in handheld search to compete for the crucial default search engine status on affected devices.  Moreover, though plaintiffs need not allege that Google's MADA is an actual exclusive dealing arrangement for the conduct alleged to be actionable under Section 1, plaintiffs' allegations suffice to make out such an arrangement.  Plaintiffs' allegations also speak to a *de facto* exclusive dealing arrangement that violates Section 1.  Furthermore, the alleged conduct, based on Google's MADA, violates Section 3 (15 U.S.C. § 14) of the Clayton Act.

2.     Plaintiffs also adequately state a claim for unlawful monopolization, or, alternatively, attempted monopolization, under Section 2 of the Sherman Act.  Plaintiffs allege with specificity that Google possesses monopoly power.  Also, they allege with specificity that Google is maintaining that power not as a consequence of a superior product, business acumen, or historic accident, but through the unlawful use of the MADA terms at issue.  Plaintiffs adequately allege the foregoing.  Furthermore, the adequacy of plaintiffs' Sherman Act Section 1, and Clayton Act Section 3, allegations do not bear on the adequacy of plaintiffs' claims under Section 2 of the Sherman Act.

3.     Additionally, plaintiffs adequately allege their state law claims.  For the foregoing reasons, Google cannot defeat plaintiffs' Cartwright Act claim at the pleadings stage of this case.  Nor can it defeat plaintiffs' California law UCL claim, which is based in part on Google's violation of law as alleged in plaintiffs' complaint.

## II.     STATEMENT OF FACTS

### A.     Google is a monopolist in general search.

General Internet searches occur, *inter alia*, when a user goes to a search engine website – Google.com, for example—and executes a query there, or when she enters a query into her browser's

search bar and a pre-designated search engine operating in the background executes it.  (Pls.' First Am. Compl. (Dkt. No. 31) ("FAC"), ¶ 19.)

Google is a monopolist in the U.S. market for general search conducted on all devices, including laptops, desktops, mobile phones, and tablets.  Reportedly, Google's search engine share over all these devices was at *81.87%* as of March 2014.  By contrast, Google competitor Bing's[1] share was at a distant 9.8% as of that point in time, and its competitor Yahoo!'s share was at an even more distant 6.42%.  (*Id.*) By any standard, Google monopolizes the U.S. market for general search.  (FAC, ¶¶ 20-21.)

**B.     Google is a monopolist in handheld general search.**

Handheld general search occurs when a smartphone or tablet user performs an Internet search query on his or her device.  If, for example, a user wants to know where the nearest coffee shop is located, he might type his query into the search bar of his mobile browser.  The browser then will hand off the request to a pre-set search engine, such as the Google search engine, that will operate behind the scenes to execute his request.  Or he might use a dedicated search app, for example, a Google-branded app that was pre-loaded onto his phone, and enter his search term there.  When he does so with a Google search app, the search is processed through the Google search engine.  (FAC, ¶ 25.)

Google is a monopolist in the U.S. market for general search conducted on handheld devices.[2]  As of March 2014, Google's U.S. handheld general search engine share—the share of mobile phone and tablet searches run through Google's search engine—reportedly was at an astounding *86.82%*.[3]  Yahoo!'s share was at a distant 7.64%, and Bing's share was at an even more

---

[1] Bing is owned and operated by Microsoft Corporation ("Microsoft").

[2] The handheld general search market is a submarket of the Internet general search market.  The former captures Internet general searches performed on portable, wireless, handheld smartphones and tablets.  The latter captures Internet general searches performed not only on these handheld devices, but on desktop and laptop computers, too.  (FAC, ¶ 27.)

[3] Recognizing that Internet search, its *sine qua non*, was migrating from desktops to mobile devices, Google purchased the Android OS in August 2005.  Handheld device manufacturers including Samsung Electronics Co., Ltd. ("Samsung"), HTC Corporation ("HTC"), and others have adopted Android as the operating system for their smartphone and tablet devices.  These devices have included the exceedingly popular Samsung Galaxy and HTC EVO smartphone lines, and the Samsung Galaxy and HTC Flyer tablet lines.  (FAC, ¶ 23.)

With respect to mobile phones, Android's share of the United States smartphone market reportedly was at 51.7% as of January 2014.  But this does not begin to tell the story of Google's dominance in handheld devices.  That dominance is based on its overwhelming monopoly share in handheld general search.  (FAC, ¶ 24.)

distant 5.16%.  By any standard, Google monopolizes the U.S. market for handheld general search.  (FAC, ¶¶ 26-27.)

**C.      Google engages in unlawful behavior in order to restrain trade and to maintain and grow its monopoly in the search markets at issue.**

Google maintains monopoly status in handheld general search, which ensures that the vast majority of mobile and tablet searches will be run by its search engine.  (FAC, ¶ 28.)  Cornering the market on handheld-device searches, in turn, translates to colossal profits.  Google makes its money by selling advertising.  The primary component of its advertising profits is search advertising.  Search advertising, which is a function of Google's AdWords platform, serves paid ads in conjunction with so-called organic or natural search results.  These search advertisements are based on a computerized analysis of the search terms that the individual entered, and paid ads are served as a function of a bidding process that advertisers have undertaken in order to "buy" words in the search query.  (FAC, ¶ 29.)  Search advertising results in billions of dollars of revenue (reportedly $15 billion to $18 billion) to Google annually.  Unfortunately, Google has not competed for these billions of dollars merely on the basis of a better search engine.  (FAC, ¶ 30.)

**1.      Google restrains and injures competition through the use of its MADAs.**

A manufacturer of a smartphone or tablet that wishes to pre-load onto a particular device a Google software application such as YouTube, Google Play (the Google Play client allows entry to the Google app store), Google Maps for Mobile, Google Calendar, Gmail, or Google Talk, among others, must obtain a license from Google.  Google exploits this state of affairs to coerce manufacturers into making its search product the default search engine on covered devices.  (FAC, ¶ 35.)

Recently revealed copies of Google's contracts with device manufacturers, called MADAs, provide the details of Google's abusive market manipulation.  (*See* FAC Exs. A and B (MADAs with Samsung and HTC, respectively).)  Consumers of Android OS handheld devices demand certain applications on their devices, such as the YouTube video app and the Google Play client, the latter of which allows entry into the exclusive Google marketplace for the purchase of mobile apps.[4]  But if a

---

[4] *See* FAC, ¶¶ 36 nn.6 (consumers demand to see the YouTube app on their Android OS devices; indeed, a study confirmed that users prefer watching video with the YouTube app than via a web browser, and another study confirmed that consumers factor into their purchasing decisions which apps are pre-installed on a given device) and 7 (consumers also demand entry into the exclusive Google Play store, so that they can buy apps from among the 1.2 million available there

1   smartphone or tablet manufacturer such as Samsung or HTC seeks, for example, to pre-load one of these

2   must-have applications on a device, then Google requires that the manufacturer enter into an MADA that

3   permits it to pre-load the application only if it also agrees to make Google the default search engine on that

4   device.[5]   This requirement means that no rival search engine can compete for default search engine status

5   on a covered device because, by definition, there can be only one default search engine.[6]   Also, the

6   manufacturer also must agree to pre-load *all* apps within a suite of Google applications onto prime screen

7   real estate, whether it wants the other apps or not.  (FAC, ¶ 36.)

8        If a Google search app or widget is placed prominently on a handheld device, Google knows that

9   phone and tablet owners will use it, though they had no choice in placing it there.  Most phone and tablet

10   users are unaware of the interaction between their browser and the search engine which happens to be

11   powering it; they simply want information from the World Wide Web.  They do not realize that when they

12   type a query into the search/address box of their mobile web browser, the query is executed via a search

13   engine such as Google.  (FAC, ¶ 40.)

