# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| GARY FEITELSON, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GOOGLE INC.,<br><br>    Defendant. | Case No.  14-cv-02007-BLF<br><br>**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT WITH LEAVE TO AMEND**<br><br>[Re:  ECF 38] |

In this putative class action antitrust case, plaintiffs Gary Feitelson and Daniel McKee (collectively, "Plaintiffs") allege that defendant Google, Inc. ("Defendant") restrains trade in the market for Internet search through confidential agreements with cell phone manufacturers.  Before the Court is Defendant's Motion to Dismiss First Amended Complaint.  Def.'s Mot., ECF 38.  The Court heard oral argument on the matter on December 18, 2014, after which it deemed the matter submitted.  After careful consideration of the parties' respective written submissions and oral argument, the Court hereby GRANTS Defendant's Motion to Dismiss with leave to amend certain claims.

## I.    BACKGROUND

The following facts are taken from the First Amended Class Action Complaint ("FAC") and are assumed to be true.

### A.    Parties

Plaintiffs are consumers who purchased mobile phones connected to Defendant's alleged anticompetitive conduct.  Mr. Feitelson owns an HTC EVO 3D mobile phone purchased in Louisville, Kentucky.  FAC ¶ 15, ECF 31.  Mr. McKee owns a Samsung Galaxy S III mobile

1    phone purchased in Des Moines, Iowa.[1]  *Id.* ¶ 16.  Both the HTC EVO 3D and Samsung Galaxy S

2    III are devices that use the Android Operating System ("Android OS").

3          Defendant is a Delaware corporation with its headquarters and principal place of business

4    in Mountain View, CA.  Defendant is perhaps best known for Internet search, with which its name

5    has become nearly synonymous.  *Id.* ¶ 4.  Defendant also owns the Android OS, which it licenses

6    to phone manufacturers for free, as well as a bevy of popular mobile applications including

7    YouTube, Google Maps, Gmail, and the "Google Play (formerly Android Market) client," through

8    which mobile phone users are able to purchase applications, music, movies, and books from the

9    Google Play store.  *Id.* ¶¶ 6-8, 17, 35.

10         **B.    Relevant Markets**

11         Internet search occurs "when a user goes to a search engine website—Google.com, for

12   example—and executes a query there, or when he enters a query into his browser's search bar and

13   a pre-designated search engine operating in the background executes it."  *Id.* ¶ 19.  Defendant and

14   its rivals—such as Microsoft's Bing and DuckDuckGo—offer rival search engines, free of charge,

15   for use by the general public.  These search engines compete for users, as increased user queries

16   help improve the search engine's effectiveness and also increases advertising revenue from paid

17   search advertising.  *See id.* ¶¶ 60-61.

18         Plaintiffs allege that the Internet search market has a number of barriers to entry.  Search

19   engines improve with use, and successful search products must attract a critical mass of users to

20   input queries that, in turn, aid in improving the algorithm underlying the search product.  *Id.* ¶¶ 59-

21   60.  Improved search capabilities attract more users, thus iteratively enhancing the search

22   product's capability and appeal.  *Id.*  This cycle tends to favor the established products over new

23   entrants.  Moreover, search engines also require significant infrastructure in the form of physical

24   plants backed by significant financial and computational resources, as well as continuous

25   programming support for the algorithms and software that support the search engine, and the

26

27   ────────────────
     [1] Though not expressly alleged, the Court infers that the named Plaintiffs are residents of
28   Kentucky and Iowa respectively.

United States District Court
Northern District of California

ability to manage search on a global scale, thus also barring new entrants. *Id.* ¶¶ 59, 60 n.22, 63.

Plaintiff defines two relevant markets affected by Defendant's alleged anticompetitive conduct: (1) the "United States market for general search," which is "general Internet search conducted on desktop computers, laptops, and handheld devices via the Google search engine or one of its general search engine rivals, such as Bing," and (2) the submarket for "handheld general search" in the United States, which is "general Internet search conducted on smartphones and tablets. *Id.* ¶¶ 27, 75. Defendant's Google search engine, as of March 2014, accounted for 81.87% of all Internet searches conducted across all devices. *Id.* ¶¶ 20-21. In that same month Defendant's share of Internet searches conducted on mobile phone and table devices was 86.82%. *Id.* ¶ 26.

### C.   Mobile Application Distribution Agreements and Anticompetitive Conduct

As previously stated, Defendant owns the Android OS, as well as a suite of mobile applications ("Google Apps") that includes YouTube, Google Play, Google Phone-top search, Google Maps, Google Calendar, Gmail, Google Talk, etc. *Id.* ¶¶ 6-8, 35. While Defendant licenses the Android OS to mobile device manufacturers (or, original equipment manufacturers, or "OEMs") for free, it places restrictions on the OEMs' installation of Google Apps on the Android OS devices that they produce.