---

(FAC, ¶ 42); though Amazon, with its deep pockets, has developed an alternative app store for its tablets and phone, the number of apps available is only a fraction of those available in the Google Play store, leading one commentator to speak for many when he said he would not buy Amazon's Fire phone because of its inability to allow him entry into Google Play).

[5] Plaintiffs do not yet have sufficient information to identify which other manufacturers beyond Samsung and HTC have, or have had, contracts with Google with these same or substantially similar terms.  But the Joint Submission of Corrected Exhibit List (Dkt. No. 923) submitted in the *Oracle Am. Inc. v. Google Inc.* matter (N.D. Cal. No. 3:10-cv-03561) lists MADAs between Google and a who's who of Android OS device manufacturers, including LG, Toshiba, Fujitsu, Funai, iriver, GigaByte Tech. Co., JVC Kenwood, NEC Casio MobileComm, NEC Corp., Phillips Electronics Hong Kong, Sony, Acer, ASUSTek Computer, Dell, TCT Mobile, Yulong Computer Telecomm. Scientific, ZTE Corp., and Kyocera.  While these MADAs are not available for public inspection because they were not entered into evidence in the case, it is reasonable to infer that they contain the same sort of restrictions and requirements that the Samsung and HTC MADAs attached to plaintiffs' complaint do.  Discovery will reveal the exact particulars.

As of December 2012, the foregoing manufacturers of Android OS devices reportedly held 63.7% of the non-Apple smartphone market in the United States. Samsung and HTC alone combined for 31.2% of all U.S. smartphone devices.  *Id.*  Other manufacturers such as Motorola and LG make up a large portion of the market, too.  (LG reportedly had 7.1% of the market as of December 2012, *id.*, and Motorola had 14.1% of the market in July 2011, before it was acquired by Google.)  Because Apple also has agreed with Google to install Google's search product as the default search engine on its devices, FAC ¶¶ 48-50, the only competition that remains occurs on non-Apple devices.

[6] Google's anti-competitive practice of garnering default search engine status in the foregoing manner is currently under investigation by European Union authorities, following the lodging of a complaint by FairSearch.org, of which Microsoft, Expedia, Tripadvisor, Oracle, and others are members.  Reportedly, the European Union is now turning its attention to this matter, among other examples of Google's unfair competition.  (FAC, ¶¶ 37-38.)

1    Google's own study[7] showed that where browsers were concerned, few users (presumably after

2    being made aware of what a default search engine is and that there might be some way to choose an

3    alternative) could actually figure out how to change their default search engine to something else.  Thus, by

4    requiring default search engine status on millions and millions of Android OS devices through terms of its

5    MADAs, Google is guaranteed many more millions of Google searches through this highly effective,

6    utterly cost efficient (being free to Google), and *sui generis* method of distribution.[8]  More searches

7    translate to a better search engine because search algorithms improve by processing high volumes of

8    searches, and this improvement, in turn translates to greater and greater monopoly power and the profits

9    that flow from it—all of which further disadvantages Google's competitors.[9]  As a Google vice-president

10   put it: "*So more users more information, more information more users, more advertisers more users*, it's a

11   beautiful thing, lather, rinse, repeat, that's what I do for a living.  So that's what someone alluded to [as] *the*

12   *engine that can't be stopped*."  (FAC, ¶ 41 (emphasis added to quotation).)

13       **2.**       **Google further forecloses competition through the use of exclusive contracts with Apple.**

14   As part of its strategy to maintain and extend its monopoly in handheld general search, Google also

15   has entered into exclusionary agreements with the largest non-Android phone manufacturer, Apple.[10]

16   (FAC, ¶ 48.)  Over the years, Google has paid Apple hundreds of millions of dollars, if not billions of

17   dollars, for distribution of its search product as the default search engine on Apple iPhones, iPads, and

18   iPods.  (FAC, ¶ 49.)  Reportedly, Google will pay Apple over a billion dollars in 2014 to retain default

19   status on these devices.  (*Id.*)  This arrangement forecloses competing search engine companies from the

20   _____

21       [7] *See* "New Microsoft Browser Raises Google's Hackles," *The New York Times*, May 1, 2006 (http://www.nytimes.com/2006/05/01/technology/ 01google.html?pagewanted=print&_r=0) (last accessed July 31, 2014).

22       [8] *See* FAC, ¶¶ 51-58 and n.20 (explaining why there is no real substitute for distribution via Google's coercion of default search engine status on affected Android devices, and noting that Microsoft had spent over $100 million in one of its advertising campaigns to little effect, if any).

23       [9] *See* FAC, ¶¶ 59-61 (discussing the effects, acknowledged by the U.S. Department of Justice's Antitrust Division and others, that come from processing more and more searches, such that the performance of Google's search algorithm is increased more and more, which further raises the already high barriers to entry in the markets for general search); FAC, ¶¶ 63-65 (discussing the high barrier to entry based on managing search at Google's level, as acknowledged by its own Executive Chairman); *see also* FAC, ¶¶ 60, 61 and n.22, (discussing the high barrier to entry due to the huge financial investments and computational power the search endeavor requires).

24       [10] Reportedly, Apple's iOS operating system had a 51.66% share of the U.S. market from April-June 2014, while Android had a 42.36% share of the market for that time period.  (FAC, ¶ 48.)

1   best remaining opportunity to break Google's stranglehold on the handheld general search market and the

2   general search market as well.  (*Id*.)  It also contributes to the network effects that improve Google's search

3   algorithm, thereby enhancing Google's monopoly power and profits, such that Google's rivals are left at

4   greater and greater competitive disadvantage as time goes on.  (FAC, ¶ 50.)

**D.     Google restrains and injures competition in markets where already there are high barriers to entry.**

6             Google's unlawful practices restrain and injure competition, and stifle innovation, in markets

7   where already there are extremely high barriers to entry.  In order to be a viable search engine, a market

8   participant must process a high volume of searches so that its search algorithms can become truly viable

9   and improve over time.  (FAC, ¶¶ 59-61.)  The need for a high volume of searches thus presents one high

10  barrier to market entry.  Also, a market participant must have the resources to build and maintain the

11  physical plant, to program and maintain the requisite software and algorithms, and to perform the web

12  crawling and indexing that makes search possible.  (FAC, ¶¶ 60-62.)  This presents another high barrier to

13  market entry.  Google adds to these barriers by coercing OEMs to make its search engine the default search

14  product on devices covered by its MADAs, which, *inter alia*, denies its competitors volumes of searches

15  whose processing would improve those competitors' search algorithms.  This, in turn, lessens its

16  competitors' effectiveness and consumer appeal going forward, which results in fewer profits that

17  otherwise would be available to sustain and build upon their presence in the market.  (FAC, ¶ 59.)

18            Microsoft, with its deep pockets, has struggled mightily, and has lost likely billions of dollars

19  attempting to compete with Google in general search.  (FAC, ¶¶ 61-65.)  Indeed, it is certainly possible that

20  Microsoft could pull the plug on its search operations, which would be devastating to consumers.  (FAC,

21  ¶¶ 61-62.)  Google's unlawful MADA restrictions hasten this possibility.  And the much smaller, niche

22  competitor DuckDuckGo has complained bitterly of how difficult it is to change the default search engine

23  in Google's Chrome web browser, which further hobbles its extremely difficult quest to compete with

24  Google in general search.  (FAC, ¶ 66.)

25

26

27

28

**E.**     **Google's unlawful practices harm consumers.**

    **1.**     **Google harms consumers by killing competition and consumer choice, and by stifling innovation.**

The Google MADA terms at issue kill competition and consumer choice, and they stifle innovation. First, by using the hammer of its exclusive apps, including the one that allows entry into the Google Play store, Google denies its rivals the ability to compete for default search engine status, thus foreclosing the most highly effective and cost-efficient means of distributing a search product, for which there is no real substitute. (FAC, ¶¶ 26, 51-58.) Second, Google distributes its search product to consumers, and causes them to use it, without their knowledge or choice, which Google itself complained was a violation of law when it perceived Microsoft to be doing what it is doing now. (FAC, ¶¶ 1-3, 40-41, 51.) As Susan Creighton, counsel for Google and former Director of the Bureau of Competition at the Federal Trade Commission, put it at a congressional hearing: "And this really gets to the question of, are there impediments to the ability of consumers to choose. So if someone found, for example, that as Microsoft did there [with respect to Netscape in an earlier controversy involving web browsers], that Microsoft was intimidating OEMs from being able to offer rival product so that it never got to market, then I would want to have relief that went to those provisions that were preventing choice." (FAC, ¶ 70.) Third, Google's arrogating of more and more searches to itself via this unlawful method, fueling what it cynically calls its "beautiful cycle," pulls the oxygen—and profits—from the market, such that competitors cannot improve their own algorithms at Google's pace, leading to less money with which to innovate in the highly technical and resource-intensive general search arena. (FAC, ¶¶ 41-42, 59-68 and n.21.) Consumers suffer from the lack of innovation that might have been.