Specifically, OEMs frequently "pre-load" applications onto their devices because consumers demand access at startup to popular Google Apps such as YouTube and the Google Play store. *Id.* ¶ 36 n.6, n.7. If an OEM wishes to pre-load any of the Google Apps on an Android OS phone, for example, they must enter into a confidential licensing agreement with Defendant called a "Mobile Application Distribution Agreement" ("MADA"). *Id.* ¶¶ 7-8, 35. Through public filings in an unrelated case, Plaintiffs have obtained two such MADAs between Defendant and OEMs HTC and Samsung. *Id.* Exhs. A-B; *see also id.* ¶ 36 n.8 (suggesting that Defendant has entered into MADAs with a panoply of Android OEMs). Among other terms in the representative MADAs, an OEM that wishes to pre-load apps like YouTube and the Play client on an Android OS phone must also agree to make Google the default search engine for all "search access points" on the device. *Id.* ¶ 36, Exh. A at 5; Exh. B at 4. The OEM must also pre-load all of a suite of

1    Google Apps and must give those apps "prime screen real estate."[2]  *Id.* at ¶ 36.  The MADAs

2    terminate after two years and cover specific device models, which must be approved by Defendant

3    and are identified by addenda to the agreements.  *See id.* Exhs. A-B.

4           Prime placement on device screens and default setting status are important avenues by

5    which search engines obtain access to users.  Handheld device users will generally use the

6    prominently placed search engine app or widget that comes pre-loaded on their phone.  *Id.* ¶ 40.

7    Moreover, handheld device users are "unaware of the interaction between their browser . . . and

8    the search engine which happens to be powering it," and will generally simply execute searches by

9    typing queries into a browser's omnibox (the search/address box at the top of each browser)

10   without realizing that the search is being powered by Google, the default search engine on their

11   device.  *Id.*  Searches improve a search engine's algorithm and can also translate to greater

12   advertising revenue.  *See id.* ¶¶ 41, 60-61.  Thus, because device users are generally unaware of

13   the default settings, or are not strongly incentivized to change the default setting, Defendant

14   benefits from consumer preference for the status quo.  *Id.* ¶¶ 42, 55.

15          In January 2014, the Android OS's share of the United States smartphone market was

16   estimated to be 51.7%.  *Id.* ¶ 24.  Additionally, over the years, Defendant has paid Apple—which

17   accounts for the other substantial portion of the smartphone and handheld device market—

18   substantial amounts of money (estimated to reach $1 billion dollars in 2014) to act as the default

19   search engine on Apple iPhones, iPads, and iPods.  *Id.* ¶ 49.

20          **D.    Harm to Plaintiffs and Claims for Relief**

21          Plaintiffs use their phones for, among other things, Internet searches.  At the time they

22   purchased their respective phones, neither Plaintiff was aware that Google search was set as the

23   default search engine on those phones.  Further, neither Feitelson nor McKee know if there is a

24   way to change the default search engine setting, nor how to change the default search engine if

25   there is indeed a way to change it.  *Id.* ¶¶ 15-16.  Both of Plaintiffs' Android-based phones are

26   alleged to be covered by MADAs between HTC and Samsung—the respective phone

27   _____

28   [2] Although not expressly alleged, it does not appear that the OEMs pay for the applications.  In
     other words, the Google Apps are free to pre-load, subject to the conditions in the MADAs.

United States District Court
Northern District of California

1    manufacturers—and Defendant. *Id.* But for Defendant's anticompetitive MADAs, Plaintiffs

2    assert that their phones "would have cost less and had better search capabilities as the result of the

3    competition that would have ensued." *Id.*; *see also id.* ¶¶ 70-73.

4           Plaintiffs allege that the MADAs "quash competition for default search engine status

5    before it even can begin." *Id.* ¶ 42.  This, in turn, forecloses competition in the market for general

6    and handheld Internet search because default search engine status is the most effective and cost-

7    effective distribution channel for search engines. *Id.* ¶¶ 51-58.  Search engines improve in quality

8    with greater usage, so the diversion of search users to the Google search engine also permits

9    Defendant to improve its search algorithm, thereby shutting out competition on the merits. *Id.* ¶¶

10   50, 59-60, 66-67.  Plaintiffs allege that this cycle, if allowed to persist, would have the effect of

11   stifling innovation and diminishing consumer choice in the market for Internet search by forcing

12   Defendant's competitors out of business. *Id.* ¶ 70.  Furthermore, the MADAs prevent Defendant's

13   search competitors from competing for default search engine status on Android phones by offering

14   to pay for that status (as Defendant has done with Apple).  Because this price competition does not

15   occur for default search engine status on Android OS phones, OEMs cannot pass on subsidies

16   from search engine competitors to consumers and Defendant therefore *causes* "supra-competitive"

17   pricing in Android phones, which injures consumers. *Id.* ¶¶ 71-73.