    **2.**     **Google harms consumers by causing supra-competitive pricing of affected Android OS devices.**

Additionally, when Google's competitors in handheld general search are prevented from competing with regard to default engine status, or for app exclusivity, on an Android OS phone or tablet, money they would pay manufacturers for that status—which would drive down the price of that device—stays in these competitors' pockets. A contest for default search engine status never occurs, so maximized payments to OEMs do not occur, such that the bottom line to affected devices cannot be subsidized by

these payments.  This means that consumers pay more for affected phones and tablets than they would but for Google's unlawful behavior.  (FAC, ¶ 71.)

This effect on consumer prices is not mere speculation.  Not only does standard economic theory support this conclusion,[11] but so, for example, do observations of the market for personal computers.  As with Windows-based personal computers, there is a race to the bottom price-wise for Android devices.  Prices would fall yet further with any funds available to manufacturers to apply to the bottom line.  (FAC, ¶ 72.)

Falling consumer prices is what has happened in the PC market due to the money that software producers pay PC manufacturers to pre-load their software onto the manufacturers' computers.  Google's MADAs foreclose analogous price-lowering subsidies to consumer prices for Android OS mobile devices.  Discovery and expert analysis will tell the tale of the exact quantum of dollars that U.S. consumers have overpaid for affected devices.  (FAC, ¶ 70.)

**F.     Only a few years ago, Google decried the behavior it now seeks to defend.**

While Google now contends that its MADAs are perfectly proper and of no consequence to competition, it sang a different song only a few short years ago.  In 2006 Google complained to the U.S. Department of Justice and the European Commission about what it said was a rival's plan to "unfairly grab Web traffic and advertising dollars from its competitors."[12]  Its own complaint to antitrust authorities was based on the very same sort of anti-competitive behavior regarding Internet search that is at issue in this suit.  (FAC, ¶ 1.)

Specifically, Google was complaining to antitrust enforcers about Microsoft's purported plans to make a Microsoft product the default search engine in a query box that Microsoft was adding to a new iteration of Internet Explorer.  As *The New York Times* reported, it was after Google's direct objections to Microsoft "went unresolved" that Google "took the matter to antitrust authorities in Europe and the United States ...."  "Google . . . informed the European authorities of its worry that 'Microsoft's approach to setting search defaults in Internet Explorer 8 benefits Microsoft while taking away choice from users.'" (FAC, ¶ 2.)

---

[11] *See* FAC, ¶ 9 n.1.

[12] "New Microsoft Browser Raises Google's Hackles," *The New York Times*, May 1, 2006 (http://www.nytimes.com/2006/05/01/technology/01 google.html?pagewanted=print&_r=0) (last accessed July 31, 2014).

1

Indeed, Google proffered a solution to the issue:

2

> The best way to handle the search box, Google asserts, would be to give users a
> choice when they first start up Internet Explorer 7.  It says that could be done by asking the
> user to either type in the name of their favorite search engine or choose from a handful of
> the most popular services, using a simple drop-down menu next to the search box.

3

4

And Google went even further.  As the *Times* noted, the Firefox and Opera browsers came with Google set

5

as the default, but Google's then-vice president for search, Marissa Mayer, "said Google would support

6

unfettered choice on those as well." (FAC, ¶ 3.)  So in 2006, Google was all about choice and viable

7

competition where search was concerned.  But Google's position, at least as to its own behavior, has

8

changed dramatically for the worse now that it seeks to maintain and expand its monopoly in general

9

search.  Now, Google thwarts competition in search and harms consumers, using the very method it

10

forcefully condemned.  Consumers and the markets deserve relief from Google's practices, which far

11

exceed in scope and effect those it called out as unlawful.

12

### III.   ARGUMENT

13

### A.    Legal standards

14

A complaint will survive a motion to dismiss when it "contain[s] sufficient factual matter, accepted

15

as true, to state a claim to relief that is plausible on its face." *Blue Sky the Color of Imagination, LLC v.*

16

*Mead Westvaco Corp.*, 2010 WL 4366849, at *1-2 (N.D. Cal. Sept. 23, 2010) (citing *Ashcroft v. Iqbal*, 129

17

S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When

18

considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must

19

construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th

20

Cir. 2000).  Although a complaint need not include "detailed factual allegations," it must offer "more than

21

an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949.

22

"When there are well-pleaded factual allegations, a court should assume their veracity and then

23

determine whether they plausibly give rise to an entitlement of relief." *Id.* at 1950.  Plaintiffs must allege

24

"plausible grounds to infer" that their claims rise "above the speculative level."[13] *Twombly*, 550 U.S. at

25

26

27

28

[13] As demonstrated throughout this memorandum, plaintiffs meet the applicable standards. Nonetheless, Google wants the Court to dismiss plaintiffs' claims out of some free-floating fear that discovery might be expensive and "push" it, as a "cost-conscious defendant," to settle.  (Def.'s Mot. To Dismiss (Dkt. No. 38) ("Mot.") at 10.)  But Google does not identify what likely discovery in this particular matter would prove so expensive that it would be "pushed" to settle supposedly "anemic" claims.  (*See id.* (citation omitted).)  Nor does Google explain what the "potentially massive factual controversy" in this case might be.  (*See id.* (citation omitted).)

1    555-56. "Determining whether a complaint states a plausible claim for relief" is "a context-specific task

2    that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct.

3    at 1950.

4         Furthermore, the Court should bear in mind that Google seeks to dismiss at the pleadings stage.

5    By contrast, Google's key authorities were not decided on motions to dismiss.  *See, e.g.*, *Allied Orthopedic*

6    *Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 994 (9th Cir. 2010) (appeal followed decisions on

7    class certification and summary judgment).[14]

8         Moreover, "[d]ismissal with prejudice and without leave to amend is not appropriate unless it is

9    clear . . . that the complaint could not be saved by amendment."  *Eminence Capital, LLC v. Aspeon, Inc.*,

10   316 F.3d 1048, 1052 (9th Cir. 2003).  Also, plaintiffs certainly may be given several opportunities to

11   amend in good faith.  *E.g.*, *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).  Plaintiffs,

12   who only have amended once as a matter of right, respectfully seek leave to amend where, in the Court's

13   view, such amendment is needed to survive dismissal of any of their claims.  Because Google would suffer

14   no prejudice as a result of any such amendment (let alone undue prejudice), the liberal policy regarding

15   amendment should be observed.  *E.g.*, *Eminence Capital*, 833 F.2d at 186 ("Absent prejudice, or a strong

16   showing of any of the remaining *Foman* factors,[15] there exists a *presumption* under Rule 15(a) in favor of

17   granting leave to amend.") (emphasis in original) (citation omitted).  This is especially so in a case

18   presenting such important claims as this one, where critical Internet search markets—which involve

19   millions and millions of consumers and billions of dollars in commerce—are at issue.