18          Based on the foregoing, Plaintiffs seek to represent a class of similarly situated purchasers

19   of Android OS mobile telephones or tablets wherein the manufacturer has entered into a similar

20   contract with Defendant "by which Google has conditioned the right to pre-load any application

21   from a suite of Google applications . . . on the manufacturer's mandatory acceptance and

22   installation of Google search, or so-called Google Phone-top Search, as the default search engine

23   on that device." *Id.* ¶ 84.  Plaintiffs assert six causes of action, seeking injunctive relief under § 1

24   and § 2 of the Sherman Act (First, Second, and Third Causes of Action, or "COAs"), 15 U.S.C. §§

25   1-2; § 3 of the Clayton Act (Fourth COA), 15 U.S.C. § 14; and the California Unfair Competition

26   Law (Sixth COA), Cal. Bus. & Prof. Code § 17200 *et seq.*; as well as injunctive relief and treble

27   damages based on monetary injuries under California's Cartwright Act (Fifth COA), Cal. Bus. &

28   Prof. Code § 16727. *Id.* ¶¶ 95-141.

United States District Court
Northern District of California

## II.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock Inc.*, 349 F.3d 1191, 1199-200 (9th Cir. 2003).  Dismissal under Rule 12(b)(6) may be based on the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged."  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  Unless it would be clearly futile, a court granting a motion to dismiss should normally permit leave to amend.  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

In assessing the sufficiency of the pleadings, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The court need not and does not accept as true allegations that are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," and a complaint that pleads facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility."  *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

"[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal quotations omitted).  However, as our Supreme Court has noted precisely in the context of private antitrust litigation, "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive."  *Id.* at 558-59 (internal citations omitted).  As such, "a district court must retain the power to insist upon some specificity in

pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983) ("*AGC*") *quoted with approval in Twombly*, 550 U.S. at 559.

## III.   SHERMAN ACT CLAIMS (FIRST, SECOND, AND THIRD COA'S)

Section 1 of the Sherman Act prohibits unreasonable contracts or combinations in restraint of trade.  15 U.S.C. § 1.  To state a claim under § 1, a private plaintiff must allege "(1) an agreement, conspiracy, or combination between two or more entities, (2) an unreasonable restraint of trade, (3) anticompetitive effects within the relevant market, and (4) a resulting antitrust injury suffered by the claimant." *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 889 (N.D. Cal. 2012) (citing *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 442 (3d Cir. 1997)), *order vacated in part on reconsideration*, No. C-10-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012).

Section 2 of the Sherman Act prohibits monopolization and attempts to monopolize.  15 U.S.C. § 2.  In order to state a claim for monopolization under this provision, a plaintiff must allege: "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury." *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010).  A claim for *attempted* monopolization, requires allegations of the defendant's "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury.  *Cost Mgmt. Servs.*, 99 F.3d at 949; *Cal. Computer Prods., Inc. v. Int'l Bus. Mach. Corp.*, 613 F.2d 727, 735 (9th Cir. 1979); *United States v. Microsoft Corp.*, 253 F.3d 34, 50, 80 (2001).

Sections 4 and 16 of the Clayton Act provide complementary vehicles for private enforcement of the federal antitrust laws (including the Sherman Act).  Section 4 allows the recovery of monetary damages, while § 16 permits a private party to enjoin anticompetitive conduct.  15 U.S.C. §§ 15, 26; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109 (1986).  Acknowledging that Clayton Act § 4 and § 16 are written in broad terms, the Supreme

United States District Court
Northern District of California

1    Court has recognized the importance of determining whether private parties are the appropriate

2    plaintiffs to enforce the antitrust laws by inquiring into their "antitrust standing" to seek relief

3    under those sections.  *See AGC*, 459 U.S. at 529–535 (factors to consider for § 4 standing include

4    (1) whether the plaintiff has suffered antitrust injury; (2) the directness of the injury; (3) the

5    speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in

6    apportioning damages); *Cargill*, 479 U.S. at 109-113 (addressing standing requirements to pursue

7    § 16 injunctive relief).

8           The element of causal antitrust injury is common to both the substantive pleading

9    requirements under the Sherman Act and the analysis of antitrust standing.  Because Plaintiffs'

10   allegations fall short on this critical element, the Court's analysis begins there, followed by a

11   discussion of the substantive sufficiency of the Sherman Act claims.

12          **A.    Antitrust Standing and Antitrust Injury**

13          The Court begins by observing that both parties have briefed the issue of antitrust standing

14   assuming that Plaintiffs are seeking damages under § 4 of the Clayton Act.  *See* Def.'s Mot. 18-23,

15   ECF 38; Pl.'s Opp. 21-23, ECF 39.  On the face of the pleadings, it appears that Plaintiffs are

16   seeking damages under the Cartwright Act and that their Sherman Act claims are only for

17   injunctive relief under § 16 of the Clayton Act.[3]  *See* FAC ¶¶ 95-135.  This distinction matters

18   because the standing requirements for injunctive relief under § 16 are more lenient than those for

19   damages under § 4 of the Clayton Act.  *See Cargill*, 479 U.S. at 111 n.6.  Regardless, "under both

20   § 16 and § 4 the plaintiff must still allege an injury of the type the antitrust laws were designed to

21   prevent."  *Id.* at 111.  Plaintiffs have not adequately done so here.

22          The four requirements for antitrust injury are "(1) unlawful conduct, (2) causing an injury

23   to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the

24   type the antitrust laws were intended to prevent."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of

25   California*, 190 F.3d 1051, 1055 (9th Cir. 1999).  The injury must occur "in the market where

26

27   _____
     [3] As addressed below, the Court finds that the Cartwright Act claim must be dismissed without
28   leave to amend.

competition is being restrained." *Id.* at 1057. "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Id.* Plaintiffs allege two types of injury from Defendant's anticompetitive use of the MADAs: (1) likely loss of innovation and concomitant restriction of consumer choice, FAC ¶ 70, and (2) supracompetitive prices for Android phones, FAC ¶¶ 71-73. Neither of these injuries suffices to maintain the claims asserted here.