20

21        [14] *See also Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1159 (9th Cir. 1997) (appeal
     following trial); *Western Parcel Express v. UPS*, 190 F.3d 974, 975 (9th Cir. 1999) (appeal
22   following summary judgment); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *1, 11
     (N.D. Cal. July 2, 2014) (matter decided on motion to dismiss, but three years after the case had
23   been filed; after plaintiff had been given leave to file a third amended complaint; and after
     discovery); *see also Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *7 (C.D.
24   Cal. Dec. 2, 2013) (finding, *inter alia*, that it was premature at the pleadings stage to determine
     whether agreements "do in fact leave open alternative methods of distribution," and citing to
25   authorities noting that key issues were not decided under Rule 12(b)(6) and that other key issues in
     exclusive dealing case could not be decided on summary judgment because of genuine issues of
26   material fact) (citations omitted).

         [15] *See id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or
27   declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant,
     repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the
28   opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave
     sought should, as the rules require, be 'freely given.'")).

**B.      Plaintiffs state a claim under Section 1 of the Sherman Act based on the anti-competitive aim and effects of Google's exclusive arrangements with device manufacturers.**

       **1.      Plaintiffs adequately state a claim based on Section 1's broad proscription of anti-competitive agreements.**

Plaintiffs adequately state a claim under Section 1 of the Sherman Act.  A Section 1 violation requires only "'(1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged.'"  *Phillips v. Bank of Am., N.A.*, 2011 WL 2160583, at *6 n.4 (D. Haw. June 1, 2011) (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988)).  Plaintiffs have alleged an agreement—the MADA, with its unlawful provision requiring the OEM counterparts to make the Google search app the default search engine on covered devices—between Google on the one hand and Samsung and HTC, respectively, on the other.  (FAC, ¶¶ 35-36.)  Plaintiffs also have alleged that Google intended the agreement to harm or unreasonably restrain competition in handheld general, and general, search.  (FAC, ¶¶ 8, 30, 35-42.)  And plaintiffs have alleged that Google's MADA has caused injury to competition within a field of commerce in which the plaintiffs are engaged (actually two: general search (and its handheld submarket), and the inextricably intertwined field of handheld devices).  (FAC, ¶¶ 59-68, 70, 79-82.)  Additionally, plaintiffs have pled Google's overwhelming market power in handheld general, and general, search.  (FAC, ¶¶ 19-26.)  And they have pled antitrust injury.  (FAC, ¶¶ 69-73, 79-82.)  Plaintiffs' detailed allegations satisfy the pleading standard for a Section 1 violation.

       **2.      Plaintiffs adequately state a claim based on Section 1's proscription of anti-competitive exclusive dealing agreements.**

Plaintiffs' allegations also suffice to state a claim for exclusive dealing under Section 1 of the Sherman Act, both based on the express terms of Google's MADAs, and as a *de facto* exclusive dealing arrangement.  With respect to the former, the U.S. Supreme Court has stated that whether a contract creates an exclusive dealing arrangement depends on its "practical effect" and its "practical application."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  And with respect to both sorts of exclusive dealing arrangements, in general;

> "a prerequisite to any exclusive dealing claim is an agreement to deal exclusively.  An express exclusivity requirement, however, is not necessary, because we look past the terms of the contract to ascertain the relationship between the parties and the effect of the

1  agreement in the real world." [*ZF Meritor*, 696 F.3d at 270] (citations and internal
2  quotation marks omitted); *see also United States v. Dentsply*, 399 F.3d 181, 189 (3d. Cir.
   2005) ("economic realities rather than a formalistic approach must govern review of
3  antitrust activity").  "Thus, *de facto* exclusive dealing claims are cognizable under the
   antitrust laws." *ZF Meritor*, 696 F.3d at 270 (citations omitted).  "There is no set formula
4  for evaluating the legality of an exclusive dealing agreement, but modern antitrust law
   generally requires a showing of significant market power by the defendant, substantial
5  foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals,
   and an analysis of likely or actual anticompetitive effects considered in light of any
6  procompetitive effects." *Id.* at 271 (citations omitted).  "Exclusive dealing will generally
   only be unlawful where the market is highly concentrated, the defendant possesses
7  significant market power, and there is some element of coercion present." *Id.* at 284
   (citations omitted).

8  *Pro Search Plus*, 2013 WL 6229141, at *5.

9          **a.      Plaintiffs adequately plead anti-competitive exclusive dealing
                    agreements.**

10         Google contends that plaintiffs have not made out an exclusive dealing claim based on its MADAs

11  for supposed pleading failures related to exclusivity, alternative distribution channels, and substantial

12  market foreclosure.  Google is wrong as to each of these.

13                  **(1)      Plaintiffs adequately allege exclusivity.**

14         First, Google claims erroneously that plaintiffs fail to allege exclusivity.  (Mot. at 11-12.)  But

15  Google points to no authority that requires "exclusivity" within the meaning that Google posits, *i.e.*, that as

16  a function of its contract, no other search engine could be distributed to handheld device users.  Google's

17  argument is really about whether all avenues of distribution are completely foreclosed by its MADA term,

18  but that kind of exclusivity is definitely not required by the case law.  Rather, as explained in the

19  immediately succeeding section, exclusive dealing arrangements have been found unlawful when

20  exclusion is at 40% or even well below.  *See, e.g.*, *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 2011

21  WL 1225912, at *6 (N.D. Cal. Apr. 1, 2011) (collecting cases and discussing substantial foreclosure as

22  possible at various percentages under differing circumstances, including at 24, 40, and 50%).  The fact that

23  theoretically another search product could be used on an affected device does not defeat plaintiffs' Section

24  1 claim.

25         Further, this case involves default search engine status, and search engines are a very special sort of

26  product.  Whereas a consumer understands how to make a choice between Coke and Pepsi, for example,

27  plaintiffs' allegations demonstrate that such is not the case with a search product.  (FAC, ¶¶ 15-16, 41.)

28  Most consumers, including the plaintiffs here, do not understand that one default search engine or another

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS                        - 13 -
Case No. 5:14-CV-02007 BLF
010437-11 726045 V1

1   is powering web searches conducted by mobile browsers or apps.  They do not perceive that their searches

2   are executed by more software operating in the background—software they did not choose.  This is the

3   singular beauty of default search engine status, and as plaintiffs have alleged, Google well knows it.  (FAC,

4   ¶¶ 15-16, 40-41, 51-52, 55.)

5        Google argues that its "MADA does not impose exclusivity on either OEMs or consumers with

6   regards to Google's mobile search app or any other app."  (Mot. at 11.)  But in fact the MADA does

7   impose exclusivity.  That is the whole point of the default search engine requirement.  *There can be only*

8   *one default search engine*, and Google requires manufacturers that want to pre-load certain of its apps on a

9   given device to pre-load its search product in that unique "position" on that device.  (FAC, ¶ 36.)  But by

10  "position," plaintiffs do not here mean the physical location of an icon on a screen, but rather the critical,

11  *sui generis*, and lucrative functionality (and avenue of distribution) that Google has taken for itself.[16]

12       Google argues that a manufacturer could pre-load another search app.  (Mot. at 12.)  But it would

13  not be the default search app; it would be buried behind Google's other apps; and it would add to the pre-

14  load clutter (which largely is a function of Google's MADA) on a device.  *Cf. United States v. Microsoft*

15  *Corp.*, 253 F.3d 34, 61, 64 (D.D.C. 2001) (upholding district court's finding that OEMs could not

16  "practically install a second browser in addition to [Internet Explorer] . . . in part because '[p]re-installing

17  more than one product in a given category . . . can lead to confusion among novice users," and citing to

18  testimony in accord with that proposition; also,  citing favorably to finding that "pre-installing a browser in

19  addition to IE would to many OEMs be 'a questionable use of the scarce and valuable space on a PC's

20  hard drive.'").