The allegations of Plaintiffs' injuries in the FAC are similar to those dismissed by the court in *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, (S.D. Cal. 2009). There, the plaintiff was a consumer in the market for cell phones and cellular services, whereas the defendant was a leader in the market for mobile phone chip technology. The plaintiff alleged that the defendant's anticompetitive licensing practices with respect to its CDMA chip technology caused harm in the form of "supracompetitive prices and impaired non-price competition in innovation of CDMA functionality." *Id.* at 1301. The supracompetitive prices were passed down through at least three levels of the supply chain—chipset manufacturers, device manufacturers, and vendors—before ultimately reaching the consumer-plaintiff. *Id.* The court, acknowledging that the plaintiff's "indirect purchaser status alone does not preclude antitrust standing" nevertheless dismissed his claim for *injunctive* relief, finding that the asserted injury incurred by the plaintiff was "too remote" from the defendant's alleged anticompetitive conduct "to support standing" to pursue such relief under the Clayton Act. *Id.* In so doing, the *Lorenzo* court appears to have also implicitly rejected the plaintiff's claim to antitrust injury from threatened harm to innovation. *Id.* at 1296 (recounting the plaintiff's allegations of anticompetitive harm including "supracompetitive prices and impaired non-price competition in innovation of CDMA functionality").[4]

Similarly here, Plaintiffs allege that they suffered antitrust injury in the form of supracompetitive pricing in Android phones, which is not the market in which the alleged anticompetitive conduct occurred. *See* Def.'s Mot. 19-21. Moreover, Plaintiffs elide allegations

[4] Though granted leave to amend, the *Lorenzo* plaintiff did not renew his federal antitrust (Clayton Act) claim in the subsequent pleading. *See Lorenzo v. Qualcomm, Inc.*, No. 08cv2124 WQH(LSP), 2009 WL 2448375, at *2 (S.D. Cal. Aug. 10, 2009).

United States District Court
Northern District of California

1  concerning the number of supply chain levels between OEMs who sign the allegedly

2  anticompetitive MADAs and end consumers like Plaintiffs.  Without such allegations, the Court

3  cannot determine whether Plaintiffs' alleged price injury "flows from that which makes

4  [Defendant's] conduct unlawful."[5]  *Am. Ad Mgmt.*, 190 F.3d at 1055.  As such, Plaintiffs have

5  failed to allege that they have suffered "antitrust injury" in the same market as and sufficiently

6  close to the alleged anticompetitive conduct to allow them to pursue private antitrust remedies

7  against Defendant.  *See Lorenzo*, 603 F. Supp. 2d at 1301.

8      Plaintiffs attempt to distinguish *Lorenzo* by arguing that the court there found that the

9  plaintiff had failed to allege "that he was the 'necessary means' by which defendant 'carried out its

10  anticompetitive licensing scheme.'"  Pl.'s Opp. 23 n.26 (quoting *Lorenzo*, 603 F. Supp. 3d at

11  1301).  The *Lorenzo* court cited *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745 (9th Cir. 1984),

12  for the "necessary means" language and Plaintiffs at oral argument urged this Court to consider

13  *Ostrofe*—which is not cited in their papers—when considering whether Plaintiffs' injury is

14  "inextricably intertwined" with Defendant's unlawful conduct.  It is not.  *Ostrofe*, decided very

15  shortly after *AGC*, interpreted *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), to

16  recognize a narrow exception to *AGC* allowing a dismissed employee to sue to enforce the

17  antitrust laws where that employee was dismissed for refusing to participate in the defendant's

18  price fixing conspiracy.  *Ostrofe*, 740 F.2d at 746.  Subsequent courts have limited *Ostrofe* to its

19  facts, finding that the exception "is limited to those cases in which a dismissed employee is an

20  'essential participant' in an antitrust scheme, the dismissal is a 'necessary means' to accomplish

21  the scheme, and the employee has the greatest incentive to challenge the antitrust violation."  *Vinci*

22  *v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir. 1996).  Similarly, the exceedingly narrow

23  *McCready* exception requires that the plaintiff's *injury* be inextricably intertwined with the injury

24  of the intended victim such that injuring the plaintiff is a necessary part of the anticompetitive

25  scheme.  *Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574, 580 (9th Cir. 1986);

26

27  _____

28  [5] Similarly, because directness is a factor to consider under *AGC* for purposes of standing for damages, Plaintiffs must also sufficiently allege directness of injury to the extent they intend to pursue a Clayton Act § 4 remedy.  *See AGC*, 459 U.S. at 543-44; *Am. Ad Mgmt.*, 190 F.3d at 1055.