21       The situation at bar is not like slotting or promotional fees paid to grocery stores for displaying

22  Pepsi or Phillip Morris cigarettes at a more prominent place on a shelf or rack than a competitor's product.

23  (*See* Mot. at 12.)  Default search engine status is a hidden state on an advanced piece of technology.  It is

24  not about having to bend down lower for a Coke when Pepsi is placed at eye level, or to look over and up

---

25  [16] Indeed, a report published since plaintiffs filed their amended complaint indicates that
26  Google has wrung yet more exclusivity from at least one of its MADA partners (likely Samsung,
    based on counsel's analysis) (https://www.theinformation.com/Google-s-Confidential-Android-
    Contracts-Show-Rising-Requirements (last accessed Oct. 15, 2014).)  Now Google demands for
27  itself the advantage of having its search widget appear when a user pushes and holds an affected
    device's hardware home button, or when she sweeps up from the bottom of the screen.  (*Id.*)  This
    is yet another type of lockout of Google's rivals in general search.

28

for a different brand of cigarettes.  Everyone knows how to do those things.  Default search engine status is about the patent, and patently valuable, but invisible, advantage that comes from operating in the background; and it is about exploiting the fact that most customers do not even realize they are using Google's search product by default, and would not know how to opt for another product even if they did.  (FAC, ¶¶ 15-16, 40-41.)

### (2)   Plaintiffs adequately plead the lack of comparable, cost-efficient alternative distribution channels.

Second, Google claims that plaintiffs concede the availability of alternative distribution channels.  (Mot. at 12-14.)  Plaintiffs concede nothing; Google's MADAs provide what they provide.  But the notion that there are *real* alternative distribution channels is a fallacy.  Rivals in search cannot distribute their search engines via the default search engine avenue because Google has locked up that channel both with respect to the dominant Android OS OEMs and also with Apple.  And as plaintiffs allege in detail, FAC, ¶¶ 40-41, 51-58, there is no substitute for default search engine status, which is why Google has paid Apple at least a billion dollars for that status on certain of Apple's products, and why Google insists upon that status in its MADAs, even though there is no technical or pro-competitive reason for that insistence.  (FAC, ¶¶ 36, 48-50.)  As plaintiffs allege, the term at issue is there because default search engine status guarantees a high degree of use from consumers, most of whom do not even know that there is such a thing—let alone how to change the search product.  (FAC, ¶¶ 15-16, 40-41, 51-52, 54, 58.)  And use translates directly to search-related ads, which yield billions of dollars in revenue each year added to Google's bottom line.  (FAC, ¶¶ 29-30.)

Plaintiffs plausibly allege that there is no comparable, cost-efficient, or effective substitute for distribution via the achievement of default search engine status.  (FAC, ¶¶ 40-41, 51-58.)  This is enough at the pleading stage.  *See, e.g.*, *Church & Dwight*, 2011 WL 1225912, at *6, 13 (denying motion to dismiss Section 1 claim; noting that plaintiffs must ultimately demonstrate that the conduct at issue "'substantially forecloses'" competition; and observing that in slotting/display space authorities cited by the defendant, "alternative means of marketing [were not] significantly curtailed"); *see also Blue Sky*, 2010 WL 4366849, at *4 (denying motion to dismiss Sherman Act claims where plaintiff alleged not that every avenue of distribution was completely closed, but that defendant had "entered into an exclusive dealing contract with the intent and effect of excluding all rivals from certain office superstores").  Moreover, as plaintiffs allege,

1   Google has demonstrated that it knows this by way of its contracts with manufacturers controlling the vast

2   majority of the market for smart handheld devices, even at the cost of the billion dollars it has paid to

3   Apple.  This is ample at the pleadings stage.

4                 **(3)      Plaintiffs adequately allege substantial market foreclosure.**

5          Third, Google claims that plaintiffs fail to allege substantial market foreclosure.  (Mot. at 14-15.)

6   In *Allied Orthopedic*, the Ninth Circuit said that "an exclusive dealing arrangement violates Section 1 only

7   if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'"  592 F.3d

8   at 996 (citation omitted).  And in fact, plaintiffs offer great detail with regard to market foreclosure, and it

9   is reasonable to infer at the pleadings stage that the foreclosure is substantial indeed.  Discovery and

10  analysis will reveal exactly how much of the market for general search that Google has foreclosed by way

11  of its exclusive agreements with manufacturers of Android manufacturers.  But plaintiffs already have pled

12  the high market share of Android OS manufacturers writ large and individually, as well as the roster

13  (including market share) of OEMs bound by, and evidently bound by, Google's MADAs.  (FAC, ¶ 36 and

14  n.8.)  Given the uniquely effective channel for the distribution of search engines to mobile device users that

15  Google has coerced for itself, FAC, ¶¶ 51-58, it is reasonable to infer at the pleadings stage that substantial

16  market foreclosure has occurred.  Further, Apple alone reportedly controls some 51.66% of the U.S.

17  market for smartphones, n.10, *supra*, and Google has also entered into a default search engine agreement

18  with it.  Again, it is reasonable to infer at the pleadings stage that the result is substantial market

19  foreclosure.[17]

20          _____

    [17] Google's authorities are inapposite.  Citing to *SanDisk*, 2014 WL 2987322, at *4, Google
21  argues that its MADAs cannot form the basis of a Section 1 claim because they are too short in
    duration (two years, FAC Exs. A and B—much longer than the 45 day term in *SanDisk*) and not as
22  restrictive as the ones "approved of" in that case.  (Mot. at 15.)  But in *SanDisk*, unlike here, the
    agreements were "easily terminable, none requiring more than 45-days' notice to cancel," *id.*,
23  whereas here, the two-year term of Google's MADAs is illusory; Android OEMs cannot cancel
    them lest they lose access to must-have applications such as YouTube and the Google Play client.
24  (FAC, ¶¶ 35-36.)  For the same reason, Google's MADAs are not less restrictive than the *SanDisk*
    agreements because Android OEMs cannot truly "shift any amount of their volume to other devices
    that are not subject to a MADA" (Mot. at 15); if they do, they lose Google's must-have apps.
25          As for *Rheumatology Diagnostics Lab., Inc. v. Aetna*, 2014 WL 524076 (N.D. Cal. Feb. 6,
    2014) and *Colonial Med. Grp., Inc. v. Catholic Healthcare W.*, 2010 WL 2108123 (N.D. Cal. May
26  25, 2010), each is also distinguishable and unavailing to Google, in part because each was based on
    highly specific fact patterns that do not mirror the facts here.  *See Rheumatology Diagnostics*, 2014
27  WL 524076, at *11-12 (despite having two opportunities to amend, plaintiffs focused on effects to
    competitors alone, not competition, and provided "*no* allegations indicating a substantial
28  foreclosure in the relevant markets"; court could at most deduce a "0.3 percent" foreclosure as to
    one of the plaintiffs) (emphasis added); *Colonial Med. Grp., Inc.*, 2010 WL 2108123, at *6 (court

1

   **b.      Plaintiffs adequately plead *de facto* anti-competitive exclusive dealing arrangements.**

2

3          Additionally, even if plaintiffs had not adequately pled actual exclusive dealing contracts, they

4    have adequately pled *de facto* exclusive dealing arrangements.[18]  *See, e.g.*, *Pro Search Plus*, 2013 WL

5    6229141, at *4-7 (having previously stated that "'the case law support[s]the general proposition that a *de*

6    *facto* exclusive dealing arrangement can run afoul of the antitrust laws,'" court denied motion to dismiss,

7    which followed amendment, upon examination of plaintiff's allegations as a whole).  Exclusionary

8    contracts can violate antitrust laws "even though [the] contract does 'not contain specific agreements not to

9    use the (goods) of a competitor,' if 'the practical effect . . . is to prevent such use.'"  *Tampa Elec.*, 365 U.S.