10

1    *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 993 n.1 (N.D. Cal. 2010).  Neither

2    *Ostrofe* nor *McCready* benefits Plaintiffs here, as their alleged injuries—supracompetitive prices

3    and threatened loss of innovation and consumer choice—are not the necessary means by which

4    Defendant is allegedly accomplishing its anticompetitive ends.[6]

5              Plaintiffs' alternative theory of antitrust injury supporting their standing to seek injunctive

6    relief—the threatened harm to innovation and consumer choice—is equally deficient.  For one,

7    accepting Plaintiffs' argument would permit any consumer of Internet search to have standing to

8    sue for injunctive relief, as the proposed class of Android OS device consumers is no different

9    from the Apple device user or the computer search user when it comes to innovation and choice in

10   the market for Internet search products.  More fundamentally, Plaintiffs' allegations of

11   hypothetical loss of consumer choice and innovation are entirely too conclusory and speculative.

12   Plaintiffs allege that the MADAs—which cover only Android devices—*could* have the ultimate

13   result of "forc[ing] [Defendant's] remaining competition, which are hanging on for dear life, from

14   the general search markets altogether," and that "[i]f Google is the only search engine left standing

15   . . . then it will have no incentive to innovate."  Pl.'s Opp. 23.  However, the Court agrees with

16   Defendant that there are no facts alleged that would render these threatened injuries more concrete

17   than hypothetical, as there are no facts alleged to indicate that Defendant's conduct has prevented

18   consumers from freely choosing among search products or prevented competitors from

19   innovating.  *See* Def.'s Reply 14-15.

20             Plaintiffs' citations to both *Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir.

21   1994), and *AGC* are unavailing.  *See* Pl.'s Opp. 22 n.25.  Plaintiffs quote passages concerning

22   parties that were directly precluded from making certain choices by the anticompetitive conduct at

23   issue, but Plaintiffs here are at least one step removed from the preclusive effect of the MADAs

24   that are at the core of Plaintiffs' antitrust claims.  Defendant uses the MADAs to capitalize on the

25   preference of consumers (like Plaintiffs) for the status quo, but this does not victimize them or

26

27   _____

28   [6] To the extent Plaintiffs are the means by which Defendant improves its search engine algorithm
     and search product, Plaintiffs' relationship to Google search as the unwitting consumer is not an
     "injury" within the meaning of the antitrust laws.

United States District Court
Northern District of California

restrict their ability to "mak[e] free choices between market alternatives." *AGC*, 459 U.S. at 528. The threatened loss of innovation is even farther removed, as the Court would have to accept that the MADAs will push competitors out of the market for general Internet search and that, as the sole remaining search product provider, Defendant will not innovate. Such allegations, without more factual enhancement, "stop[] short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

To be sure, the standing requirements for injunctive relief are lower than those for damages, and Plaintiffs may likely have standing to pursue a Clayton Act § 16 remedy if they are able to successfully allege antitrust injury. In support of their contention that the present pleadings suffice for standing to pursue injunctive relief, however, Plaintiffs place sole reliance on *Axiom Advisers & Consultants, Inc. v. School Innovation & Advocacy*, Inc., No. 2:05CV 02395 FCD PAN, 2006 WL 1049997 (E.D. Cal. Mar. 20, 2006), wherein the court found adequate the plaintiffs' allegations that the defendant's conduct "has injured competition and consumers and that its acts have an anticompetitive effect of harming the competitive process, limiting consumer choice, and harming consumers." *Id.* at *8. As Defendant points out in reply, *Axiom* was decided before the enunciation of the *Twombly* standard, and subsequent courts have questioned whether *Axiom* would reach the same result today. *S. California Inst. of Law v. TCS Educ. Sys.*, No. CV 10-8026 PSG AJWX, 2011 WL 1296602, at *8 n.6 (C.D. Cal. Apr. 5, 2011). As described above, the allegations of antitrust injury fall far short of the plausibility standard set forth in *Twombly* and *Iqbal* and are thus insufficient for standing to pursue either monetary or injunctive relief.

## B.   Exclusive Dealing

Defendant also challenges the substantive sufficiency of Plaintiffs' allegations of anticompetitive conduct, which focuses on a theory of exclusive dealing. The Court agrees, though the deficiencies here are less significant than those with respect to Plaintiffs' standing to maintain this suit.

Exclusive dealing is a theory under both § 1 and § 2 of the Sherman Act.[7]  The classic

---

[7] For purposes of this motion, Defendant has elected not to challenge Plaintiffs' allegations of the relevant market and of its market power in those relevant markets. Def.'s Mot. 17 n.11. As such,

United States District Court
Northern District of California

United States District Court
Northern District of California

exclusive dealing case "involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic*, 592 F.3d at 996. Because there are "well-recognized economic benefits to exclusive dealing arrangements," such arrangements are not per se violations of § 1 and must instead be analyzed under the antitrust rule of reason. *Id.* (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)). Exclusive dealing thus violates § 1 "only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Id.* (quoting *Omega*, 127 F.3d at 1162). "Substantial share" has been quantified as foreclosure of 40% to 50% of the relevant market.[8] *Microsoft*, 253 F.3d at 70.