10   at 326-27.  "An express exclusivity requirement . . . is not necessary because [courts] look past the terms of

11   the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real

12   world.'  Thus, *de facto* exclusive dealing claims are cognizable under the antitrust laws."  *ZF Meritor, LLC*

13   *v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (citations omitted).  Whether a contract creates an

14   exclusive dealing arrangement depends on the contract's "practical effect" and its "practical application."[19]

15   *Tampa Elec.*, 365 U.S. at 327.  Here, as plaintiffs have pled, the practical effect of Google's MADAs,

16   which require that the powerful default search engine avenue of distribution be given to Google free of

17   charge, is to quash competition from Google's rivals.  (FAC, ¶¶ 40-42, 51-61.)

18          Google's exclusive dealing arrangements with device manufacturers are factually distinguishable

19   from cases upholding short-term, *easily terminable* exclusive dealing contracts.  Here, as plaintiffs have

20   pled, the exclusive dealing arrangements "'foreclose competition in a substantial share of the line of

21   commerce affected.'"  *Allied Orthopedic*, 592 F.3d at 996 (citation omitted).  Moreover, the MADAs are

22   not "easily terminable."  A manufacturer wishing to forego these contracts can do so only at the extreme

23   cost of losing the ability to pre-load Google's essential Android apps, including the YouTube app and the

---

24   dismissed with leave to amend because plaintiff only alleged an effect on one customer in the posited market, and only under one circumstance).

25        [18] Whether an arrangement between parties is a *de facto* exclusive dealing arrangement presents questions of fact.  *Masimo Corp. v. Tyco Health Care Grp.*, 2004 WL 5907538, at *16 (C.D. Cal. June 10, 2004); *see also Blue Sky*, 2010 WL 4366849, at *4 (distinguishing cases not decided under Rule 12(b)(6)).

26

27        [19] Further, "[t]he question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage." *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013).

28

Google Play client which allows consumers entry into the Android app store.  (FAC, ¶¶ 35-36.)  Given these circumstances, Google's authorities are inapposite.

*Western Parcel Express v. UPS of Am.*, 190 F.3d 974 (9th Cir. 1999), affirmed summary judgment on an exclusive dealing claim "based on uncontradicted evidence in the record" establishing that the contracts: (a) were terminable "for 'virtually any reason at any time'"; (b) were not even exclusive dealing contracts, but rather were volume discount contracts; and (c) had lawful pro-competitive effects in a highly competitive expanding market with no entry barriers and in which competitors "aggressively entered" and in which plaintiff had "seen significant increase in profits."  190 F.3d at 975-77 (citation omitted).  These characteristics do not describe Google's MADAs or the practical impossibility of terminating the arrangements they demand.

As for *Omega*, an undisputed and complete *post-trial* evidentiary record showed, *inter alia*, that: (a) the agreements there foreclosed 38% (well less than the practical effect of Google's foreclosures here, given its contracting partners' market share; the Android OS market share; and Google's exclusionary arrangements with Apple); (b) there were hundreds of distributors available to manufacturers; (c) there were four other competing manufacturers that had significant "sales to end-users as an alternative channel of distribution"; (d) all of the distributor contracts were for one year only and were easily terminable (here, the agreements were/are facially for two years, but they were/are not at all easily or realistically terminable given Google's must-have-apps hammer); and (e) there was actual entry and expansion of a competing manufacturer, while "industry output . . . expanded substantially."  127 F.3d at 1162-65.  But Google's rivals in search have paltry market share in the search markets identified (FAC, ¶¶ 20, 26); there are hardly "hundreds of distributors" available to these rivals given Google's widespread exclusivity arrangements for default search engine status (FAC, ¶ 36 and n.8); and as stated above, in the real world, Google's exclusivity arrangements with Android OEMs are not easily terminable, no matter their ostensible two-year term, because manufacturers need to be able to pre-load apps like YouTube and the Google Play client to make their devices saleable (FAC, ¶¶ 35-36 and nn.6-7).

Thus, even if plaintiffs had not adequately pled actual exclusive dealing arrangements, which they did, their allegations suffice to state claims based on *de facto* exclusive dealing arrangements.

**C.  Plaintiffs state a claim under Section 2 of the Sherman Act for monopolization, and, alternatively, attempted monopolization.**

A violation of Section 2 for unlawful monopoly maintenance consists of two elements: (1) possession of monopoly power (which Google does not contest at this stage of the case (Mot. at 17 n.11)); and (2) "maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *E.g.*, *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 480 (1992). Section 2 prohibits a monopolist from conduct seeking "to foreclose competition, to gain a competitive advantage, or to destroy a competitor," *id.* at 482-83, or "'attempting to exclude rivals on some basis other than efficiency.'" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (citation omitted). It also is unlawful for a monopolist to engage in "'conduct which unnecessarily excludes or handicaps competitors'" in order to maintain a monopoly. *Id.* at 597 (citation omitted). Furthermore, whether conduct is anticompetitive is a question of fact for the jury. *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1255 (9th Cir. 1990).

Plaintiffs allege by way of detailed facts that Google possesses monopoly shares in the two general search markets it has identified. (FAC, ¶¶ 19-27.) Furthermore, they allege that Google has maintained that power (or, alternatively, attempted to establish a monopoly) by willful use of its unlawful MADA terms in the manners alleged. (FAC, ¶¶ 28, 41-42, 51, 58-61, 101-22.) Thus, plaintiffs have adequately stated a claim under Section 2 of the Sherman Act.

Nonetheless, Google contends that because the plaintiffs, in its view, have not stated a claim under Section 1 of the Sherman Act, "they cannot use those same flawed allegations to form the basis of a Section 2 claim." (Mot. at 17.) But Google is wrong, both in terms of whether plaintiffs have stated a Section 1 claim, and also in terms of the supposed effect on plaintiffs' Section 2 claims.

"Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist." *Dentsply*, 399 F.3d at 187. "'[A] monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior.'" *Id.* (quoting *LePage's, Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003)). Accordingly, "practices that harm rivals unnecessarily may be violations of § 2 when committed by a dominant firm, even though they would not be violations of other provisions when no dominant firm is involved." 3 Philip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651i, at 128 (3d ed.

2008).  Thus, a monopolist's exclusive dealing arrangements may not violate § 1, but can still run afoul of § 2.  11 Areeda & Hovenkamp, Antitrust Law ¶ 1800, at 21-22 (3d ed. 2011) ("The court [in Microsoft] rejected Microsoft's contention that a finding of no liability under § 1 'necessarily precludes holding it liable under § 2.'" (quoting *Microsoft*, 253 F.3d at 70)).

"The point is that § 2's highly general proscription of  'monopolistic' practices is not cabined by any specific statutory formulation and thus can be both less than or more than the prohibitions of the other antitrust laws," which "gives the courts more flexibility to fashion legal doctrine respecting dominant firms."  3 Areeda & Hovenkamp, ¶ 651i, at 128-29.  For this reason, "a finding in favor of the defendant [on an exclusive dealing claim] under Section 1 of the Sherman Act . . . [does] not 'preclude the application of evidence of exclusive dealing to support the [Section 2 claim.'"[20]  *Dentsply*, 399 F.3d at 197 (quoting *LePage's*, 324 F.3d at 157 n.3); *accord*, *Tele Atlas*, 2008 WL 4911230, at *1 ("[E]xclusive dealing arrangements that may not violate [§] 1 of the Sherman Act can still run afoul of [§] 2.").