In determining whether an alleged exclusionary arrangement violates the antitrust laws, courts consider a number of factors including the potential amount of foreclosure, the duration of the agreement, and the alternative avenues of distribution available to competitors. "The prevailing rule in districts and circuits across the country is that where exclusive or semi-exclusive contracts are short in duration, easily terminable, incentive-based, and leave open alternative channels to competitors, they are not exclusionary." *Church & Dwight*, 868 F. Supp. 2d at 903;

---

the parties' briefing (and this Court's order) focuses on the sufficiency of the allegations with respect to Defendant's exclusionary conduct, and not with respect to any other elements of Plaintiffs' § 2 claims for monopolization and attempted monopolization. The Court notes only that the analysis of attempted monopolization is "wholly independent" from the analysis of monopoly maintenance. *Microsoft*, 253 F.3d at 81. To the extent Defendant does not challenge Plaintiffs' allegations of its market power, *see* FAC ¶¶ 19-27 (alleging more than 80% share of the relevant markets), the claim of "attempted monopolization" would appear superfluous—if not paradoxical—in the face of those allegations.

[8] It is not clear that there are any pleading differences between exclusive dealing under § 1 and § 2 with respect to the degree of market foreclosure, and the parties' briefing does not suggest that they believe there is a difference. For purposes of this motion, the Court assumes that at the pleading stage, the degree of market foreclosure required to make out an exclusive dealing claim does not differ under § 1 and § 2. *Compare Microsoft*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.") *to Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (describing the § 2 standard as "the more stringent monopoly standard"); *see generally* Areeda & Hovenkamp, Fundamentals of Antitrust Law § 18.01 (4th ed. 2014) ("As a legal matter, § 2 requires that the defendant have either monopoly power or a dangerous probability of achieving it, but when such power is established may find illegality on lower percentages than the § 1 law of exclusive dealing requires. By contrast, § 1 is sometimes applied to nondominant defendants and where a 'dangerous probability' of monopoly is not in prospect, but in such cases assesses somewhat higher foreclosure requirements.").

1    *see also PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689-WHO, 2014 WL 2987322, at *4

2    (N.D. Cal. July 2, 2014) ("*SanDisk*").  Defendant contends that the MADAs are short in duration,

3    do not foreclose alternative avenues of distribution, and are not even restrictive because OEMs are

4    welcome to preload other search products onto covered phones.  Def.'s Mot. 11-15.  Further,

5    because they only cover specific approved phone models, OEMs may set other search products as

6    the default search on phone models that are not covered by the MADAs.  *Id.* at 11.

7            Plaintiffs contend that the limited duration and reach of the MADAs is not fatal to their

8    exclusive dealing claim, *see* Pl.'s Opp. 14-16, and the Court agrees in a limited respect.  As a

9    practical matter, although other distribution channels for Internet search products do exist, the

10   allegations demonstrate that the default search setting on mobile devices is the most effective and

11   cost-efficient method of distribution.  FAC ¶¶ 51-58.  Taken as true, the allegations suggest that

12   alternative distribution methods are viable but not effective compared to the default search setting

13   status.  *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (citing

14   *Microsoft*, 253 F.3d at 71, for proposition that alternative distribution channels must "pose[] a real

15   threat" of competition).  Because, by definition, there can only be one default search engine on a

16   given device, Defendant's use of the MADAs has the effect of excluding rival search products

17   from the most effective means of distribution to handheld device users.

18           Moreover, the short duration and easy terminability of the MADAs does not, within the

19   context of handheld devices, necessarily diminish their exclusivity.  Any person who has

20   purchased a handheld device in the last decade knows that new models are introduced nearly

21   annually (if not more frequently), and that older models become obsolete very quickly.  This is

22   borne out by the large number of devices covered by the HTC MADA, with the opportunity to add

23   additional devices subject to Defendant's approval.  *See* FAC Exh. B (HTC MADA Exh. B).  As a

24   practical matter, the fact that each MADA lasts only two years does not preclude the MADAs

25   from being effectively exclusive for the lifetime of the covered models.  Furthermore, unlike

26   *SanDisk*, upon which Defendant relies, Plaintiffs have alleged that competitors cannot offer better

27   terms to lure OEMs away from Defendant's MADAs because there is no other method by which

28   OEMs can obtain licenses to preload Google Apps onto their Android OS devices.  FAC ¶ 36;

United States District Court
Northern District of California

14

*compare SanDisk*, 2014 WL 2987322, at *6 (competitor plaintiff did not allege that it offered better terms to retailers in short term exclusive contracts with defendant).  As a whole, the allegations in the FAC thus plausibly suggest that the MADAs, though limited in duration and in scope, have the practical effect of foreclosing Defendant's search rivals from effective access to handheld Internet search users on covered Android OS devices.[9]

Where Plaintiffs' allegations fail, however, is in tying the effect of the MADAs to the relevant alleged markets—general Internet search and handheld search—to demonstrate substantial foreclosure of competition in those markets.  Plaintiffs contend that "[g]iven the uniquely effective channel for the distribution of search engines to mobile device users that Google has coerced for itself, it is reasonable to infer at the pleadings stage that substantial market foreclosure has occurred."  Pl.'s Opp. 16.  Plaintiffs have only alleged that the Android OS occupies a 51.7% share of the United States *smartphone* market, FAC ¶ 24, and they fail to explain how the logical leap from that allegation to substantial market foreclosure in the market for general handheld search (which includes all handheld devices such as phones and tablets) is reasonable based upon the existence of MADAs that admittedly only cover a subset of Android devices, FAC ¶ 36 n.8.[10]  To be sure, this is a close call.  However, the Court must insist on some greater specificity in pleading "before allowing a potentially massive factual controversy to proceed," *AGC*, 459 U.S. at 528, n.17, and Plaintiffs should have the opportunity to amend in order to more plausibly allege the relationship between the MADAs and competition in the market for handheld general search.