So again, even if plaintiffs had not adequately pled a claim for exclusive dealing under Section 1 (which they have),[21] they nonetheless are able to proceed with their Section 2 claims on the basis of the facts pled, for "[a]lthough not illegal in themselves, exclusive dealing arrangements can be an improper means of maintaining a monopoly."  *Dentsply*, 399 F.3d at 187 (citing *United States v. Grinnell Corp.*, 384 U.S. 563 (1966)); *LePage's*, 324 F.3d at 157.  The bottom line is that plaintiffs have plausibly alleged the obvious: that Google's MADAs are designed to aid its efforts to maintain[22] its monopolies in general

---

[20] Also, in considering § 2 violations, it is "improper 'to focus on specific individual acts of an accused monopolist while refusing to consider the overall combined effect.'"  *Masimo*, 2004 WL 5907538, at *5 (quoting *Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1378 (9th Cir. 1992)); *Tele Atlas*, 2008 WL 4911230, at *1-2 (N.D. Cal. Nov. 13, 2008) ("[C]ourts must consider all of an alleged monopolist's related conduct in the aggregate" and "[w]hat matters is whether the 'synergistic effect' of the alleged conduct is to harm competition, and thus perpetuate a monopoly.") (citations omitted); *id.*, at *1 ("anticompetitive conduct" in maintenance of monopoly "may include otherwise *legal* conduct," which is a "point [that] is clear from this past century's jurisprudence") (emphasis in original).

[21] A monopolist violates Section 2 by entering into exclusive dealing arrangements, whether express or *de facto*, that unreasonably foreclose a substantial portion of the relevant market to existing or potential competitors.  *Tampa Elec. Co.*, 365 U.S. at 327; *Dentsply*, 399 F.3d at 191 (finding foreclosure in Section 2 case when exclusionary practices "ensure[d] that the key dealers offer [supplier's product] either as the only or dominant choice," and noting that "it is not necessary that all competition be removed from the market").  "Exclusive dealing arrangements are of special concern when imposed by a monopolist."  *ZF Meritor*, 696 F.3d at 271.

[22] Plaintiffs alternatively have pled an attempted monopolization claim.  Because plaintiffs have met the pleading standards with respect to their monopolization claim, *a fortiori* they have met the pleading standards for their attempted monopolization claim.  For example, with respect to

search and handheld general search.  Thus, plaintiffs have adequately pled their Section 2 monopolization claims based on Google's actions as alleged.

**D.     Plaintiffs state a claim under Section 3 of the Clayton Act based on Google's anti-competitive MADAs and *de facto* exclusionary arrangements.**

Under Section 3 of the Clayton Act (15 U.S.C. § 14), "unreasonable" exclusive dealing contracts or arrangements, including *de facto* arrangements, are illegal.  *E.g.*, *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984).  "In order to prevail on [a] section 3 claim, [plaintiff] will have to show both that there was an agreement, though not necessarily an explicit agreement, between it and [defendant] . . . and that the agreement was likely to have a substantial though not necessarily an immediate anticompetitive effect." *Id.* at 392 (citations omitted); *see also Tampa Elec.*, 365 U.S. at 327-28. Furthermore, "[t]he Sherman Act requires that an exclusive dealing arrangement actually foreclose competition, while the Clayton Act requires only that an agreement is likely to foreclose competition." *Blue Sky*, 2010 WL 4366849, at *4 (citation omitted).

Because plaintiffs have adequately pled Sherman Act violations based on actual or *de facto* exclusive dealing arrangements, their Clayton Act claim likewise (and more easily) survives Google's attempt at dismissal.[23]

**E.     Plaintiffs adequately allege antitrust injury and adequately demonstrate antitrust standing.**

Google argues that plaintiffs have alleged no antitrust injury, and, therefore, that they have no standing to bring their claims.  To bring an antitrust claim and recover damages[24] under the antitrust laws, a

---

the latter alternative, the "minimum showing of market share required . . . is a lower quantum than the minimum showing required in an actual monopolization case." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). "When the claim involves attempted monopolization, . . . [a] market share of 44 percent is sufficient as a matter of law to support a finding of market power. . . ." *Id.* (citations omitted); *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1207 (9th Cir. 1997) ("even if the ISOs only succeeded in proving a share near 50%, this would suffice to support a jury finding of market power for the purposes of the . . . attempted monopolization claim").

[23] Google also argues that the Clayton Act and Cartwright Act cannot apply because supposedly this case is about licenses rather than commodities or goods.  (Mot. at 18 and 24.) Google focuses on the MADAs as "licenses," but the products at issue are not the MADAs but rather, the software, including search software, that the MADAs cover.  There is no bar to either of these claims on this basis.  *See, e.g.*, *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1338 (9th Cir. 1984) ("The issue presented for review is whether Data General's refusal to license its NOVA operating system software except to purchasers of its NOVA central processing units (CPUs) is an unlawful tying arrangement under section 1 of the Sherman Act, 15 U.S.C. § 1 (1976) and section 3 of the Clayton Act, 15 U.S.C. § 14 (1976). We conclude that it is.").

private plaintiff must prove the existence of "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis in original).  "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *Id.* "[B]ecause the Sherman Act's concern is consumer welfare, antitrust injury occurs only when the claimed injury flows from acts harmful to consumers."[25] *Rebel Oil*, 51 F.3d at 1445.

Plaintiffs allege that Google's MADAs have led to supra-competitive handheld device prices because Google requires that Android OS OEMs seeking to pre-load its must-have apps on a device must give its search product default search engine status on that device for free.  (FAC, ¶¶ 36, 51, 58, 71-73.)  They allege that Android OEMs compete vigorously on price, and that sums that search engine companies would pay in free competition for default search engine status would be applied to the retail bottom line for handheld devices given the cutthroat pricing environment.  (FAC, ¶ 71-73.)  They cite to an academic study and what has occurred in an analogous circumstance with personal computers to support their claims.  (FAC, ¶¶ 9 and n.1, and 72-73.)  This is adequate at the pleadings stage.

As for plaintiffs' injuries giving rise to injunctive relief, in *Axiom Advisers & Consultants, Inc. v. School Innovations & Advocacy, Inc.*, 2006 U.S. Dist. LEXIS 11404, at *23 (E.D. Cal. Mar. 20, 2006), the court held that an allegation that "[defendant's] conduct has injured competition and consumers and that its acts have an anticompetitive effect of harming the competitive process, limiting consumer choice, and harming consumers" was sufficient to satisfy the antitrust injury pleading requirement.  Plaintiffs' allegations in this matter are even more detailed.

Specifically, plaintiffs have alleged that Google has made itself the default search engine on millions of devices, without consumer knowledge or choice, with the grave effect of foreclosing

---

[24] Additionally, plaintiffs seek injunctive relief with respect to Google's exclusionary MADAs. Even if this Court were to find that plaintiffs have not met their pleading requirements with respect to monetary damages, the standard for injunctive relief is lower.  Injunctive relief may be granted even where an antitrust plaintiff has failed to prove actual damages or lacks standing to sue for damages.  *E.g.*, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 112 (1986).

[25] Conduct that restricts consumer choice or makes the market "'unresponsive to consumer preference'" harms consumers and results in antitrust injury.  *See, e.g.*, *Sullivan v. National Football League*, 34 F.3d 1091, 1101 and n.3 (1st Cir. 1994); *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions. . . .").

competition, and strangling competitors, in markets where already there are extremely high barriers to entry.  (FAC, ¶¶ 35-36, 56, 58-68 .)  When an "agreement detrimentally change[s] the market make-up and limit[s] consumers' choice to one source of output," this causes the cognizable antitrust injury of "'prevent[ing] its victims from making free choices between market alternatives.'"  *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (citation omitted).  If Google is permitted to persist in its exclusionary arrangements, it well could force its remaining competitors, which are hanging on for dear life, from the general search markets altogether.  The market will be limited to Google, and consumers will no longer be able to choose between competitive offerings. This alone constitutes antitrust injury, which plaintiffs have thoroughly pled.