---

[9] At a higher level of abstraction, this means that those competitors who cannot access users are unable to improve their search algorithms, thereby impairing their ability to compete with Defendant on the merits of their respective search products.  *See* FAC ¶¶ 59-60.  This is akin to the theory of Sherman Act § 2 monopoly maintenance described in *Microsoft*, 253 F.3d at 60-62, wherein Microsoft's exclusive licensing terms prevented OEMs from promoting rival Internet browsers, thereby reducing rival browser usage and developer interest in those browsers, with the effect of maintaining developer focus on developing for Microsoft's Windows operating system, which contributed to maintaining Microsoft's monopoly over the market for operating systems.  Whether this theory is viable under § 1 is unclear.

[10] Plaintiffs attempt to further atomize the relevant market into not just handheld search, but handheld search on non-Apple devices.  That is not the relevant market that Plaintiffs have alleged for § 1 purposes, although the Court acknowledges that Defendant's conduct with respect to Apple devices may be relevant to a § 2 analysis.

United States District Court
Northern District of California

1   As to the broader market for general Internet search, the inference of substantial

2   foreclosure is significantly less reasonable.  The FAC contains no allegations concerning the

3   actual portion of general Internet search that consists of handheld search.  Lacking such

4   allegations concerning the relationship between the two markets, the Court is unable to infer that

5   the MADAs, which cover only a portion of the handheld search market, substantially foreclose

6   competition in the market for general Internet search.

7   Defendant's Motion to Dismiss is accordingly GRANTED with respect to Plaintiffs'

8   Sherman Act claims (First, Second, and Third COAs).  Plaintiffs shall have leave to amend in

9   order to adequately allege causal antitrust injury and substantial foreclosure in the relevant alleged

10  markets caused by Defendant's anticompetitive conduct.[11]

## IV.   CLAYTON AND CARTWRIGHT ACT CLAIMS (FOURTH AND FIFTH COA'S)

12  The deficiencies in Plaintiffs' allegations of antitrust injury and exclusionary conduct

13  described above equally apply to Plaintiffs' claims under § 3 of the Clayton Act and § 16727 of

14  the California Business & Professions Code, a provision of California's Cartwright Act.  These

15  claims furthermore suffer from an even more fatal flaw.  Defendant contends that, as a matter of

16  law, Plaintiffs cannot state claims under the Clayton and Cartwright Acts because the subject

17  MADAs are not tangible commodities (nor do they cover tangible commodities) within the

18  narrower scope of the Clayton and Cartwright Acts.  Def.'s Mot. 18, 23.  The Court agrees.

19  Section 3 of the Clayton Act prohibits tying and exclusive dealings in the lease, sale, or

20  contract for sale of "goods, wares, merchandise, machinery, supplies, or other *commodities*."

21  15 U.S.C. § 14 (emphasis added).  Section 16727 of the Cartwright Act is based on § 3 of the

22  Clayton Act and has a similar scope, including with respect to the definition of "commodities."

---

[11] Should Plaintiffs successfully amend to allege cognizable antitrust injury, they would also need to demonstrate other factors in support of standing to pursue monetary relief (to the extent they do intend to seek damages under § 4 of the Clayton Act).  The Court assumes that Plaintiffs are familiar with the *AGC* factors for § 4 standing, as further elaborated in *American Ad Management*. *See AGC*, 459 U.S. at 536-46; *Am. Ad Mgmt.*, 190 F.3d at 1055; *see also Cargill*, 479 U.S. at 110 n.5 ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons.").  Plaintiffs are also encouraged to clearly indicate in their amended pleading whether they are in fact seeking § 4 relief.

United States District Court
Northern District of California

1   *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal. App. 3d 532, 549 (1980); *see*

2   *also Morrison v. Viacom*, 66 Cal. App. 4th 534, 546 (1998).  Courts have "strictly construed" the

3   term "commodit[y]" and held "that it denotes only tangible products of trade."  *Tele Atlas N.V. v.*

4   *Navteq Corp.*, 397 F. Supp. 2d 1184, 1192 (N.D. Cal. 2005) (quoting *Innomed Labs, LLC v. ALZA*

5   *Corp.,* 368 F.3d 148, 155 (2d Cir. 2004).