Plaintiffs also have pled harm to innovation.  If Google is the only search engine left standing, as it is dangerously close to being now, then it will have no incentive to innovate, and there will be no rivals to innovate themselves.  This, too, constitutes antitrust injury.  *E.g.*, *Free Freehand Corp. v. Adobe Sys.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012) (citing *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007) (allegations of stifling innovation in the market sufficient for antitrust injury)); *see also* FAC, ¶ 59 n.21 (referring to paper concluding that in high tech cases, "[t]he restraint's impact on consumer choice and innovation must also be considered.").

For these reasons, plaintiffs adequately allege antitrust injury for purposes of establishing antitrust standing.[26]

---

[26] Additionally, Google argues that plaintiffs have no antitrust standing with respect to their claims for monetary damages because, in its view, such damages, if any, were suffered in a device market, and not a market for search.  (Mot. at 19-21.) But Google is wrong.  As plaintiffs have alleged, FAC, ¶¶ 79-82, their monetary damages were suffered in a market inextricably intertwined with the search markets they have identified.  The restrictions in the MADAs were necessarily meant to operate on, and to be executed through, handheld devices, via which the prize—more searches via Google—was to be won.  Google's strategy could not be effected unless consumers used their MADA-covered, supra-competitively priced handheld devices.  Thus, consumers were the necessary means by which Google carried out its anticompetitive scheme.  (FAC, ¶¶ 15-16, 40-41, 51, 54.)  Plaintiffs naturally suffered damages as a result based on the lack of competition and subsidies that Google's exclusions have wrought.  *See, e.g.*, *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1030 (C.D. Cal. 2011) (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982) (stating "[w]here the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations ... would be likely to cause") (internal citations omitted)).  Google's authority, *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291 (S.D. Cal. 2009), is inapposite.  There, unlike here, the plaintiff failed to allege, *inter alia*, that he was the "'necessary means'" by which defendant "carried out its anticompetitive licensing scheme." *Id.* at 1301(citation omitted).  So because of plaintiff's failure to allege sufficiently that his injury was inexplicably intertwined with the defendants' unlawful conduct, *id.*, the court granted the motion to dismiss, albeit with leave to

1

**F.      Plaintiffs adequately plead state law claims.**

2

**1.      Plaintiffs state a claim under California's Cartwright Act.**

3

"Cartwright Act claims raise basically the same issues as do Sherman Act claims." *McGlinchy*,

4

845 F.2d at 811 n.4; *accord*, *Church & Dwight*, 2011 WL 1225912, at *16 (Sections 16720 and 16726 of

5

the Cartwright Act were patterned after the Sherman Act; "thus the requirements for stating a claim under

6

both federal and California antitrust statutes are similar." (citations omitted). Because plaintiffs' Sherman

7

(and Clayton) Act claims survive, so do their Cartwright Act claims.

8

**2.      Plaintiffs state a claim under California's Unfair Competition Law.**

9

California's UCL defines "unfair competition" to mean and include "any unlawful, unfair or

10

fraudulent business act or practice." The statute's intent and purpose is to protect both consumers and

11

competitors by promoting fair competition in commercial markets for goods and services. *See Cel-Tech*

12

*Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548 (1999). It

13

covers three types of unfair competition, including acts that are unlawful or unfair. *People ex rel. Bill*

14

*Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515, 128 Cal. Rptr. 2d 463 (2002); *Wilner v.*

15

*Sunset Life Ins. Co.*, 78 Cal. App. 4th 952, 964, 93 Cal. Rptr. 413 (2000). The coverage of Section 17200

16

is "broad" and "sweeping" and was intended by the Legislature "'to permit tribunals to enjoin on-going

17

wrongful business conduct in whatever context such activity might occur.'" *Cel-Tech*, 20 Cal. 4th at 181

18

(citation omitted). Also, the determination as to whether a challenged practice is "unfair" under Section

19

17200 "is a question of fact." *Community Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.*, 92 Cal. App. 4th

20

886, 894-95, 112 Cal. Rptr. 2d 304 (2001).

Section 17200 is not limited solely to illegal conduct or traditional anticompetitive practices. In

21

*Cel-Tech*, the Supreme Court of California articulated "that a practice may be deemed unfair even if not

22

specifically proscribed by some other law." 20 Cal. 4th at 180. "[T]he word 'unfair' in that section

23

[17200] means conduct that threatens an incipient violation of an antitrust law, or violates the policy or

24

spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or

25

otherwise significantly threatens or harms competition." *Id.* at 187; *see also Knevelbaard Dairies v. Kraft*

26

27

amend. *Id.* at 1307-08. Also, in *Qualcomm*, the plaintiff was not even a participant in the market
alleged, *id.* at 1301, whereas here, plaintiffs are absolutely participants in the general Internet

28

search markets at issue. (FAC, ¶¶ 15-16.)

1   *Foods, Inc.*, 232 F.3d 979, 994 (9th Cir. 2000).  Plaintiffs adequately state a claim under the unfairness

2   prong based on their detailed allegations pertaining to violations of antitrust law.  (*E.g.*, FAC, ¶¶ 19-30, 35-

3   36, 48-50, 59-73.)

4   But even if this Court were to find that plaintiffs had not sufficiently pled antitrust claims,

5   plaintiffs' UCL claim remains viable based on their allegations as to Google's conduct.  *See Chavez v.*

6   *Whirlpool Corp.*, 93 Cal. App. 4th 363, 375, 113 Cal. Rptr. 2d 175 (2001) ("We do not hold that in all

7   circumstances an 'unfair' business act or practice must violate an antitrust law to be actionable under the

8   unfair competition law.  Instead we hold that conduct alleged to be 'unfair' because it unreasonably

9   restrains competition and harms consumers . . . is not 'unfair' if the conduct is deemed reasonable and

10  condoned under the antitrust laws.").  Here, Google's conduct as alleged is decidedly not reasonable or

11  condoned under the antitrust laws, and certainly not on the pleadings.

12  As for the UCL's "unlawful" prong, virtually any "'civil or criminal, federal, state or municipal,

13  statutory, regulatory, or court-made,'" or "local law" can serve as the predicate for a claim under Section

14  17200.  *E.g.*, *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal. App. 4th 1388, 1425 n.15, 120 Cal. Rptr. 2d 392

15  (2002).  Hence, the statute permits violations of other laws to be treated as unfair competition that is

16  actionable thereunder.  *Cel-Tech*, 20 Cal. 4th at 180; *Farmers Ins. Exch. v. Superior Ct.*, 2 Cal. 4th 377,

17  383, 6 Cal. Rptr. 2d 487 (1992) (statute borrows violations of other laws and treats these violations, when

18  committed pursuant to business activity, as unlawful practices independently actionable under section

19  17200).  In other words a business practice is "unlawful" if it is "'forbidden by law.'" *Cel-Tech*, 20 Cal. 4th

20  at 180 (citation omitted).  Plaintiffs have adequately alleged that Google has violated the Sherman and

21  Clayton Acts. (FAC, ¶ 46.)  Accordingly, plaintiffs' claim under the unlawful prong of the UCL also is

22  adequately pled.

**IV.   CONCLUSION**

23  For all of the foregoing reasons, plaintiffs pray respectfully that defendant's motion be denied in its

24  entirety and that they be permitted to amend their complaint as necessary to avoid dismissal of any of their

25  claims.

26

27

28

DATED:  October 17, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP


By _____/s/ Steve W. Berman_____
           Steve W. Berman
Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Jeff D. Friedman
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2014, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

Dated: October 17, 2014                    /s/ *Steve W. Berman*
                                                              Steve W. Berman

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
Case No. 5:14-CV-02007 BLF
010437-11  726045 V1

- 27 -