6        *Tele Atlas* concerned tying and exclusive dealing claims directed at a patent holder's

7   refusal to license its patented navigation display technology unless a licensee also agreed to

8   license map data for use with the licensed technology.  *Tele Atlas*, 397 F. Supp. 2d at 1187.  In

9   rejecting the plaintiff's Clayton Act § 3 and Cartwright Act § 16727 claims, the *Tele Atlas* court

10  reasoned that "[a] license is not the sale of a tangible good" and thus could not fall within the

11  ambit of the Clayton and Cartwright Acts.  *Id.* at 1192.  The court further rejected the plaintiff's

12  arguments that it should apply the "dominant nature" test to the license agreements, as the plaintiff

13  alleged only that the defendant sold a "purely ethereal consideration" and did not allege the sale of

14  any physical item.  *Id.*; *accord Code Rebel, LLC v. Aqua Connect, Inc.*, No. CV 13-4539 RSWL

15  MANX, 2014 WL 46696, at *5 (C.D. Cal. Jan. 3, 2014) (dismissing claim under Clayton Act §

16  2—which also only extends to commodities—because software product at issue was not tangible,

17  and therefore not a "commodity").

18       Relying on *Tele Atlas*, Defendant characterizes the MADAs as licenses to use the Google

19  Apps, which are not tangible commodities.  Def.'s Mot. 18, 23.  Plaintiffs disagree with this

20  characterization, cursorily arguing that the "products at issue" are not licenses but the software

21  that the MADAs cover.  Pl.'s Opp. 21 n.23.  This is a strained reading of the MADAs, which

22  clearly confer nonexclusive *licenses* to reproduce and distribute the Google Apps according to the

23  terms and conditions set forth in the agreements.  *See, e.g.*, FAC Exh. A § 2.1, ECF 31-1.  In any

24  case, even accepting Plaintiffs' interpretation of the MADAs, Plaintiffs identify no authority

25  holding that software products are absolutely within the coverage of the Clayton and Cartwright

26  Acts, regardless of their tangibility.

27       For the proposition that software products are "commodities" within the meaning of the

28  Clayton and Cartwright Acts, Plaintiffs rely on an implied holding from *Digidyne Corp. v. Data*

United States District Court
Northern District of California

1   *Gen. Corp.*, 734 F.2d 1336 (9th Cir. 1984), wherein the Ninth Circuit concluded that a defendant's

2   refusal to license operating system software except to purchasers of its central processing units

3   was an unlawful tying arrangement under § 1 of the Sherman Act and § 3 of the Clayton Act. *Id.*

4   at 1338. However, the ultimate holding of the *Digidyne* court was that the trial court erred in

5   setting aside a jury verdict for the plaintiffs on the issue of the defendant's economic power in an

6   alleged *per se* tying arrangement; aside from passing mention of the Clayton Act, it does not

7   appear that the court ever considered whether the Clayton Act could apply to completely

8   intangible software products. *See generally*, *id.* *Digidyne* thus avails Plaintiffs little, even were

9   the Court to accept the illusory distinction between software and licenses that Plaintiffs proffer.

10      Rather, the Court finds more persuasive the weight of opinion that "commodity," as that

11   term is used in § 3 of the Clayton Act, refers to *tangible* goods. *See Tele Atlas* 397 F. Supp. 2d at

12   1192-93 (collecting cases); *see also May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211,

13   1214-15 (9th Cir. 1980) *and Code Rebel*, 2013 WL 5405706, at *7-8 (same interpretation of

14   "commodity" in analogous context of Clayton Act § 2). Here, Plaintiffs do not allege that the

15   Google Apps are sold to OEMs in physical form, or even that the Google Apps have any tangible

16   component. Nor does it appear that they can so allege, as the subject matter of the MADAs is the

17   limited conferral of certain incorporeal rights to OEMs to install and distribute Google Apps on

18   the OEMs' Android devices. As such, the MADAs are not sales or contracts for sale of *tangible*

19   goods. Defendant's Motion to Dismiss is therefore GRANTED as to these claims, and Plaintiffs'

20   Clayton Act § 3 and Cartwright Act § 16727 claims (Fourth and Fifth COAs) are dismissed

21   without leave to amend.

22   **V.   UNFAIR COMPETITION (SIXTH COA)**

23      Plaintiffs' UCL claim based on "unfair" competition rises and falls with their Sherman Act

24   claims. *See City of San Jose v. Office of the Comm'r of Baseball*, ---F.3d---, 2015 WL 178358, at

25   *5 (9th Cir. Jan. 15, 2015). As Plaintiffs have been given leave to amend their Sherman Act

26   claims, they shall also have the opportunity to amend the UCL claim, particularly as it relates to

27   antitrust injury and Plaintiffs' loss of money or property due to Defendant's unfair practices.

28   *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011).

18

1    More fundamentally, neither of the named Plaintiffs resides in California, though they seek

2  to enforce California law.  Plaintiffs' counsel indicated at oral argument that although they believe

3  it is sufficient for purposes of the UCL claim that Defendant is headquartered in California, they

4  can easily identify and name an additional plaintiff who resides in California.  As such, the Court

5  shall GRANT Defendant's Motion to Dismiss the UCL claim (Sixth COA) with leave to amend in

6  order to address the deficiencies identified in this order and to add a named plaintiff from

7  California.

8  **VI.    ORDER**

9    For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion to

10  Dismiss is GRANTED.  Plaintiffs shall have leave to amend only their Sherman Act and

11  California UCL claims.  The amended pleading shall be due **within twenty-one (21) days** of the

12  date of this order.

13    **IT IS SO ORDERED.**

14  Dated: February 20, 2015

15  _____

16  BETH LABSON FREEMAN
   United States District Judge